1   DAVID L. NEALE (SBN 141225)
    JULIET Y. OH (SBN 211414)
2   LEVENE, NEALE, BENDER, YOO & BRILL L.L.P.
3   10250 Constellation Boulevard, Suite 1700
    Los Angeles, California 90067
4   Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
    Email: dln@lnbyb.com, jyo@lnbyb.com
5

6   Attorneys for Judgment Creditor, Fred Kayne,
    Individually and as Trustee of the Fred & Lenore
7   Kayne Family Trust

8
                 **UNITED STATES BANKRUPTCY COURT**
9
                  **CENTRAL DISTRICT OF CALIFORNIA**
10
                      **LOS ANGELES DIVISION**
11

12

13  In re:                              ) Case No.: 2:14-bk-11195-PC
                                        )
14  RAPHAEL MENSE; and                  ) (Jointly administered with:
                                        ) Case No. 2:14-bk-11194-PC)
15  COTTONSMITH, LLC,                   )
                                        ) Chapter 11 cases
16                                      )
            Debtors and Debtors in Possession.  )
17  _____ )
                                        )
18  ☒  Affects both Debtors            ) **NOTICE OF MOTION AND MOTION**
                                        ) **BY JUDGMENT CREDITOR FRED**
19  ☐ Affects Raphael Mense only       ) **KAYNE FOR ENTRY OF ORDER**
                                        ) **DISMISSING DEBTORS' CHAPTER**
20  ☐ Affects Cottonsmith, LLC only    ) **11 CASES; MEMORANDUM OF**
                                        ) **POINTS AND AUTHORITIES;**
21                                      ) **DECLARATION OF FRED KAYNE IN**
                                        ) **SUPPORT THEREOF**
22                                      )
                                        )
23                                      ) DATE:      April 2, 2014
                                        ) TIME:      9:00 a.m.
24                                      ) PLACE:     Courtroom "1468"
                                        )            255 E. Temple Street
25                                      )            Los Angeles, California 90012
                                        )
26                                      )
                                        )
27  _____ )

28

                                    1

# TABLE OF CONTENTS

**MEMORANDUM OF POINTS AND AUTHORITIES**...................................................... **4**

**I.      INTRODUCTION** .............................................................................................. **4**

**II.     STATEMENT OF FACTS**................................................................................. **5**

    **A.      Events Leading To Litigation Between Kayne, Mense And
Cottonsmith, LLC** .................................................................................. **5**

    **B.      State Court Litigation Initiated By Kayne Against Cottonsmith
And Mense** ................................................................................................ **6**

    **C.      Debtors' Commencement Of Bankruptcy Cases And Filing Of
Stay Relief Motions** ............................................................................ **10**

**III.    DISCUSSION** ................................................................................................ **17**

    **A.      The Court Should Dismiss The Debtors' Chapter 11 Cases
Because They Were Not Filed In Good Faith**...................................... **17**

        **1.      The Debtors Filed Their Cases In Bad Faith Solely To Avoid
Posting An Appeal Bond And Not For Any Legitimate
Reorganization Purpose** ........................................................ **19**

        **2.      Cottonsmith's Bankruptcy Case Was Commenced In Bad
Faith Since There Is No Legitimate Purpose To Be Served
By The Bankruptcy Case**........................................................ **24**

        **3.      Mense's Bankruptcy Case Was Commenced In Bad Faith
Since Mense Has The Ability To Satisfy The Judgment Or
Post An Appeal Bond** ............................................................. **26**

    **B.      The Court Should Dismiss The Debtors' Chapter 11 Cases Due To
The Continuing Loss To Or Diminution Of The Estates And The
Absence Of A Reasonable Likelihood Of Rehabilitation** .............................. **29**

**IV.     CONCLUSION** ............................................................................................ **31**

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Clarkson v. Cooke Sales And Service Co. (In re Clarkson)*
    767 F.2d 417 (8th Cir. 1985) ...................................................29

*In re Boynton*
    184 B.R. 580 (Bankr. S.D. Cal. 1995) ...................................19, 23, 24

*In re Citi-Toledo Partners*
    170 B.R. 602 (Bankr. N.D. Ohio 1994) ...................................29

*In re Gonic Realty Trust*
    909 F.2d 624 (1st Cir. 1990) ...................................................30, 5

*In re Great American Pyramid Joint Venture*
    144 B.R. 780 (Bankr. W.D. Tenn. 1992) ...................................29, 30

*In re HBA East, Inc.*
    87 B.R. 248 (Bankr. E.D.N.Y. 1988) ...................................18

*In re Holm*
    75 B.R. 86 (Bankr. N.D. Cal. 1987) ...................................26, 27, 28

*In re Karum Group, Inc.*
    66 B.R. 436 (Bankr. W.D. Wash. 1986) ...................................21, 22

*In re Original IFPC Shareholders, Inc.*
    317 B.R. 738 (Bankr. N.D. Ill. 2004) ...................................29

*In re SGL Carbon Corp.*
    200 F.3d 154 (3d Cir. 1999) ...................................................18

*In re Southern Cal. Sound Sys., Inc.*
    69 B.R. 893 (Bankr. S.D. Cal. 1987) ...................................18, 30

*Koerner v. Colonial Bank (In re Koerner)*
    800 F.2d 1358 (5th Cir. 1986) ...................................................18

*Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*
    779 F.2d 1068 (5th Cir. 1986) ................................................... passim

*Marsch v. Marsch (In re Marsch)*
    36 F.3d 825 (9th Cir. 1994) ...................................18, 24, 26, 27

*Matter of Namer*
    141 B.R. 603 (Bankr. E.D. La. 1992) ...................................18

ii

*Stage I Land Co. v. U.S. Dept. of H.U.D.*
    71 B.R. 225 (D. Minn. 1986) ..................................................................................30

**CALIFORNIA CASES**

*Grant v. Superior Court* (1990)
    225 Cal.App.3d 929, 275 Cal.Rptr. 564 ...............................................................19, 6

**FEDERAL STATUTES**

11 U.S.C. § 341(a) ........................................................................................... passim

11 U.S.C. § 1112 ......................................................................................................17

11 U.S.C. § 1112(b) ....................................................................................... passim

11 U.S.C. § 1112(b)(1) ...........................................................................................29

11 U.S.C. § 1112(b)(4) ..............................................................................2, 5, 29, 31

**CALIFORNIA STATUTES**

Cal. Code Civ. Proc. § 917.1 ........................................................................19, 21, 23

Cal. Code Civ. Proc. § 917.1(a)(1)-(b) ...................................................................19

**OTHER STATUTES**

Civil Code § 3287(a)..................................................................................................9

Penal Code § 496(c).................................................................................................7, 9

**OTHER AUTHORITIES**

7 Collier on Bankruptcy ¶ 1112.04[2] at 1112-23 (15th Ed. Rev. 2008) ......................18

1st Sess. 406 (1977) .................................................................................................18

Fed.R.Bankr.P. 9013-1(f)...........................................................................................3

Fed.R.Bankr.P. 9013-1(h)...........................................................................................3

California Rules of Court Rule 3.1802 .......................................................................9

Rep. 595, 95th .........................................................................................................18

**PLEASE TAKE NOTICE THAT** a hearing will be held on April 2, 2014 at 9:00 a.m., before the Honorable Peter H. Carroll, United States Bankruptcy Judge for the Central District of California, in Courtroom "1468" located at 255 East Temple Street, Los Angeles, California, for the Court to consider the motion (the "Motion") filed by Fred Kayne, individually and as Trustee of the Fred & Lenore Kayne Family Trust ("Kayne"), a judgment creditor of Raphael Mense ("Mense") and Cottonsmith, LLC ("Cottonsmith," and together with Mense, the "Debtors"), the debtors and debtors in possession in the above-captioned, jointly-administered Chapter 11 bankruptcy cases, for the entry of an order dismissing the Debtors' bankruptcy cases.  The complete relief requested and the bases for this Motion are set forth in the annexed Memorandum of Points and Authorities and the Declaration of Fred Kayne annexed hereto.

The Debtors' bankruptcy cases were commenced solely to prevent or, at a minimum, delay the enforcement of a state court judgment entered in favor of Kayne and against the Debtors (the "Judgment"), following years of litigation and a lengthy jury trial, and not by any genuine desire, intent or need to reorganize the Debtors' financial affairs.  Cottonsmith has no ongoing business, has no employees, has no income, has no assets other than cash (which is quickly being dissipated by the Debtors) and has no legitimate creditors other than Kayne. Mense is a solvent individual who has the financial ability to either satisfy the Judgment or obtain an appeal bond to pursue an appeal of the Judgment as required by California state law. The Debtors' utilization of the bankruptcy process to avoid the enforcement of the Judgment and to circumvent the requirement to post an appeal bond to stay the enforcement of the Judgment pending appeal, without any legitimate reorganization purpose, was in bad faith, and therefore "cause" exists under 11 U.S.C. § 1112(b) to dismiss the Debtors' bankruptcy cases.  In addition, Kayne submits that there is a "continuing loss to or diminution of the estate" and "absence of a reasonable likelihood of rehabilitation" in both of the Debtors' cases (but particularly in Cottonsmith's bankruptcy case) and therefore, cause exists under 11 U.S.C. § 1112(b)(4) to dismiss the Debtors' bankruptcy cases.

2

The Motion is based upon 11 U.S.C. § 1112(b), this Notice of Motion and Motion, the Memorandum of Points and Authorities and Declaration of Fred Kayne annexed hereto, the entire record in the Debtors' cases, the statements, arguments and representations of counsel to be made at the hearing on this Motion, and any other evidence properly presented to the Court at or prior to the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(f), any opposition to the Motion must be in writing, filed with the Court and served upon the United States Trustee as well as counsel for Kayne at the address set forth in the upper left-hand corner of the first page of this Notice and Motion by no later than fourteen (14) days before the date of the hearing on the Motion.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to Local Bankruptcy Rule 9013-1(h), the failure to file and serve a timely opposition to the Motion may be deemed by the Court to constitute consent to the granting of the relief requested in the Motion.

**WHEREFORE**, Kayne respectfully requests that the Court enter an order: (i) granting the Motion and dismissing the Debtors' Chapter 11 bankruptcy cases; and (ii) granting such other and further relief as the Court deems just and proper under the circumstances of these cases.

Dated: March 12, 2014                              FRED KAYNE

By:_____
          DAVID L. NEALE
          JULIET Y. OH
          LEVENE, NEALE, BENDER, YOO
             & BRILL L.L.P.
          Attorneys for Fred Kayne, Individually
          and as Trustee of the Fred & Lenore
          Kayne Family Trust

3

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

### I.

3

### INTRODUCTION

4      Fred Kayne, individually and as Trustee of the Fred & Lenore Kayne Family Trust

5   ("Kayne"), a judgment creditor of Raphael Mense ("Mense") and Cottonsmith, LLC

6   ("Cottonsmith," and together with Mense, the "Debtors"), the debtors and debtors in possession

7   in the above-captioned, jointly-administered Chapter 11 bankruptcy cases, hereby files this

8   motion for the entry of an order dismissing the Debtors' bankruptcy cases.

9      The Debtors' bankruptcy cases were commenced solely to prevent, or at least delay, the

10   enforcement of the state court judgment obtained by Kayne against the Debtors (the

11   "Judgment"), following years of litigation and a lengthy jury trial.  These cases involve a classic

12   two-party dispute between the Debtors, on the one hand, and Kayne, on the other hand, and

13   simply do not belong in Chapter 11 bankruptcy.  Mense concedes in papers filed in these cases

14   that he is solvent and that the Debtors' bankruptcy cases were commenced because the Debtors

15   allegedly lacked the liquidity with which to post an appeal bond (as required by California state

16   law to pursue an appeal of an adverse judgment).   By the Debtors' own admissions, the

17   bankruptcy filings represented the "only means by which to avoid the consequences of

18   enforcement of writs of execution" by Kayne.[1]  Cottonsmith has no ongoing business, has no

19   employees, has no income, has no assets other than cash (which is quickly being dissipated by

20   the Debtors) and has no legitimate creditors other than Kayne.  Mense, on the other hand, has the

21   financial ability to either satisfy the Judgment or obtain an appeal bond to pursue an appeal of

22   the Judgment as required by California state law.  The Debtors' utilization of the bankruptcy

23   process to avoid the enforcement of the Judgment and to circumvent the requirement to post an

24   appeal bond to stay the enforcement of the Judgment pending appeal, without any legitimate

25   reorganization purpose, was in bad faith, and therefore "cause" exists under 11 U.S.C. § 1112(b)

26   to dismiss the Debtors' bankruptcy cases.

27

28      [1] *See,* Debtors' 7-Day Packages, Statement of Major Issues and Timetable Report, attached as Exhibit "3" (Cottonsmith) and Exhibit "4" (Mense) to the Declaration of Fred Kayne annexed hereto ("**Kayne Declaration**").

1   The record in these cases reflects that more than $450,000 of Cottonsmith's cash (its only

2   asset) has been dissipated in the last approximately six months. The Debtors have acknowledged

3   that Cottonsmith's cash will continue to be dissipated while an appeal of the Judgment is

4   pending. In the meantime, Mense has indicated that he will need to dip into his cash savings and

5   potentially other assets to cover a monthly income deficit of $18,600 and to maintain his

6   extravagant lifestyle. Under the circumstances, Kayne submits that there is a "continuing loss to

7   or diminution of the estate" and "absence of a reasonable likelihood of rehabilitation" in both of

8   the Debtors' cases (but particularly in Cottonsmith's bankruptcy case) and therefore, cause exists

9   under 11 U.S.C. § 1112(b)(4) to dismiss the Debtors' bankruptcy cases.

**II.**

**STATEMENT OF FACTS**

**A.    Events Leading To Litigation Between Kayne, Mense And Cottonsmith, LLC.**

13      1.    Cottonsmith was in the business of manufacturing and importing so-called

14   "blank" tee shirts for sale to customers who dye and/or screen print them according to customer

15   specifications. Cottonsmith manufactured the vast majority of its products for Fortune Fashion

16   Industries, LLC ("FFI"), a screen printing company of which Kayne was the majority owner.

17      2.    Cottonsmith was originally formed as a Delaware corporation in 1994, with the

18   original shareholders being Kayne, Mense, FFI, and certain other parties. By 1995, the sole

19   shareholders of Cottonsmith were Kayne and Mense, each of whom owned a 50% interest. In

20   2001, Cottonsmith was converted to an LLC, with Kayne and Mense each holding a 50%

21   interest. In 2004, Kayne transferred his interest in Cottonsmith to the Fred & Lenore Kayne

22   Family Trust (the "Trust").

23      3.    In or about June, 2006, at Kayne's suggestion, Kayne and Mense agreed that

24   Kayne would reduce the Trust's ownership interest as a member in Cottonsmith from 50% to

25   10%, and Mense's ownership interest as a member in Cottonsmith would be increased from 50%

26   to 90%, and Mense would become the sole manager of Cottonsmith. Pursuant to this agreement,

1   Kayne executed Cottonsmith's Amended and Restated Operating Agreement (the "Amended

2   Operating Agreement") as of June 1, 2006.

3          4.     In September, 2010, Cottonsmith's primary customer, FFI, was experiencing

4   financial difficulties, and Cottonsmith had accumulated a substantial receivable from FFI.  After

5   much discussion with Mense and FFI, and in an effort to help FFI meet its obligations to its

6   customers, Kayne advanced a total of $750,000 (the "Advance") to Cottonsmith from the Trust.

7   The parties agreed that the Advance was to be used solely to purchase fabric to fulfill FFI orders

8   and that the Trust would be repaid the Advance from the proceeds of the sale of the fabric or the

9   tee shirts made from the fabric (the "Fabric Purchase Agreement").

10         5.     In early August, 2011, Kayne made a written request to Cottonsmith to disburse

11  Kayne's capital account (which held funds in excess of $700,000) and to reimburse the Trust for

12  the Advance.  Cottonsmith refused to disburse Kayne's capital account or to turn over any of the

13  proceeds of the sale of the fabric (or the tee shirts made from such fabric) to reimburse the Trust

14  for the Advance.

15         6.     In the spring of 2011, Mense informed Kayne that he intended to wind up

16  Cottonsmith's business, to sell all of its assets and to distribute the proceeds.  By July, 2011,

17  Costtonsmith was no longer conducting any customer business and all of Cottonsmith's assets

18  had been reduced to cash.

19  **B.     State Court Litigation Initiated By Kayne Against Cottonsmith And Mense.**

20         7.     Given Cottonsmith's continuing refusal to disburse Kayne's capital account or to

21  repay the Advance to the Trust, Kayne was forced to bring suit against both Debtors to seek the

22  disbursement of Kayne's capital account and the repayment of the Advance for the Trust.

23  Accordingly, on August 24, 2011, Kayne filed a complaint asserting breach of contract,

24  rescission, conversion, breach of fiduciary duty, accounting, and constructive trust against the

25  Debtors in the Los Angeles Superior Court (the "Superior Court"), thereby commencing case

26  number BC 468228 (the "State Court Action").

27

28

8.      Thereafter, Kayne filed a first amended complaint (the "<u>Complaint</u>"), pursuant to which Kayne asserted the following causes of action against the Debtors:  (a) breach of written contract (Amended Operating Agreement), (b) breach of oral contract (Fabric Purchase Agreement), (c) breach of fiduciary duty (against Mense only), and (d) for treble damages under Penal Code § 496(c).

9.      The Debtors, in turn, brought various claims against Kayne, including for breach of contract, breach of fiduciary duty, unjust enrichment, and fraud.

10.      Nearly two years after the commencement of the State Court Action, the matter went to trial on May 8, 2013 in the Superior Court.

11.      On June 12, 2013, following a four-week trial, the Superior Court submitted all claims to the jury.  Following deliberation, the jury rendered a verdict in favor of Kayne and against the Debtors.  The jury found that the Debtors had breached the Amended Operating Agreement by failing to relinquish Kayne's capital account (which contained funds in excess of $700,000) within six months of demand, had breached a separate oral agreement to hold the $750,000 Advance in trust for Kayne pursuant to the Fabric Purchase Agreement, and that such breach also constituted embezzlement and a violation of Penal Code § 496(c).  The jury also found that Mense had breached his fiduciary duty to Kayne as a minority member of Cottonsmith, and that he had acted with oppression, fraud, or malice, justifying an award of punitive damages.  True and correct copies of the jury verdict and the Superior Court minutes relating thereto are collectively attached as **Exhibit "A"** to the Request For Judicial Notice filed concurrently herewith (the "<u>RJN</u>").

12.      On June 13, 2013, a bifurcated trial on punitive damages was held in the Superior Court.  The jury ultimately awarded Kayne $750,000 in punitive damages against Mense.  A true and correct copy of the Superior Court minutes reflecting the jury verdict on the issue of punitive damages is attached as **Exhibit "B"** to the RJN.

13.      During the punitive damages phase of the trial, Mense submitted to the Superior Court his personal financial documents, which showed that, as of June, 2013, Mense had more

7

than $9,000,000 of cash in a number of accounts maintained at Merrill Lynch and Bank of America, plus numerous real estate holdings.  True and correct copies of the personal financial documents submitted by Mense to the Superior Court are attached as **Exhibit "1"** to the Kayne Declaration annexed hereto.

14.    According to Cottonsmith's balance sheet as of August 31, 2013 (which was provided to Kayne in October, 2013), Cottonsmith had cash totaling approximately $1,570,000 in two separate bank accounts, and no liabilities.  A true and correct copy of Cottonsmith's balance sheet as of August 31, 2013 is attached as **Exhibit "2"** to the Kayne Declaration.

15.    On September 6, 2013, Kayne submitted a proposed judgment tracking the jury's verdict, for a total of $3,522,399, plus $750,000 in punitive damages, for a total of $4,272,399. Kayne's initial proposed judgment reflected the calculation that the Debtors' attorneys had presented to the jury during the punitive damages phase of the trial.

16.    On September 16, 2013, the Debtors filed objections to Kayne's proposed judgment concurrently with their motions for new trial and for judgment notwithstanding the verdict (the "Motions for New Trial and JNOV").  The Debtors' objections proposed numerous changes to the form of the judgment proposed by Kayne, and argued for a substantial reduction in the damages awarded.  After due consideration, Kayne agreed to the proposed changes in form, but opposed the reduction of damages.  On September 26, 2013, Kayne filed responses to the Debtors' objections and submitted an amended proposed judgment.  On October 2, 2013, the Debtors filed a reply brief to Kayne's responses.

17.    On November 11, 2013, during the hearing on the Debtors' Motions for New Trial and JNOV, the Superior Court denied the Motions for New Trial and JNOV and ordered that Kayne file a response to the Debtors' objections and reply briefs.  A true and correct copy of the Superior Court's minute order denying the Motions for New Trial and JNOV, which adopted the Superior Court's tentative rulings on such motions, is attached as **Exhibit "C"** to the RJN. Thereafter, on November 14, 2013, Kayne filed a response as ordered by the Superior Court.

8

18.    On November 15, 2013, the Superior Court issued a Minute Order overruling each of the Debtors' objections to the amended proposed judgment with one exception (holding that Penal Code § 496(c) does not provide for prejudgment interest and limiting Kayne to trebling the actual damages of $750,000 from the breach of the Fabric Purchase Agreement).

19.    Accordingly, on November 19, 2013, Kayne filed a second amended proposed judgment trebling only the actual damages of $750,000 and including interest accrued in the 161 days since the entry of the jury verdict, at the contract rate of 10%, pursuant to California Rules of Court Rule 3.1802, Civil Code Section 3287(a) and other applicable law.

20.    That same day, November 19, 2013, the Debtors served an objection to the second amended proposed judgment demanding that Kayne make an election of remedies and choose between any contractual prejudgment interest and treble damages. Two days later, on November 21, 2013, the Debtors served supplemental objections arguing, for the first time, that (a) Kayne was precluded from seeking pre-judgment interest on the punitive damage award, or at least that he must be limited to 7% interest on said damages, and (b) Kayne must elect between breach of contract or fiduciary duty on his capital account claim.

21.    On December 31, 2013, the Superior Court issued a minute order instructing Kayne to file a 5-page response to the Debtors' objections to the second amended proposed judgment and an associated attorney declaration justifying the form of the second amended proposed judgment. Kayne filed a response and an attorney declaration as ordered by the Superior Court on January 10, 2014.

22.    Thereafter, the Debtors filed a reply brief to Kayne's response and Kayne filed an objection to the Debtors' reply brief (asking that the Superior Court strike the Debtors' reply brief as an improper and unauthorized filing).

23.    On January 14, 2014, the Superior Court issued an order striking the Debtors' reply brief and chastising the Debtors for "attempting to extend briefings in this matter indefinitely to delay the judgment" (the "January 14, 2014 Order"). A true and correct copy of the January 14, 2014 Order is attached as **Exhibit "D"** to the RJN. In the January 14, 2014

1    Order, the Superior Court held that Kayne was required to elect his remedies between tort and

2    contract.  The Court presumed, correctly, that Kayne would opt to recover in tort, and held that

3    Kayne's pre-cost, pre-interest judgment would be $3,747,698 and would bear interest at 7%, or

4    $718.74 per day, from the day of the jury verdict.  On January 17, 2014, Kayne submitted a third

5    amended proposed judgment in line with the Superior Court's ruling in the January 14, 2014

6    Order.  The third amended proposed judgment (referred to herein as the "Judgment") was

7    entered by the Superior Court on January 27, 2014.  A true and correct copy of the Judgment is

8    attached as **Exhibit "E"** to the RJN.

9            24.    Although the Judgment provides for Kayne to recover from the Debtors the costs

10   of suit and reasonable attorneys' fees incurred by Kayne in connection with the State Court

11   Action, the Judgment left open the calculation of the amounts of the costs of suit and attorneys'

12   fees to be recovered, pending the filing of a Memorandum of Costs and motion for recovery of

13   attorneys' fees by Kayne.

14   **C.    Debtors' Commencement Of Bankruptcy Cases And Filing Of Stay Relief Motions.**

15           25.    On January 22, 2014 (the "Petition Date"), each of the Debtors filed a voluntary

16   petition for relief under Chapter 11 of 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code").

17   Pursuant to an order entered by the Court on February 19, 2014, the Debtors' bankruptcy cases

18   are being jointly administered under the lead case of Mense.

19           26.    On February 12, 2014, each of the Debtors filed a motion seeking relief from the

20   automatic stay to appeal the Judgment and the underlying jury verdict entered in favor of Kayne

21   and against the Debtors in the Superior Court (the "Stay Relief Motion").

22           27.    On February 19, 2014, Kayne filed oppositions to the Stay Relief Motion.

23           28.    On February 26, 2014, each of the Debtors filed a reply (the "Stay Relief Reply")

24   to Kayne's oppositions to the Stay Relief Motion.  A true and correct copy of the Stay Relief

25   Reply filed in Mense's case [Doc. No. 58] is attached as **Exhibit "F"** to the RJN.[2]  In their Stay

26   Relief Reply, the Debtors acknowledge that they "filed their bankruptcy cases in lieu of posting a

27

28           [2] A virtually identical reply was filed in Cottonsmith's bankruptcy case.  *See*, Doc. No. 47.

1  bond" and claim that doing so does not provide grounds to grant Kayne relief from the automatic

2  stay.[3]  The Debtors argue that they "attempted to secure a bond in connection with the appeal."[4]

3         29.     In the Stay Relief Reply, the Debtors claim that "[a]fter significant efforts to do

4  so, the Debtor realized there were insufficient liquid assets to support a bond in an amount equal

5  to one and a half times the Judgment, plus the bond premium[,]" which Mense determined would

6  require cash or letter of credit approaching $7 million.  The Debtors claim that "the combined

7  cash assets of the Joint Debtors are approximately $5.5 million."[5]  The Debtors then claim that

8  Mense was informed that borrowing money against his other assets would require "extensive

9  underwriting with no assurance of success, in a process that could take 6 weeks or longer."[6]

10         30.     After the hearing on the Stay Relief Motion held on March 5, 2014 (the transcript

11  of which is attached as **Exhibit "J"** to the RJN), the Court entered orders on the Relief From

12  Stay Motion, pursuant to which both the Debtors and Kayne were granted relief from the

13  automatic stay to proceed with the State Court Action to final judgment (including any appeals)

14  in accordance with applicable non-bankruptcy law.[7]  The foregoing orders did not, however,

15  grant relief from the automatic stay to permit Kayne to enforce his judgment against the Debtors

16  at that time.

17         31.     On or about January 31, 2014, the Debtors submitted their 7-Day Packages to the

18  Office of the United States Trustee ("UST").  True and correct copies of the 7-Day Packages

19  submitted by Cottonsmith and Mense are attached as **Exhibit "3"** and **Exhibit "4"**, respectively,

20  to the Kayne Declaration.

---

[3]  *See*, Stay Relief Reply, attached as Exhibit "F" to the RJN, p. 9, lines 16-17.

[4]  *See*, Stay Relief Reply, attached as Exhibit "F" to the RJN, p. 9, lines 19-20.

[5]  *See*, Stay Relief Reply, attached as Exhibit "F" to the RJN, p. 9, lines 19-27; Declaration of Mense, ¶ 5.

[6]  *See*, Stay Relief Reply, attached as Exhibit "F" to the RJN, Declaration of Mense, ¶ 5.

[7]  As noted above, the Judgment provides for Kayne to recover the costs of suit and attorneys' fees, with the calculation of such costs of suit and attorneys' fees to be determined following the filing of a Memorandum of Costs and motion for recovery of attorneys' fees by Kayne in the Superior Court.  In light of the Court's orders granting relief from the automatic stay to both the Debtors and Kayne, Kayne intends to proceed with the filing of such Memorandum of Costs and motion for recovery of attorneys' fees in the Superior Court.

32.     On February 26, 2014, the Debtors filed their respective Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs ("SOFA").  True and correct copies of the Schedules and SOFAs filed by Cottonsmith and Mense are attached as **Exhibit "G"** and **Exhibit "H"**, respectively, to the RJN.

33.     On March 5, 2014, the Debtors filed a Status Report in their jointly-administered bankruptcy cases [Doc. No. 67], a true and correct copy of which is attached as **Exhibit "I"** the RJN.

34.     On March 6, 2014, the Debtors appeared at the Section 341(a) meetings of creditors conducted in the Debtors' bankruptcy cases.  A true and correct copy of the transcript from the Section 341(a) meetings of creditors held on March 6, 2014 (the "341 Meeting Transcript") is attached as **Exhibit "5"** to the Kayne Declaration.

35.     As noted below, the Debtors' own papers and testimony at the Section 341(a) meetings of creditors conducted on March 6, 2014 reflect that Cottonsmith has no ongoing business, has no employees, has only one asset (*i.e.,* cash, which is quickly being dissipated by the Debtors), and has no significant debts (if any) other than the Judgment.

    a.     In its 7-Day Package, Cottonsmith notes that it does not maintain any insurance coverage or any certificates and licenses as Cottonsmith "is not currently operating."[8]  Since Cottonsmith has not operated any business in at least two years, Cottonsmith notes in its 7-Day Package that it has not issued any financial statements in the two year period prior to the filing of its bankruptcy case.[9]

    b.     At the Section 341(a) meetings of creditors conducted on March 6, 2014, Mense testified that Cottonsmith is not an operating business, has no assets other than cash, has no employees, and is currently generating no income.[10]  Mense also testified

---

[8]  *See*, Cottonsmith's 7-Day Package, attached as Exhibit "3" to the Kayne Declaration, Sections 3.4 and 4.2.

[9]  *See*, Cottonsmith's 7-Day Package, attached as Exhibit "3" to the Kayne Declaration, Section 6.

[10]  *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 5, lines 16-21; p 33, lines 2-3 and 21-23.

1    that the last time that Cottonsmith had conducted any business was in 2011 and that,

2    thereafter, Cottonsmith liquidated all of its remaining assets.[11]

3        c.    Cottonsmith's Schedules reflect that Cottonsmith sole asset is cash in a

4    business checking account in the sum of $1,400,000 (as of the Petition Date).

5    Cottonsmith's Schedules reflect that the amount of Cottonsmith's cash decreased by

6    approximately $170,000 (from $1,570,000 to $1,400,000) during the five-month period

7    between August 31, 2013 and the Petition Date.[12]    However, at the Section 341(a)

8    meeting of creditors conducted on March 6, 2014, Mense testified that, as of March 6,

9    2014, Cottonsmith's cash had decreased further to $1,118,593.16.[13]    Accordingly, in a

10    period of a little more than six months, more than $450,000 of Cottonsmith's cash (its

11    only asset) has been dissipated.

12        d.    At the Section 341(a) meeting of creditors, Mense also testified that

13    Cottonsmith had submitted a budget which projected that Cottonsmith would spend

14    approximately $11,540 during a ninety (90) day period.[14]    Mense testified that the

15    expenses anticipated to be paid by Cottonsmith include, among other things, Mense's

16    personal medical insurance expense, Mense's personal automobile insurance expense,

17    and Mense's personal cell phone expense.

18        e.    The Schedules filed by Cottonsmith also reflect that, other than the

19    Judgment claim held by Kayne, the only other potential claim against Cottonsmith is the

20    disputed claim of Horvitz & Levy LLP.  As Mense testified at the Section 341(a) meeting

21    of creditors for Cottonsmith, Horvitz & Levy LLP is an appellate law firm that the

---

[11] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 32-33.

[12]    As noted above, Cottonsmith's balance sheet as of August 31, 2013, a true and correct copy of which is attached as Exhibit "2" to the Kayne Declaration, reflected that Cottonsmith had cash totaling approximately $1,570,000 in two accounts, and no liabilities.

[13] *See*, Transcript from the Section 341(a) meeting of creditors conducted on March 6, 2014 (the "341a Meeting Transcript"), a true and correct copy of which is attached as **Exhibit "5"** to the Kayne Declaration, p. 16, lines 21-24.

[14] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 19-20.

13

1    Debtors consulted with prior to the Petition Date (but ultimately did not retain), and the

2    Debtors dispute the validity of the claim asserted by Horvitz & Levy LLP.[15]

3    36.    As noted below, the Debtors' own papers and testimony at the Section 341(a)

4    meetings of creditors conducted on March 6, 2014 reflect that Mense has no genuine desire,

5    intent or need to reorganize his financial affairs.  Mense, by his own admission, is solvent, is

6    current on his loans and tax obligations, and has the ability to either satisfy the Judgment from

7    his assets or post a bond in accordance with California state law while he pursues an appeal of

8    the Judgment.  In the meantime, since Mense and his wife are not earning insufficient income to

9    cover their monthly living expenses, Mense is liquidating his assets to have sufficient funds to

10    cover living expenses.

11    a.    In their Status Report, the Debtors acknowledge that "Mense is not an

12    insolvent Debtor, even if required to pay the judgment" and that "[b]ased on the speed

13    with which Kayne was able to execute on the Debtor's assets, the only viable option was

14    to seek the protection of the Bankruptcy Court and the imposition of the automatic stay,

15    for the duration of the period necessary to complete the appeal."[16]

16    b.    In the Status Report, the Debtors note that "[b]ased on a judgment,

17    estimated to be approximately $4.5 million dollars or more with the inclusion of legal

18    fees and costs, the Surety Company, Bond Services required cash or cash equivalent of

19    $6.85 million inclusive of the bond premium."[17]  The Debtors further note that, although

20    Mense explored the possibility of pledging real estate and other assets to raise the funds

21    necessary to purchase an appeal bond, he was told that this would require a lengthy

22    underwriting period with no assurance or guaranty that a bond would ultimately issue.[18]

23    c.    The Schedules filed by Mense indicate that Mense owns real property

24    assets valued at $10,375,000, and personal property assets valued at $9,721,615.49, for

25    [15] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 30, lines 7-20.

26    [16] *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 3-9.

27    [17] *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 1-3.

28    [18] *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 4-6.

total assets valued at $20,096,615.49.  The Schedules filed by Mense reflect that his assets are encumbered by secured debts in the total sum of $5,498,746.00.  Accordingly, by his own Schedules, Mense acknowledges that the value of his equity in his assets totals more than $14.5 million.

d.    At the Section 341(a) meeting of creditors conducted on March 6, 2014, Mense testified that the values of the real properties in which Mense has a 50% tenancy-in-common interest (listed in Schedule A) is actually double the value listed in Schedule A.[19]  However, the secured debt listed for such real properties appear to reflect the entire amount of the debt against such properties.  Accordingly, as illustrated in the table below, the equity in the properties (and therefore Mense's 50% share of such equity, assuming creditors would only be entitled to proceed to enforce their claims against Mense's share of such equity) appears to be far greater than that reflected in Schedule A.

| Property Address | Property Value | Secured Claim | Total Equity | Debtor's Equity Share |
|---|---|---|---|---|
| 1008 Ogden Dr., West Hollywood, CA (50%) | $1,340,000 | $509,167 | $830,833 | $415,416.50 |
| 1016 Ogden Dr., West Hollywood, CA (50%) | $1,340,000 | $510,000 | $830,000 | $415,000 |
| 1020 Ogden Dr., West Hollywood, CA (50%) | $1,340,000 | $463,100 | $876,900 | $438,450 |
| 1013 Genesee Dr., West Hollywood, CA (50%) | $1,340,000 | $526,881 | $813,119 | $406,559.50 |
| 505 Hayworth Ave., Los Angeles, CA (50%) | $1,750,000 | $667,369 | $1,082,631 | $541,315.50 |
| 7164 Melrose Ave., Los Angeles, CA (50%) | $4,600,000 | $1,827,000 | $2,773,000 | $1,386,500 |

---

[19]  *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 51-52.  As a tenant in common, Mense holds an undivided interest in the underlying real properties.

| Property Address | Property Value | Secured Claim | Total Equity | Debtor's Equity Share |
|---|---|---|---|---|
| 10146 Baywood Court, Los Angeles, CA | $1,800,000[20] | $611,252 | $1,188,748 | $1,188,748 |
| 8255 S. Las Vegas Blvd., #1815, Las Vegas, NV | $280,000 | $383,977 | $0 | $0 |
| Block 11 – Building and land in Tel Aviv, Israel | $1,000,000 | $0 | $1,000,000 | $1,000,000 |
| Block 4 – Land in Tel Aviv, Israel | $840,000 | $0 | $840,000 | $840,000 |
| Western Part – Tel Aviv, Israel | $1,200,000 | $0 | $1,200,000 | $1,200,000 |
| Total: | | | | $7,831,989.50 |

e.     The Schedules filed by Mense reflect that Mense has cash totaling more than $4,244,000 in a number of bank accounts and other significant personal property (including interests in Glen Wok Corp., Ness Holdings, LLC and Ness Holdings Fund I, LLC) with a value in excess of $2,500,000.   Accordingly, Mense appears to have unencumbered personal property assets with an aggregate value of more than $6,700,000.

f.     The Schedules filed by Mense reflect that, other than Kayne and the banks which hold deeds of trust against Mense's real properties (whose loans are all current), Mense has very few creditors (if any).   The only other known debts listed in Mense's Schedule F include (i) fees allegedly owed to Azami Investments Inc. (the contractor hired by Mense to do renovation work on Mense's primary residence), (ii) the disputed claim of Horvitz & Levy LLP, (iii) a claim of $4,000 for unpaid fees owed to Mense's accountant, Ofir Alfassi, and (iv) a claim of $255,000 for a purported loan from Ronen Mense (who is apparently Mense's nephew).[21]

[20]   At the Section 341(a) meeting of creditors conducted on March 6, 2014, Mense testified that the value of $1,200,000 for his primary residence located at 10146 Baywood Court was based on his own estimate, without any consultation from a real estate broker or professional.   *See*, 341 Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 46-48.   However, based on Mense's testimony regarding the quality of his lot and view therefrom, and an estimate obtained from Zillow (which estimates the value of the property at $2,182,688 as of March 11, 2014), Kayne submits that the value of the property – even with a home under construction – is far greater than $1,200,000.   Accordingly, an estimated value of $1,800,000 has been listed herein.

[21]   *See*, Status Report, attached as Exhibit "I" to the RJN, p. 7, line 6.

16

g.  The Schedules filed by Mense also reflect that he and his wife receive monthly income totaling $7,497.40, while he and his wife have monthly expenses totaling $26,100.00.  At the Section 341(a) meeting of creditors conducted on March 6, 2014, Mense indicated that he is using cash and liquidating his existing assets to cover the monthly deficiency of approximately $18,600.[22]

h.  In the Statement of Major Issues and Timetable Report of his 7-Day Package, Mense states that he does not believe any of the loans which are secured by various real properties are currently in default.[23]

37.  Mense testified at the Section 341(a) meeting of creditors conducted on March 6, 2014 that he is current on his tax obligations.[24]

## III.

## DISCUSSION

**A.  The Court Should Dismiss The Debtors' Chapter 11 Cases Because They Were Not Filed In Good Faith.**

Section 1112(b) of the Bankruptcy Code requires that, absent "unusual circumstances" or, in the case of certain narrowly defined exceptions (none of which are applicable in these cases), a court "shall" dismiss a chapter 11 case if the movant establishes cause.  11 U.S.C. § 1112(b).  Section 1112(b) of the Bankruptcy Code affords courts broad discretion in deciding whether cause exists and does not define what constitutes "cause" warranting dismissal, although Section 1112(b) does contain examples of what could constitute "cause" under appropriate circumstances.  The list of factors that a Court can consider for purposes of finding "cause" is not exhaustive.  As set forth in the legislative history of Section 1112, "The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result

---

[22] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 23, lines 13-16.  The Debtors have filed no motion(s) to use or sell any of their assets outside the ordinary course.

[23] *See*, Mense's 7-Day Package, attached as Exhibit "4" to the Kayne Declaration, Statement of Major Issues and Timetable Report.

[24] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 23, line 17.

17

1    in individual cases."  H. Rep. 595, 95th Cong., 1st Sess. 406 (1977); *see also* **Error! Bookmark**

2    **not defined.***Koerner v. Colonial Bank (In re Koerner)*, 800 F.2d 1358, 1367-1368 (5th Cir.

3    1986); **Error! Bookmark not defined.***In re SGL Carbon Corp.*, 200 F.3d 154 (3d Cir. 1999).  As

4    one commentator has stated, "section 1112(b) was designed to provide the court with a powerful

5    tool to weed out inappropriate Chapter 11 cases at the earliest possible stage."  7 *Collier on*

6    *Bankruptcy* ¶ 1112.04[2] at 1112-23 (15th Ed. Rev. 2008).

7        Although lack of good faith is not expressly mentioned in Section 1112(b) of the

8    Bankruptcy Code as grounds for dismissal, it has been incorporated into the Bankruptcy Code by

9    judicial interpretation.  *See In re HBA East, Inc.*, 87 B.R. 248, 258 (Bankr. E.D.N.Y. 1988)

10   (granting creditor's motion to dismiss debtor's chapter 11 case for lack of good faith).  The

11   movant is not required to show malice in a challenge for bad faith.  *In re Southern Cal. Sound*

12   *Sys., Inc.*, 69 B.R. 893, 901 n. 2 (Bankr. S.D. Cal. 1987) (dismissing debtor's chapter 11 case as

13   an abuse of the bankruptcy process).  The movant is merely required to show that the case was

14   filed "for a purpose other than that sanctioned by the Bankruptcy Code."  *Id.*

15       Courts have identified several factors for determining whether a case has been

16   commenced in "good faith," including, without limitation:  (1) the debtor has one asset; (2) there

17   are generally no employees except for the principals; (3) there is little or no cash flow; (4) there

18   are no available sources of income to sustain a plan of reorganization; (5) there are few, if any,

19   unsecured creditors whose claims are relatively small; (6) *the debtor and one creditor have*

20   *proceeded to a stand-still in state court litigation, and the debtor has lost or has been required*

21   *to post a bond which it cannot afford*; and (7) there are allegations of wrongdoing by the debtor.

22   *Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.)*, 779 F.2d

23   1068, 1073 (5th Cir. 1986) (emphasis added); *see also* **Error! Bookmark not defined.***Matter of*

24   *Namer*, 141 B.R. 603, 607-608 (Bankr. E.D. La. 1992).

25       The Ninth Circuit Court of Appeals has adopted the *Little Creek* factors, and has

26   unequivocally recognized that "a lack of good faith in filing a chapter 11 petition establishes

27   cause for dismissal."  *Marsch v. Marsch (In re Marsch),* 36 F.3d 825, 828 (9th Cir. 1994)

28

1  (affirming bankruptcy court's dismissal of chapter 11 case for bad faith based on finding that

2  debtor filed chapter 11 petition solely to delay collection of a restitution judgment).  As one

3  bankruptcy court in the Ninth Circuit has stated, "the established rule is that the determination of

4  good faith depends upon the bankruptcy court's on-the-spot evaluation of the debtor's financial

5  condition, motives, and local financial realities."  *In re Boynton*, 184 B.R. 580, 583 (Bankr. S.D.

6  Cal. 1995) (granting dismissal motion where debtor was not a "viable company that provides

7  jobs as an operating business.") (citation omitted).

8      ***1.    The Debtors Filed Their Cases In Bad Faith Solely To Avoid Posting An***

9          ***Appeal Bond And Not For Any Legitimate Reorganization Purpose.***

10         It is no coincidence that the Debtors commenced their bankruptcy cases within days after

11  Kayne lodged the Judgment with the Superior Court.  The lodging of the Judgment occurred

12  after weeks of unsuccessful attempts by the Debtors to delay the entry of a judgment in the State

13  Court Action.  As the Debtors are undoubtedly aware, once a judgment is entered, California law

14  requires an appellant to post an appeal bond to forestall collection efforts.  *See Cal. Code Civ.*

15  *Proc. § 917.1(a)(1)-(b).*  The purpose of this provision is to protect a judgment creditor (here,

16  Kayne) from being harmed by asset dissipation or other misconduct by the appealing party (here,

17  the Debtors) while an appeal is pursued.  "The statute [Cal. Code Civ. Proc. § 917.1] is clearly

18  designed to protect the judgment won in the trial court from becoming uncollectible while the

19  judgment is subjected to appellate review. […]  A successful litigant will have an assured source

20  of funds to meet the amount of the money judgment, costs and postjudgment interest after

21  postponing enjoyment of a trial court victory.  *Grant v. Superior Court* (1990) 225 Cal.App.3d

22  929, 934, 275 Cal.Rptr. 564.

23         The Debtors admit, in pleadings and documents filed in these cases, as well as at the

24  Debtors' Section 341(a) meetings of creditors conducted on March 6, 2014, that the Debtors

25  commenced their bankruptcy cases to prevent the enforcement of the Judgment and to pursue an

26  appeal of the Judgment without having to post an appeal bond as required by California law.

27

28

1  Specifically, the Debtors or their counsel have made the following statements and

2  representations regarding the purpose for their bankruptcy filings:

3  • In the Statement of Major Issues and Timetable Report included in their 7-Day

4  Packages, the Debtors noted that "[g]iven the amount of the judgment [obtained

5  by Kayne], neither [of the Debtors] had the liquidity with which to post an

6  appellate bond.  Filing of Chapter 11 cases was the only means by which to avoid

7  the consequences of enforcement of writs of execution."

8  • In their Status Report, the Debtors stated that "[b]ased on the speed with which

9  Kayne was able to execute on the Debtor's assets, the only viable option was to

10  seek the protection of the Bankruptcy Court and the imposition of the automatic

11  stay, for the duration of the period necessary to complete the appeal."[25]

12  • At the hearing on the Stay Relief Motion held on March 5, 2014, counsel for the

13  Debtors stated "In other words, $7 million of cash or cash equivalent would have

14  to have been posted in order for Mr. Mense to obtain the bond necessary to stay

15  the – to stay the enforcement of the judgment pending appeal.  He didn't have it.

16  At the same time, he is solvent.  […]  Because [Mense] could not raise the

17  funding necessary to post a bond, he opted for the filing of a Chapter 11 to avoid

18  the Draconian consequences of enforcement of judgment."[26]

19  • At the Section 341(a) meetings of creditors conducted on March 6, 2014, Mense

20  testified that "the judgment made it impossible for me to put a bond, because it

21  would make impossible for me to continue my life and continue supporting

22  myself, because I have no work.  I'm pulling out money from my saving.  […]

23  [t]his judgment made it impossible for me.  I cannot come up with so much

24  cash."[27]

25  _____

26  [25] *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 6-9.

26  [26] *See*, Transcript of hearing on Stay Relief Motion, attached as Exhibit "J" to the RJN, p. 3, line 23 – p. 4, line
27  2; p. 4, lines 16-19.

28  [27] *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 23, lines 13-19.

- In the Statement of Major Issues and Timetable Report included in their 7-Day Packages, both of the Debtors also note that a win on an appeal of the Judgment "could mean a re-trial or reversal of judgment" and that "[s]uch a result would allow for a dismissal of the Chapter 11 cases."

These statements by the Debtors clearly reflect the Debtors' intent to use the bankruptcy process to circumvent the requirement under California law to post an appeal bond before they pursue an appeal of an adverse judgment. The purpose of the requirement set forth in § 917.1(a) of the California Code of Civil Procedure is to protect a judgment creditor like Kayne from being harmed by asset dissipation or other misconduct by the Debtors while the Debtors pursue an appeal of the Judgment and to protect the Judgment from becoming uncollectible while it is subjected to appellate review.

Based on the Debtors' statements regarding the difficulties they have faced in obtaining an appeal bond, the Debtors appear to have no plans to comply with the provisions of California Code of Civil Procedure § 917.1(a).[28] In the meantime, the Debtors appear to have no intention of proposing a plan of reorganization in their bankruptcy cases until the appeal has been completed, which the Debtors optimistically estimate will take 18-24 months.[29] The Debtors have indicated that, if they win on appeal, they will seek the dismissal of their Chapter 11 cases.[30] The facts of these cases are similar to those in *In re Karum Group, Inc.*, 66 B.R. 436 (Bankr. W.D. Wash. 1986). In the *Karum* case, the debtor was unable to post a bond to pursue an appeal of an adverse judgment. At the time of its bankruptcy filing, the debtor had no

[28] For example, in their Status Report, the Debtors note that the Debtors would be required to come up with cash or cash equivalent of $6.85 million to obtain a bond (which cash the Debtors indicate they don't have) and that, although Mense explored the possibility of pledging real estate and other assets to raise the funds necessary to obtain an appeal bond, this would require a lengthy underwriting period with no assurance or guaranty that a bond would ultimately issue. *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 1-6.

[29] At the Section 341(a) meetings of creditors conducted on March 6, 2014, the Debtors indicated that no decision had yet been made about whether they would propose a plan of reorganization prior to the appeal being resolved or only after the appeal was finally resolved. *See*, 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 26, lines 1-15. *See also*, 7-Day Packages, attached as Exhibit "3" and Exhibit "4" to the Kayne Declaration, Statement of Major Issues and Timetable Report.

[30] *See*, Debtors' 7-Day Packages, attached as Exhibits "3" and "4" to the Kayne Declaration, Statement of Major Issues and Timetable Report.

financial problems except for the adverse judgment sought to be appealed.  Counsel for the debtor in *Karum* acknowledged that the debtor intended to dismiss the bankruptcy cases if it was successful in its appeal.  From these facts, the court in *Karum* concluded that the debtor was using the Chapter 11 process as a litigation tactic to avoid the posting of a *supersedeas* bond, that it had little, if any, intention to reorganize when it filed, and that the filing was in bad faith, therefore warranting the dismissal of the debtor's bankruptcy case.  As in *Karum*, the facts in these cases demonstrate that the Debtors filed their bankruptcy cases solely to enable them to appeal the Judgment without having to post an appeal bond.  The Debtors have acknowledged that they commenced these bankruptcy cases to avoid the requirement to post an appeal bond.  The Debtors' Schedules reflect that, as of the Petition Date, the Debtors had no financial problems other than the Judgment.  Moreover, the Debtors have indicated that a win on an appeal of the Judgment will likely lead to a dismissal of these cases.  These facts, which are virtually identical to the facts of the *Karum* case, should result in the same conclusion – *i.e.*, that the Debtors filed these cases as a litigation tactic to avoid the posting of an appeal bond, that they had little if any intention to reorganize when they filed, and that the filings were in bad faith, therefore warranting the dismissal of the Debtors' bankruptcy cases.

In the meantime, the Debtors acknowledge that, while these bankruptcy cases are proceeding (and an appeal of the Judgment is pending), Cottonsmith's only asset (cash) is being dissipated and Mense will need to dip into his cash savings and potentially other assets to maintain his lifestyle.  As noted above, during a period of a little over six months (from August 31, 2013 through March 6, 2014), Cottonsmith depleted more than $450,000 of its cash (from $1,570,000 to $1,118,593.16).[31]  Moreover, Cottonsmith apparently intends to continue using its cash to pay Mense's personal expenses and to fund the purported costs of litigating the appeal of

---

[31] Cottonsmith's balance sheet as of August 31, 2013, a true and correct copy of which is attached as Exhibit "2" to the Kayne Declaration, reflected that Cottonsmith had cash totaling approximately $1,570,000, and no liabilities.  At the Section 341(a) meeting of creditors conducted on March 6, 2014, Mense testified that, as of March 6, 2014, Cottonsmith's cash was down to $1,118,593.16.  *See* 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, p. 16, lines 21-24.

1   the Judgment.[32]   Meanwhile, Mense and his wife have monthly living expenses of $26,100 per

2   month and an anticipated monthly income of only $7,500, resulting in a monthly deficit of

3   $18,600, which Mense testified at his Section 341(a) meeting of creditors would require him to

4   use his cash assets to cover.[33]   In addition, Mense has testified that he and his wife have

5   commenced an extensive renovation of their primary residence, which he anticipates, upon

6   completion, will have a market value between $3,500,000 – 4,000,000 (up from a value which

7   Mense currently places at $1,200,000).  Nowhere has Mense indicated or testified how he and his

8   wife intend to fund this extensive renovation, but presumably they intend to do so from Mense's

9   current liquid assets.[34]

10          The bond requirement set forth in § 917.1(a) of the California Code of Civil Procedure

11  exists to prevent the type of asset dissipation that the Debtors have already demonstrated (and

12  that the Debtors have acknowledged will continue through the pendency of an appeal).  The

13  Debtors should not be permitted to use the bankruptcy process to prevent the enforcement of the

14  Judgment while dissipating the assets which could be used to satisfy the Judgment.  This would

15  be a result in direct contravention of the purpose of the protections afforded by California Code

16  of Civil Procedure § 917.1(a).  *In re Boynton*, 184 B.R. 580 (Bankr. S.D. Cal. 1995) (finding that

17  the debtor's chapter 11 petition was filed in bad faith and that dismissal of the case was

18  warranted).

19          The facts of the *Boynton* case are comparable to the facts in these cases.  In *Boynton*, the

20  vast majority of the debtors' assets were liquid in an investment account, which assets were

21  being utilized by the debtors to continue to pay their own living expenses and to pay the

22  expenses of prosecuting their appeal of an adverse judgment in favor of the IRS (without posting

23

24          [32]  At the Section 341(a) meeting of creditors, Mense testified that Cottonsmith intends to spend approximately
25  $11,540 during a ninety (90) day period to pay, among other things, Mense's personal medical insurance expense,
     Mense's personal automobile insurance expense, and Mense's personal cell phone expense.  *See*, 341a Meeting
26  Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 19-20.

27          [33]  See Mense's Schedules I and J, attached as Exhibit "H" to the RJN. *See also,* 341a Meeting Transcript,
     attached as Exhibit "5" to the Kayne Declaration, p. 23, lines 13-16.

28          [34]  *See* 341a Meeting Transcript, attached as Exhibit "5" to the Kayne Declaration, pp. 46-48.

1    a bond). The court in *Boynton* noted that, if the debtors lost their appeal in substantial measure,

2    they would be unable to pay the judgment in full from present assets, hence, there was no down-

3    side to the debtors' pursuit of the appeal, which, in effect, was being prosecuted using the funds

4    that the IRS otherwise already would have seized. The court found that, in practical effect, the

5    IRS was funding the appeal against itself while it was prevented from seizing those funds and

6    while the debtors avoided the requirement of an appeal bond. The Debtors have substantial

7    liquid assets, which would have been available to satisfy Kayne's Judgment, but are intended by

8    the Debtors to be used to pay Mense's living expenses and the costs of pursuing an appeal of the

9    Judgment. As a result, Kayne is essentially funding the appeal against himself while he is

10   prevented from seizing the Debtors' assets and while the Debtors avoid the requirement of an

11   appeal bond. Given the similarity of facts to the *Boynton* case, Kayne submits that the Court in

12   these cases should reach the same conclusion reached by the court in the *Boynton* case – *i.e.*, that

13   the Debtors' bankruptcy cases were filed in bad faith, therefore warranting the dismissal of their

14   cases.

15        **2.    *Cottonsmith's Bankruptcy Case Was Commenced In Bad Faith Since There Is***

16             ***No Legitimate Purpose To Be Served By The Bankruptcy Case.***

17        Whether good faith exists "depends on an amalgam of factors and not upon a specific

18   fact," and "the test is whether a debtor is attempting to unreasonably deter and harass creditors or

19   is attempting to effect a speedy, efficient reorganization on a feasible basis." *In re Marsch*, 36

20   F.3d at 828 (quoting *Idaho v. Arnold (In re Arnold)*, 806 F.2d 937, 939 (9th Cir. 1986)). As

21   noted above, the Ninth Circuit Court of Appeals has adopted the *Little Creek* factors in

22   determining whether a case has been commenced in "good faith," including, without limitation:

23   (1) the debtor has one asset; (2) there are generally no employees except for the principals; (3)

24   there is little or no cash flow; (4) there are no available sources of income to sustain a plan of

25   reorganization; (5) there are few, if any, unsecured creditors whose claims are relatively small;

26   (6) the debtor and one creditor have proceeded to a stand-still in state court litigation, and the

27   debtor has lost or has been required to post a bond which it cannot afford; and (7) there are

28

1  allegations of wrongdoing by the debtor.  *In re Little Creek Dev. Co.*, 779 F.2d at 1073 (5th Cir.

2  1986).

3  When considered in light of the *Little Creek* factors, the evidence in the record of these

4  cases clearly supports a finding that Cottonsmith filed its bankruptcy petition in bad faith.  Factor

5  1 supports a finding of bad faith since Cottonsmith has only one asset (*i.e.*, cash).  Factor 2

6  supports a finding of bad faith since Cottonsmith has no ongoing business and no employees

7  (other than perhaps Mense, who is a principal of Cottonsmith and who is having his personal

8  expenses paid through Cottonsmith).  Factors 3 and 4 support a finding of bad faith since

9  Cottonsmith is generating no income or cash flow, and therefore has no available source of

10  income to support or sustain a plan of reorganization.  Factor 5 supports a finding of bad faith

11  since Cottonsmith has only one creditor – *i.e.*, Kayne.  Cottonsmith's own Schedules reflect that

12  there is only one other potential claim (other than the Judgment claim held by Kayne), which is

13  for approximately $12,000 and is disputed by Cottonsmith.  Factor 6 supports a finding of bad

14  faith since Cottonsmith and its only creditor, Kayne, have proceeded to a stand-still in their state

15  court litigation – namely, the Debtors have lost in the State Court Action and had the Judgment

16  entered against them, which requires the Debtors to either satisfy the Judgment or post a bond to

17  appeal the Judgment.  Factor 7 supports a finding of bad faith since both of the Debtors engaged

18  in improper prepetition conduct (as evidenced by the jury verdict and Judgment rendered against

19  them) and engaged in numerous delay tactics to avoid the ultimate entry of the Judgment against

20  them.  Accordingly, an application of the *Little Creek* factors to the facts in Cottonsmith's case

21  overwhelming supports a finding that Cottonsmith filed its bankruptcy petition in bad faith.

22  Since Cottonsmith has no business to reorganize and no creditors (other than Kayne) to

23  protect, the commencement of the bankruptcy case by Cottonsmith was undoubtedly motivated

24  by the Debtors' desire to prevent, or, at a minimum, delay the enforcement of the Judgment, not

25  by any genuine desire or intent to reorganize Cottonsmith's financial affairs.  Cottonsmith's

26  utilization of the bankruptcy process to avoid the enforcement of the Judgment and to circumvent

27  the requirement to post an appeal bond to stay the enforcement of the Judgment pending appeal

28

was in bad faith, and constitutes "cause" under 11 U.S.C. § 1112(b) to dismiss Cottonsmith's bankruptcy case.

Based on the foregoing, Kayne respectfully requests that the Court enter an order dismissing Cottonsmith's bankruptcy case.

### 3. *Mense's Bankruptcy Case Was Commenced In Bad Faith Since Mense Has The Ability To Satisfy The Judgment Or Post An Appeal Bond.*

Bankruptcy courts have held that the filing of a Chapter 11 petition to avoid posting an appeal bond even though the debtor can satisfy the judgment with non-business assets is a filing in bad faith. *In re Marsch*, 36 F.3d 825, 828-29; *see also In re Holm*, 75 B.R. 86, 87 (Bankr. N.D. Cal. 1987) ("[I]f the debtor has the ability to satisfy the judgment from non-business assets, then it is bad faith to attempt to use the bankruptcy laws to appeal without posting a bond. Stated another way, a Chapter 11 proceeding should be dismissed only if the debtor has the clear ability to survive without bankruptcy court protection.").

The record in the Debtors' cases demonstrate that Mense has the financial ability to satisfy the Judgment or, in the alternative, post an appeal bond pending an appeal of the Judgment, but has instead elected to use the bankruptcy process as a litigation strategy to avoid complying with California law requiring the posting of an appeal bond and to hinder and delay Kayne's ability to enforce the Judgment.

Mense, by his own admission, is solvent, is current on his loan and tax obligations, and has the ability to either satisfy the Judgment from his assets or post a bond in accordance with California state law while he pursues an appeal of the Judgment. In the Debtors' Status Report, the Debtors acknowledge that "Mense is not an insolvent Debtor, even if required to pay the judgment."[35]  Not only is Mense solvent, Mense has significant assets, with an aggregate value exceeding $14,000,000, which is more than sufficient to obtain an appeal bond in connection with the Judgment. As reflected in his Schedules, Mense has cash totaling more than $4,244,000 in a number of bank accounts and other significant personal property (including interests in Glen

---

[35] *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 3-4.

1   Wok Corp., Ness Holdings, LLC and Ness Holdings Fund I, LLC) with a value in excess of

2   $2,500,000.[36]  Accordingly, Mense appears to have unencumbered personal property assets with

3   an aggregate value of more than **$6,700,000**, which could be liquidated or pledged to obtain an

4   appeal bond.  In addition to these personal property assets, Mense has substantial real property

5   assets.  As illustrated by the table on page 13 above, the total value of Mense's interests in the

6   various real properties listed on Schedule A appears to exceed **$7,800,000** (even taking into

7   account Mense's 50% tenancy-in-common interest in certain of the properties).  Based on the

8   foregoing, Mense has personal property and real property assets which have an aggregate value

9   exceeding **$14,000,000**.

10          As the Debtors noted in their Status Report, they were informed by the surety company

11  that they contacted (Bond Services) that they could obtain an appeal bond using cash or cash

12  equivalent of $6,850,000, or by pledging real estate and other assets, which would potentially

13  require underwriting in a process that could take 6 weeks or longer.[37]  Given the total value of

14  Mense's cash and non-cash assets (which exceed $14,000,000), there is no doubt that Mense has

15  the financial wherewithal and ability to either satisfy the Judgment or post an appeal bond to stay

16  the enforcement of the Judgment pending an appeal.

17          The *Marsch* case and the *Holm* case are instructive here.  In the *Marsch* case, the Ninth

18  Circuit affirmed the bankruptcy court's dismissal of the debtor's bankruptcy case as a bad faith

19  filing, finding that the record of the case supported the bankruptcy court's findings that the

20  debtor had the financial means to pay the judgment and that, since the debtor wasn't involved in

21  a business venture, the judgment didn't pose any danger of disrupting business interests.  Like

22  the debtor in *Marsch*, Mense has the financial means to pay the Judgment (or post an appeal

---

24      [36]  *See*, Mense's Schedules, attached as Exhibit "H" to the RJN.

25      [37]  *See*, Status Report, attached as Exhibit "I" to the RJN, p. 4, lines 1-6; *see also*, Stay Relief Reply, attached as
    Exhibit "F" to the RJN, Declaration of Mense, ¶ 5.  It is important to note that nowhere has Mense indicated or
26  testified that his efforts to obtain an appeal bond have continued since the commencement of these cases.  Mense has
    now obtained the benefit of at least 6-weeks' delay (or, by virtue of the Debtors' tactics in Superior Court to delay
27  the entry of the Judgment, an 8-months' delay following the jury verdict) in Kayne's enforcement of the Judgment,
    yet appears to have abandoned any effort to procure a bond.  In the time these cases have been pending, the Debtors
28  would have had an ample opportunity to proceed with the underwriting process that Mense has testified to.

1   bond pending an appeal of the Judgment).  Mense is not involved in any business venture that

2   would be jeopardized by the satisfaction of the Judgment or the posting of an appeal.

3           In the *Holm* case, the court found that the debtor's assets far exceeded his debts and

4   concluded that "the debtor could easily satisfy the judgment or post an appeal bond merely by

5   liquidating some of his real estate holdings.  To do so would not disrupt his business activities, as

6   he is primarily a real estate developer with no large staff or business establishment.  In these

7   circumstances, it would be improper to allow the debtor to use the bankruptcy laws merely to

8   avoid liquidating his properties."  *In re Holm*, 75 B.R. at 87.  The court in *Holm* ultimately held

9   that, if the debtor had neither formally abandoned the appeal nor posted an appeal bond within

10  60 days, then the debtor's chapter 11 bankruptcy proceedings would be dismissed with prejudice.

11  Kayne submits that, given the similarity of facts, the court's holding in the *Holm* case should

12  apply equally to Mense's case.  As demonstrated above, Mense's assets far exceed his debts, and

13  Mense could easily satisfy the Judgment or post an appeal bond by liquidating some of his real

14  estate holdings (as well as his more liquid assets).  To do so would not disrupt Mense's business

15  activities, as he is primarily a real estate developer with no staff or business establishment.  Like

16  the debtor in the *Holm* case, Mense should be required to either formally abandon the appeal or

17  post an appeal bond within a limited period of time, or have his bankruptcy case dismissed with

18  prejudice.

19          Finally, when the evidence in the record of Mense's bankruptcy case is viewed in light of

20  the *Little Creek* factors, it is clear that Mense's bankruptcy case petition was filed in bad faith.

21  Kayne submits that Factor 1 is neutral because, although Mense has more than one asset,

22  Mense's assets are limited to cash and interests in real estate and business holdings.  Factor 2

23  supports a finding of bad faith since Mense is primarily a real estate developer with no staff or

24  business establishment.  Factors 3 and 4 support a finding of bad faith since Mense and his wife

25  are generating insufficient income to meet their personal living expenses, and therefore have

26  negative cash flow.  Accordingly, there is no available source of income to support or sustain a

27  plan of reorganization in Mense's case.  Factor 5 supports a finding of bad faith since Mense has

28

few legitimate creditors.  Mense's Schedules reflect that, other than Kayne and the banks which

hold deeds of trust against Mense's real properties (whose loans are all current), Mense has very

few creditors (if any).[38]  Factor 6 supports a finding of bad faith since Mense and his primary (if

not sole) creditor, Kayne, have proceeded to a stand-still in their state court litigation – namely,

the Debtors have lost in the State Court Action and had the Judgment entered against them,

which requires the Debtors to either satisfy the Judgment or post a bond to appeal the Judgment.

Factor 7 supports a finding of bad faith since both of the Debtors engaged in improper

prepetition conduct (as evidenced by the jury verdict and Judgment rendered against them) and

engaged in numerous delay tactics to avoid the ultimate entry of the Judgment against them.

Accordingly, an application of the *Little Creek* factors to the facts in Mense's case overwhelming

supports a finding that Mense filed his bankruptcy petition in bad faith.

**B.**    **The Court Should Dismiss The Debtors' Chapter 11 Cases Due To The Continuing Loss To Or Diminution Of The Estates And The Absence Of A Reasonable Likelihood Of Rehabilitation.**

Under Section 1112(b)(4) of the Bankruptcy Code, cause exists where there is both

"continuing loss to or diminution of the estate" and "absence of a reasonable likelihood of

rehabilitation."  *In re Original IFPC Shareholders, Inc.*, 317 B.R. 738, 743 (Bankr. N.D. Ill.

2004) (dismissing debtor's chapter 11 case where debtor had ongoing negative cash flow

resulting in a net decrease in value and no definite source of income); *Clarkson v. Cooke Sales

And Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985) (bankruptcy court properly

dismissed case under Section 1112(b)(1) upon finding of an absence of sufficient financial data

and "certain sources of income" coupled with an erosion in creditors' positions).  Diminution of

an estate exists where, for example, the debtor's business has ceased.  *In re Citi-Toledo Partners*,

170 B.R. 602, 606 (Bankr. N.D. Ohio 1994).   A debtor lacks a reasonable likelihood of

---

[38]   The only other known debts listed in Mense's Schedule F include (i) fees allegedly owed to Azami Investments Inc. (the contractor hired by Mense to do renovation work on Mense's primary residence), (ii) the disputed claim of Horvitz & Levy LLP, (iii) a claim of $4,000 for unpaid fees owed to Mense's accountant, Ofir Alfassi, and (iv) a claim of $255,000 for a purported loan from Mense's nephew.  *See*, Mense's Schedules, attached as Exhibit "H" to the RJN.

1    rehabilitation where, for example, it lacks income or operating funds. *In re Great American*

2    *Pyramid Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992). In addition, a debtor lacks

3    a reasonable likelihood of rehabilitation where it lacks employees, capital, or continuing

4    revenue-generating activity. *In re Gonic Realty Trust*, 909 F.2d 624, 627 (1st Cir. 1990) (case

5    dismissed where there was no business left to rehabilitate). Where a court finds that no

6    reasonable possibility of reorganization exists, it should not be compelled to wait a certain period

7    of time, to the detriment of creditors, before ordering conversion or dismissal of a case. *Stage I*

8    *Land Co. v. U.S. Dept. of H.U.D.*, 71 B.R. 225, 231 (D. Minn. 1986) (debtor's chapter 11 case

9    should be dismissed at the outset for cause where no reasonable possibility of a reorganization

10    exists).

11        In addressing the reasonable likelihood of the rehabilitation causal element, the court in

12    *In re Great American Pyramid Joint Venture* stated that, in ascertaining whether the grounds for

13    conversion or dismissal set forth are satisfied, a court "must determine whether the causes of the

14    debtors' continuing losses can be corrected," and emphasized that "the purpose of the laws of

15    Congress relating to bankruptcy are to encourage financial restructuring and to encourage

16    payments to creditors." *In re Great American Pyramid Joint Venture*, 144 B.R. at 791.

17    However, "when no or substantially no business is left to reorganize, Chapter 11 cases do not

18    serve those purposes, and 'cause' exists." *Id.* Similarly, in *Southern Cal. Sound Sys., Inc.*,

19    *supra*, 69 B.R. 893, 899-900, the court dismissed the corporate debtor's chapter 11 petition

20    where the debtor had no employees except the principal, no cash flow or available source of

21    income, nine creditors, and its petition was filed for the purpose of avoiding a state court action

22    and the costs associated therewith.

23        There is ample evidence in these cases to establish "cause" for dismissal of the Debtors'

24    cases on the grounds that there is a continuing loss to or diminution of the estates and no

25    reasonable likelihood of rehabilitation for the Debtors. As noted above, more than $450,000 of

26    Cottonsmith's cash (its only asset) has been dissipated in the last approximately six months. The

27    Debtors have acknowledged that Cottonsmith's cash will continue to be dissipated while an

28

1  appeal of the Judgment is pending.  Similarly, Mense has indicated that he will need to dip into

2  his cash savings and potentially other assets to cover his monthly income deficit of $18,600,

3  therefore dissipating the assets of his bankruptcy estate, to the detriment of his creditors.

4  Cottonsmith has no ongoing business, no employees, no income and one potential creditor other

5  than Kayne.  Mense is a retired individual with investments in real estate and has no ongoing

6  business or employees.    Although Mense and his wife generate income, the income is

7  insufficient to meet their monthly living expenses (resulting in a monthly deficit of $18,600).

8  Mense has few legitimate creditors, if any, other than Kayne.  Under the circumstances, Kayne

9  submits that there is a "continuing loss to or diminution of the estate" and "absence of a

10 reasonable likelihood of rehabilitation" in both of the Debtors' cases and, therefore, cause exists

11 under 11 U.S.C. § 1112(b)(4) to dismiss the Debtors' bankruptcy cases.

12                                          **IV.**

13                                    **<u>CONCLUSION</u>**

14         **WHEREFORE**, Kayne respectfully requests that the Court enter an order: (i) granting

15 the Motion and dismissing the Debtors' Chapter 11 bankruptcy cases; and (ii) granting such

16 other and further relief as the Court deems just and proper under the circumstances of these

17 cases.

18 Dated:  March 12, 2014                    FRED KAYNE

19

20

21                                          By:_____

22                                              DAVID L. NEALE
                                                JULIET Y. OH
23                                              LEVENE, NEALE, BENDER, YOO
                                                   & BRILL L.L.P.
24                                              Attorneys for Fred Kayne, Individually
                                                and as Trustee of the Fred & Lenore
25                                              Kayne Family Trust

26

27

28

                                          31

1          **DECLARATION OF FRED KAYNE**

2          I, Fred Kayne, hereby declare as follows:

3          1.     I am over 18 years of age.  I have personal knowledge of the facts set forth below,

4    and, if called to testify, I would and could competently testify thereto.

5          2.     I submit this declaration in support of the memorandum of points and authorities

6    submitted in support of my motion (the "Motion") for relief from the automatic stay filed in the

7    jointly-administered Chapter 11 bankruptcy cases of Raphael Mense ("Mense") and Cottonsmith,

8    LLC ("Cottonsmith," and together with Mense, the "Debtors").  Pursuant to the Motion, I seek

9    relief from the automatic stay to enforce my state court judgment against the Debtors.   All

10   capitalized terms not specifically defined herein shall have the meanings ascribed to them in the

11   memorandum of points and authorities to which this declaration is attached.

12         3.     I am a judgment creditor of both Debtors.  I am a member of Cottonsmith with a

13   minority interest in Cottonsmith.

14         4.     Cottonsmith was in the business of manufacturing and importing so-called "blank"

15   tee shirts for sale to customers who dye and/or screen print them according to customer

16   specifications.  Cottonsmith manufactured the vast majority of its products for Fortune Fashion

17   Industries, LLC ("FFI"), a screen printing company of which I was the majority owner.

18         5.     Cottonsmith was originally formed as a Delaware corporation in 1994, with the

19   original shareholders being Mense, FFI, certain other parties and me.  By 1995, the sole

20   shareholders of Cottonsmith were Mense and me, with each of us owning a 50% interest.  In 2001,

21   Cottonsmith was converted to an LLC, with Mense and me each holding a 50% interest.  In 2004, I

22   transferred my interest in Cottonsmith to the Fred & Lenore Kayne Family Trust (the "Trust").

23         6.     In or about June, 2006, at my suggestion, Mense and I agreed that I would reduce

24   the Trust's ownership interest as a member in Cottonsmith from 50% to 10%, and Mense's

25   ownership interest as a member in Cottonsmith would be increased from 50% to 90%, and Mense

26   would become the sole manager of Cottonsmith.  Pursuant to this agreement, I executed

27   Cottonsmith's  Amended  and  Restated  Operating  Agreement  (the  "Amended  Operating

28

Agreement") as of June 1, 2006.

7.     In September, 2010, Cottonsmith's primary customer, FFI, was experiencing financial difficulties, and Cottonsmith had accumulated a substantial receivable from FFI.  After much discussion with Mense and FFI, and in an effort to help FFI meet its obligations to its customers, I advanced a total of $750,000 (the "Advance") to Cottonsmith from the Trust.  The parties agreed that the Advance was to be used solely to purchase fabric to fulfill FFI orders and that the Trust would be repaid the Advance from the proceeds of the sale of the fabric or the tee shirts made from the fabric (the "Fabric Purchase Agreement").

8.     In early August, 2011, I made a written request to Cottonsmith to disburse my capital account (which held funds in excess of $700,000) and to reimburse the Trust for the Advance.  Cottonsmith refused to disburse my capital account to me or to turn over any of the proceeds of the sale of the fabric (or the tee shirts made from such fabric) to reimburse the Trust for the Advance.

9.     In the spring of 2011, Mense informed me that he intended to wind up Cottonsmith's business, to sell all of its assets and to distribute the proceeds.  It is my understanding and belief that, by July, 2011, Costtonsmith was no longer conducting any customer business and all of Cottonsmith's assets had been reduced to cash.

10.     Given Cottonsmith's continuing refusal to disburse my capital account or to repay the Advance to the Trust, I was forced to bring suit against both of the debtors to seek the disbursement of my capital account and the repayment of the Advance for the Trust.  Accordingly, on August 24, 2011, I caused a complaint to be filed, asserting breach of contract, rescission, conversion, breach of fiduciary duty, accounting, and constructive trust, against the Defendants in the Los Angeles Superior Court (the "Superior Court"), thereby commencing case number BC 468228 (the "State Court Action").

11.     Thereafter, I caused a first amended complaint (the "Complaint") to be filed, pursuant to which I asserted the following causes of action against the Defendants:  (a) breach of written contract (Amended Operating Agreement), (b) breach of oral contract (Fabric Purchase

Agreement), (c) breach of fiduciary duty (against Mense only), and (d) for treble damages under Penal Code § 496(c).

12.    The Debtors, in turn, brought various claims against me, including for breach of contract, breach of fiduciary duty, unjust enrichment, and fraud.

13.    Nearly two years after the commencement of the State Court Action, the matter went to trial on May 8, 2013 in the Superior Court.

14.    On June 12, 2013, following a four-week trial, the Superior Court submitted all claims to the jury.  Following deliberation, the jury rendered a verdict in favor of me and against the Debtors.  The jury found that the Debtors had breached the Amended Operating Agreement by failing to relinquish my capital account (which contained funds in excess of $700,000) within six months of demand, had breached a separate oral agreement to hold the $750,000 Advance in trust for me pursuant to the Fabric Purchase Agreement, and that such breach also constituted embezzlement and a violation of Penal Code § 496(c).  The jury also found that Mense had breached his fiduciary duty to me as a minority member of Cottonsmith, and that he had acted with oppression, fraud, or malice, justifying an award of punitive damages.  True and correct copies of the jury verdict and the Superior Court minutes relating thereto are collectively attached as **Exhibit "A"** to the Request for Judicial Notice filed concurrently herewith (the "RJN").

15.    On June 13, 2013, a bifurcated trial on punitive damages was held in the Superior Court.  The jury ultimately awarded me $750,000 in punitive damages against Mense.  A true and correct copy of the Superior Court minutes reflecting the jury verdict on the issue of punitive damages is attached as **Exhibit "B"** to the RJN.

16.    During the punitive damages phase of the trial, Mense submitted to the Superior Court his personal financial documents, which showed that, as of June, 2013, Mense had more than $9,000,000 of cash in a number of accounts maintained at Merrill Lynch and Bank of America, plus numerous real estate holdings.  True and correct copies of the personal financial documents submitted by Mense to the Superior Court are attached as **Exhibit "1"** hereto.

17.    According to Cottonsmith's balance sheet as of August 31, 2013 (which was

1    provide to me in October, 2013), Cottonsmith had cash totaling approximately $1,570,000 in two

2    separate bank accounts, and no liabilities.  A true and correct copy of Cottonsmith's balance sheet

3    as of August 31, 2013 is attached as **Exhibit "2"** hereto.

4         18.    On September 6, 2013, I submitted a proposed judgment tracking the jury's verdict,

5    for a total of $3,522,399, plus $750,000 in punitive damages, for a total of $4,272,399.  It is my

6    understanding and belief that my initial proposed judgment reflected the calculation that the

7    Debtors' attorneys had presented to the jury during the punitive damages phase of the trial.

8         19.    On September 16, 2013, the Debtors filed objections to my proposed judgment

9    concurrently with their motions for new trial and for judgment notwithstanding the verdict (the

10   "Motions for New Trial and JNOV").  It is my understanding and belief that the Debtors'

11   objections proposed numerous changes to the form of the judgment I proposed, and argued for a

12   substantial reduction in the damages awarded.  After due consideration, I agreed to the proposed

13   changes in form, but opposed the reduction of damages.  On September 26, 2013, I filed responses

14   to the Debtors' objections and submitted an amended proposed judgment.  On October 2, 2013, the

15   Debtors filed a reply brief to my responses.

16        20.    It is my understanding and belief that, on November 11, 2013, during the hearing

17   on the Debtors' Motions for New Trial and JNOV, the Superior Court denied the Motions for New

18   Trial and JNOV and ordered that I file a response to the Debtors' objections and reply briefs.  A

19   true and correct copy of the Superior Court's minute order denying the Motions for New Trial and

20   JNOV, which adopted the Superior Court's tentative rulings on such motions, is attached as

21   **Exhibit "C"** to the RJN.  Thereafter, on November 14, 2013, I filed a response as ordered by the

22   Superior Court.

23        21.    It is my understanding and belief that, on November 15, 2013, the Superior Court

24   issued a Minute Order overruling each of the Debtors' objections to the amended proposed

25   judgment with one exception (holding that Penal Code § 496(c) does not provide for prejudgment

26   interest and limiting me to trebling the actual damages of $750,000 from the breach of the Fabric

27   Purchase Agreement).

28

22.     Accordingly, on November 19, 2013, I filed a second amended proposed judgment trebling only the actual damages of $750,000 and including interest accrued in the 161 days since the entry of the jury verdict, at the contract rate of 10%.

23.     It is my understanding and belief that, on November 19, 2013, the Debtors served an objection to the second amended proposed judgment demanding that I make an election of remedies and choose between any contractual prejudgment interest and treble damages.  It is further my understanding and belief that, two days later, on November 21, 2013, the Debtors served supplemental objections arguing, for the first time, that (a) I was precluded from seeking pre-judgment interest on the punitive damage award, or at least that I must be limited to 7% interest on said damages, and (b) I must elect between breach of contract or fiduciary duty on my capital account claim.

24.     I am advised and believe that, on December 31, 2013, the Superior Court issued a minute order instructing me to file a 5-page response to the Debtors' objections to the second amended proposed judgment and an associated attorney declaration justifying the form of the second amended proposed judgment.  I filed a response and an attorney declaration as ordered by the Superior Court on January 10, 2014.

25.     Thereafter, the Debtors filed a reply brief to my response and I filed an objection to the Debtors' reply brief (asking that the Superior Court strike the Debtors' reply brief as an improper and unauthorized filing).

26.     It is my understanding and belief that, on January 14, 2014, the Superior Court issued an order striking the Debtors' reply brief and chastising the Debtors for "attempting to extend briefings in this matter indefinitely to delay the judgment" (the "January 14, 2014 Order").  A true and correct copy of the January 14, 2014 Order is attached as **Exhibit "D"** to the RJN.  In the January 14, 2014 Order, the Superior Court held that I was required to elect my remedies between tort and contract.  The Court presumed, correctly, that I would opt to recover in tort, and held that my pre-cost, pre-interest judgment would be $3,747,698 and would bear interest at 7%, or $718.74 per day, from the day of the jury verdict.  On January 17, 2014, I submitted a third

1    amended proposed judgment in line with the Superior Court's ruling in the January 14, 2014

2    Order. The third amended proposed judgment (the "Judgment") was entered by the Superior Court

3    on January 27, 2014. A true and correct copy of the Judgment is attached as **Exhibit "E"** to the

4    RJN.

5        27.    Although the Judgment provides for me to recover from the Debtors the costs of

6    suit and reasonable attorneys' fees incurred by me in connection with the State Court Action, the

7    Judgment left open the calculation of the amounts of the costs of suit and attorneys' fees to be

8    recovered, pending the filing of a Memorandum of Costs and motion for recovery of attorneys'

9    fees.

10        28.    I am advised and believe that, on January 22, 2014 (the "Petition Date"), each of

11   the Debtors – i.e., Cottonsmith and Mense – filed a voluntary petition for relief under Chapter 11

12   of the Bankruptcy Code. I am further advised and believe that, pursuant to an order entered by the

13   Court on February 19, 2014, the Debtors' bankruptcy cases are being jointly administered under

14   the lead case of Mense.

15        29.    On February 12, 2014, each of the Debtors filed a motion seeking relief from the

16   automatic stay to appeal the Judgment and the underlying jury verdict entered in my favor and

17   against the Debtors in the Superior Court (the "Stay Relief Motion").

18        30.    On February 19, 2014, I filed oppositions to the Stay Relief Motion.

19        31.    On February 26, 2014, each of the Debtors filed a reply (the "Stay Relief Reply") to

20   my oppositions to the Stay Relief Motion. A true and correct copy of the Stay Relief Reply filed in

21   Mense's case is attached as **Exhibit "F"** to the RJN. It is my understanding and belief that a

22   virtually identical reply was filed in Cottonsmith's bankruptcy case. I am advised and believe that

23   a hearing on the Stay Relief Motion (and my oppositions thereto) was held before the Court on

24   March 5, 2014. A true and correct copy of the transcript from the foregoing hearing is attached as

25   **Exhibit "J"** to the RJN.

26   ///

27   ///

28

1      32.     I am advised and believe that, on March 10, 2014, the Court entered orders on the

2 Relief From Stay Motion, pursuant to which both the Debtors and I were granted relief from the

3 automatic stay to proceed with the State Court Action to final judgment (including any appeals) in

4 accordance with applicable non-bankruptcy law. The foregoing orders did not, however, grant

5 relief from the automatic stay to permit me to enforce my judgment against the Debtors at that

6 time.

7      33.     I am advised and believe that, on or about January 31, 2014, the Debtors submitted

8 their 7-Day Packages to the Office of the United States Trustee. True and correct copies of the 7-

9 Day Packages submitted by Cottonsmith and Mense are attached as **Exhibit "3"** and **Exhibit "4"**,

10 respectively, hereto.

11      34.     I am also advised and believe that, on February 26, 2014, the Debtors filed their

12 respective Schedules of Assets and Liabilities ("Schedules") and Statements of Financial Affairs

13 ("SOFA"). True and correct copies of the Schedules and SOFAs filed by Cottonsmith and Mense

14 are attached as **Exhibit "G"** and **Exhibit "H"**, respectively, to the RJN.

15      35.     I am advised and believe that, on March 5, 2014, the Debtors filed a Status Report

16 in their jointly-administered bankruptcy cases, a true and correct copy of which is attached as

17 **Exhibit "I"** the RJN.

18      36.     I am advised and believe that, on March 6, 2014, the Debtors appeared at the

19 Section 341(a) meetings of creditors conducted in the Debtors' bankruptcy cases. I ordered a

20 transcript of the Section 341(a) meetings conducted on March 6, 2014. A true and correct copy of

21 the transcript from the Section 341(a) meetings of creditors conducted on March 6, 2014 (the "341

22 Meeting Transcript") is attached as **Exhibit "5"** hereto.

23     I declare under penalty of perjury under the laws of the United States of America that the

24 foregoing is true and correct.

25     Executed this 12th day of March, 2014, at Los Angeles, California.

26

27                                                          FRED KAYNE

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "1"

[Personal Financial Documents Submitted by
Raphael Mense To Superior Court]

**Bank of America**

Bank of America, N.A.
P.O. Box 25118
Tampa, FL 33622-5118

Combined Statement
Page 1 of 4
Statement Period
04-25-13 through 05-24-13
B 16 0 1 P PI  16        0101918

*Wealth Management Banking*

28318 001 SCM999 I  3  0

RAPHAEL MENSE
VICKY T MENSE
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

Our Online Banking service allows you to check balances, track account activity and more.
With Online Banking you can also view up to 18 months of this statement
online and even turn off delivery of your paper statement.
Enroll at www.bankofamerica.com.

Customer Service Information
www.bankofamerica.com

For additional information or services you may call:          Or you may write to:
1.800.637.7455 Wealth Management Client Services            Bank of America, N.A.
1.800.288.4408 TDD/TTY Users Only                           P.O. Box 25118
1.800.688.6086 En Español                                   Tampa, FL 33622-5118

## Your Statement Summary

| Account Name | Account Number | Statement Date | Balance ($) |
|---|---|---|---|
| Bank Deposit Accounts ** | | | |
| Adv Tiered Interest Chkg | 8879 | 05-24 | 81,030.82 |

**Total Deposit Account Balance $81,030.82**

** Banking products such as checking and savings accounts are offered by Bank of America, N.A., member FDIC. Bank of America credit cards
are issued and administered by FIA Card Services, N.A.

## Did you know there's an easier way to make deposits?

Now when you get a check, you can securely deposit it right into your account using the App and
camera on your smartphone or tablet. There's no planning a trip to the banking center or ATM. It's easy
to deposit checks on your schedule. Download the newest Mobile Banking App by texting APP1 to
226526

Deposits not available for immediate withdrawal. Restrictions apply. See Mobile App for details. Wireless
fees may apply. For text messages, supported carriers include: Alltel, AT&T, Cellular One, T-Mobile,
Virgin Mobile, US Cellular, Verizon Wireless. Text STOP to 226526 to cancel. Text HELP to 226526 for
help. Bank of America, N.A. Member FDIC

H

Combined Statement
Page 2 of 4
Statement Period
04-25-13 through 05-24-13
B 16 0 I P PI    16

RAPHAEL MENSE
VICKY T MENSE

---

## Pick your cash back deals. BankAmeriDeals® makes it easy.

Online or on your mobile device, check out the BankAmeriDeals offered to you. Choose the deals, make
the purchases and the cash back gets put into the Bank of America® checking or savings account you
select. Learn more at www.bankofamerica.com/deals or tap the "Deals" icon in Mobile Banking.

---

**Coming soon** - a new and improved banking statement designed to help you find the information you
need. This enhanced statement will feature color graphics to highlight key details and important
notifications. We believe you will find it beneficial in monitoring your account activity. Over the next few
months, a guide will be included with your new statement detailing the enhancements.  If you have
questions, please call the phone number on your statement.

---

## Deposit Accounts

---

## Premium Tiered Interest Checking 1.800.444.8660 - Customer Service
### Adv Tiered Interest Chkg

### RAPHAEL MENSE  VICKY T MENSE

---

## Your Account at a Glance

| | | |
|---|---|---|
| Account Number | XXXX XXXX 8879 | |
| Beginning Balance on 04-25-13 | $    58,764.64 | *Annual Percentage Yield Earned this Statement* |
| Deposits and Other Additions | +    45,579.43 | *Period:  0.02%* |
| Checks Posted | -    20,976.31 | *Interest Paid Year to Date:  $6.24* |
| Other Subtractions | -    2,336.94 | |
| Ending Balance on 05-24-13 | $    81,030.82 | |

---

## Adv Tiered Interest Chkg Additions

| Deposits and Other Additions | Date Posted | Amount($) |
|---|---|---|
| Wire Type:Book IN Date:130506 Time:1332 Et | 05-06 | 20,000.00 |
| Trn:2013050600212889 Seq:P43126009327/321389 | | |
| Orig:Raphael Vicky Mense Ttees ID:8U230355 Orig Bk | | |
| Merrill Lynch And Co., Inc. ID:Mlcous33 | | |
| Counter Credit | 05-09 | 4,913.28 |
| Wire Type:Book IN Date:130510 Time:0551 Et | 05-10 | 15,000.00 |
| Trn:2013051000061450 Seq:P43130001779/335620 | | |
| Orig:Raphael Vicky Mense Ttees ID:8U230355 Orig Bk | | |
| Merrill Lynch And Co., Inc. ID:Mlcous33 | | |
| SSA  Treas 310  Des:Xxsoc Sec  ID:Xxxxxxxxxa  SSA | 05-15 | 1,698.40 |
| Indn:Raphael Mense          Co ID:9031736026 Ppd | | |
| Counter Credit | 05-21 | 3,966.69 |
| Interest Earned | 05-24 | 1.06 |

**Total Deposits and Other Additions $45,579.43**

Combined Statement
Page 3 of 4
Statement Period
04-25-13 through 05-24-13
B 16 0 1 P P1 16          018192l

RAPHAEL MENSE
VICKY T MENSE

## Adv Tiered Interest Chkg Subtractions

| Check # | Posting Date | Amount($) | Check # | Posting Date | Amount($) | Check # | Posting Date | Amount($) |
|---------|--------------|-----------|---------|--------------|-----------|---------|--------------|-----------|
| 3157 | 04-25 | 4,890.14 | 3179 | 05-10 | 4,573.05 | 3193* | 05-22 | 112.50 |
| 3158 | 04-25 | 5,345.06 | 3180 | 05-13 | 202.75 | 6520* | 05-01 | 105.00 |
| 3166* | 04-25 | 277.01 | 3181 | 05-10 | 1,312.58 | 6521 | 05-06 | 100.00 |
| 3172* | 04-29 | 375.00 | 3182 | 05-14 | 37.20 | 6522 | 05-13 | 500.00 |
| 3175* | 04-29 | 1,885.26 | 3184** | 05-09 | 100.00 | 6525* | 05-13 | 155.47 |
| 3178* | 05-20 | 750.00 | 3185 | 05-24 | 55.29 | | | |

**Total Checks Posted $20,976.31**

* Gap in sequential check numbers

| Other Subtractions | | Date Posted | Amount($) |
|--------------------|--|-------------|-----------|
| Jhusa          Des:Payments   ID:107094012499 | | 04-29 | 135.00 |
| Indn:Vicky Mense          Co ID:6779361019 Ppd | | | |
| Bel Air Ridge    Des:Hoa Dues   ID:Mense | | 05-06 | 375.00 |
| Indn:Raphael Mense          Co ID:1953151447 Ppd | | | |
| Anthem Bluecross Des:Blue Cross ID:06Be00833A75768 | | 05-07 | 979.00 |
| Indn:Vicky Mense          Co ID:9618841002 Ppd | | | |
| One Las Vegas Ho Des:Dir Debit ID: Onla0001 1815 | | 05-08 | 580.28 |
| Indn:02Mense, Raphael          Co ID:1262230147 Ppd | | | |
| The Gas Company  Des:Simplepay   ID:1200014200780061 | | 05-20 | 67.66 |
| Indn:Mense Raphael          Co ID:8881052494 Ppd | | | |

**Total Other Subtractions $2,336.94**

## Daily Balance Summary

| Date | Balance($) | Date | Balance($) | Date | Balance($) |
|------|------------|------|------------|------|------------|
| Beginning | 58,764.64 | 05-08 | 63,517.89 | 05-20 | 77,230.86 |
| 04-25 | 48,252.43 | 05-09 | 68,331.17 | 05-21 | 81,197.55 |
| 04-29 | 45,657.17 | 05-10 | 77,445.54 | 05-22 | 81,085.05 |
| 05-01 | 45,552.17 | 05-13 | 76,387.32 | 05-24 | 81,030.82 |
| 05-06 | 65,077.17 | 05-14 | 76,350.12 | | |
| 05-07 | 64,098.17 | 05-15 | 78,048.52 | | |

# SCHEDULE OF REAL ESTATE OWNED

Borrower: Raphael & Vicky Mense July 2013

Proposed status changes in the near future (sale, exchange, rental composition, etc.) should be described in remarks

| # | Property Address / Status | Property Type | % of Owrshp | Acq. Date / Cost | Market Value | Mortgage Liens | Total Monthly Rents | Monthly Mtg. Pmt | Monthly Taxes, Ins. Maintenance | Net Rental Income |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 505 Hayworth, Los Angeles CA 90048 — 505 N HAYWORTH, LLC — Owner Occupied / Rental / Pending Sale / Sold | Duplex | 50% | Date Dec-07 / Cost $750,000 | $750,000 | 1st $533,850 / 2nd $141,000 | $ 4,900 | $3,700 | $1,000 | 200 |
| 2 | 1013 Genesee, West Hollywood CA 90046 — Taylor Trust/ Mense Trust — Owner Occupied / Rental / Pending Sale / Sold | SFR Rental | 50% | Date Dec-10 / Cost $615,000 | $700,000 | 1st $465,000 | $ 3,300 | $2,365 | $800 | 135 |
| 3 | 815 W Rialto Ave, San Bernardino CA — NESS HOLDINGS, LLC — Owner Occupied / Rental / Pending Sale / Sold | Industrial Single Tenant | 20% | Date Nov-07 / Cost $1,600,000 | $1,000,000 | 1st $940,000 | $ 4,681 | $6,533 | $2,000 | -3852 |
| 4 | 1020 N Ogden Dr, West Hollywood CA 90046 — Taylor Trust/ Mense Trust — Owner Occupied / Rental / Pending Sale / Sold | SFR | 50% | Date May-11 / Cost $645,000 | $700,000 | 1st $465,000 | $ 3,215 | $2,415 | $800 | 0 |
| 5 | 1006 -1008 Ogden Dr, West Hollywood CA 90046 — Taylor Trust/ Mense Trust — Owner Occupied / Rental / Pending Sale / Sold | Duplex | 50% | Date Jun-11 / Cost $665,000 | $700,000 | 1st $465,000 | $ 4,560 | $2,415 | $800 | $1,345 |
| 6 | 1016 Ogden Dr, West Hollywood CA 90046 — Taylor Trust/ Mense Trust — Owner Occupied / Rental / Pending Sale / Sold | SFR | 50% | Date Oct '11 / Cost $630,000 | $700,000 | 1st $492,000 | $ 3,050 | $2,050 | $800 | 200 |

| # | Property | Type | % | Date | Value | 1st/2nd | | Monthly | | |
|---|----------|------|---|------|-------|---------|--|---------|--|--|
| 7 | 7164 - 7168 Melrose Ave<br>Los Angeles CA 90046<br>Taylor Trust/ Mense Trust<br>Owner Occupied / Rental<br>Pending Sale / Sold | Mixed Use<br>Retail/Office | 50% | Date<br>Nov-10<br><br>Cost<br>$2,200,000 | $2,200,00 | 1st<br>$1,900,000<br><br>2nd | $ 4,716 | $11,720 | $2,500 | 496 |
| 8 | 1 Las Vegas<br>Las Vegas NV<br>Taylor Trust/ Mense Trust<br>Owner Occupied / Rental<br>Pending Sale / Sold | Condo | 100% | Date<br>Nov-09<br><br>Cost<br>$550,000 | $250,000 | 1st<br>$380,000<br><br>2nd | $ 1,650 | $1,850 | $800 | -1000 |
| 9 | 10146 Baywood Court<br>Los Angeles CA 90077<br>Taylor Trust/ Mense Trust<br>X Owner Occupied / Rental<br>Pending Sale / Sold | Primary<br>Residence | 100% | Date<br>Jan-85<br><br>Cost<br>$900,000 | $2,500,000 | 1st<br>$600,000<br><br>2nd | | $4,200 | $2,500 | -6,700 |

**TOTALS**

MY SHARE
MONTHLY CASH FLOW        -8488

TOTAL DEBT            3,398,925

PORTFOLIO VALUE       5,825,000

NET WORTH            2,426,075



**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

# Portfolio Review

Prepared exclusively for:

## MENSE, RAPHAEL

June 13, 2013



The Merrill Lynch Wealth Management Process

The Wealth Management Process offers brokerage advice as part of the "Merrill Lynch Wealth Management" offering of financial services. This analysis is one of the brokerage reports available through the Wealth Management Process. It provides you with a detailed review of your investment strategy, including current financial positions, asset allocation and investment performance. In conjunction with a financial advisor's advice, this report can help you make informed investment decisions in order to reach your financial objectives. Merrill Lynch offers brokerage, investment advisory and other services. For more information about any of these services and their differences, including the type of advice and assistance offered, see your Financial Advisor.

# Table of Contents



**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

1.  Account List
2.  Balances



Reviewing your investment strategy is an important part of managing, building and preserving your wealth. Our review focuses on your current financial position, asset allocation and investment performance to determine progress toward your specified goals, and assist you in making adjustments to your financial strategy if needed.

# Account List

**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

As of Close of Business: 06/12/2013

**Merrill Lynch**

| Account Number/NickName | Account Title | Credit Type | Account Registration | Market Value($) | % of Total |
|---|---|---|---|---|---|
| XXX-XX354 | | Cash | CMA Pledged | 6,988,501 | 99.84 |
| | Service Type: Merrill Lynch Personal Advisor | | | | |
| XXX-XX355 | | Cash | CMA Pledged | 9,794 | 0.14 |
| XXX-XX713 "CONSTRUCTION ACCOUNT" | | Cash | CMA | 925 | 0.01 |
| **Total** | | | | **6,999,220** | **100** |

**Credit and Loans**

| Account Number | Account Title | Balance As Of | Credit Type | Account Registration | Ownership | Outstanding Balance($) |
|---|---|---|---|---|---|---|
| XXX-XX110 | | | Cash | LMA | LIV TST | 1,948,208.00 |
| **Total** | | | | | | **1,948,208.00** |

Unless otherwise indicated, investment accounts are held at Merrill Lynch, Pierce, Fenner & Smith Incorporated, Member SIPC. Bank deposits are held at the Bank of America, N.A. and affiliated banks or other depository institutions and are covered by FDIC insurance up to applicable limits. Bank deposits are not protected by SIPC.

Banking products are provided by Bank of America, N.A. and affiliated banks, Members FDIC and wholly owned subsidiaries of Bank of America Corporation.

Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith Incorporated (MLPF&S) and other subsidiaries of Bank of America Corporation("BAC").

Trust and fiduciary services are provided by Merrill Lynch Trust Company, a division of Bank of America, N.A., Member FDIC. Insurance and annuity products are offered through Merrill Lynch Life Agency Inc., a licensed insurance agency.

Investment products, insurance and annuity products:

| Are Not FDIC Insured | Are Not Bank or State Guaranteed | May Lose Value |
|---|---|---|
| Are Not Deposits | Are Not Insured by Any Federal Government Agency | Are Not a Condition to Any Banking Service or Activity |

MLPF&S, Bank of America, N.A., and Merrill Lynch Life Agency Inc. are wholly owned subsidiaries of BAC. MLPF&S is a registered broker-dealer, Member SIPC and wholly owned subsidiary of BAC.

MLPF&S makes available investment products sponsored, managed, distributed or provided by companies that are affiliates of BAC or in which BAC has a substantial economic interest, including BofA™ Global Capital Management.

©2013 Bank of America Corporation. All rights reserved.

Loan Management Accounts® (LMA® accounts) are demand lines of credit provided by Bank of America, N.A. secured by eligible Merrill Lynch brokerage accounts and are displayed under Merrill Lynch for your convenience. Please refer to "Important Information About this Report" for more information.

All reports other than the Balances Report contain brokerage account information only.

Report created June 13, 2013
for MENSE, RAPHAEL

# Balances

**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

As of Close of Business: 06/12/2013

## Merrill Lynch

| Account | Account Registration | Cash Balance($) | Money Accounts($) | Priced Investments($) | Margin Balance($) | Market Value($) |
|---|---|---|---|---|---|---|
| XXX-XX354 ▉ | CMA Pledged | 0.71 | 46,418.00 | 6,942,082.08 | 0.00 | 6,988,500.79 |
| XXX-XX355 ▉ | CMA Pledged | 0.93 | 9,793.00 | 0.00 | 0.00 | 9,793.93 |
| XXX-XX713 "CONSTRUCTION ACCOUNT" | CMA | 0.02 | 925.00 | 0.00 | 0.00 | 925.02 |
| **Total** | | **1.66** | **57,136.00** | **6,942,082.08** | **0.00** | **6,999,219.74** |

## Credit and Loans

| Account Number | Account Registration | As of Date | Cash Balance($) | Outstanding Balance($) | Credit Available($) |
|---|---|---|---|---|---|
| XXX-XX110 | LMA | 06/12/2013 | 632.33 | 1,948,208.00 | 2,530,628.22 |
| **Total** | | | **--** | **1,948,208.00** | **2,530,628.22** |

Loan Management Accounts® (LMA® accounts) are demand lines of credit provided by Bank of America, N.A. secured by eligible Merrill Lynch brokerage accounts and are displayed under Merrill Lynch for your convenience. Please refer to "Important Information About this Report" for more information.

Insurance Cash Values and Annuity Contract Values (if applicable) are used to calculate Total Portfolio Value. These values are as of Close of Business one business day prior to the 'as of' date shown above. Insurance Cash Values may not reflect immediately available funds due to loan balances and/or policy charges. Annuity Contract Values may not reflect immediately available funds due to contract charges. Annuities and life insurance products are not held in your account. Their values are listed here for your convenience.

**Accounts included in this report:** Please refer to the Account List for accounts included in this report.

Report created June 13, 2013
for MENSE, RAPHAEL

For Informational Purposes Only - Account Statement is Official Record of Holdings, Balances and Security Values

Page 3

# Important Information About This Report



Bank of America Corporation

---

Unless otherwise indicated, investment accounts are held at Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), Member SIPC. Bank deposits are held at Bank of America, N.A. ("BANA") and affiliated banks or other depository institutions and are covered by FDIC insurance up to applicable limits. Bank deposits are not protected by SIPC. When assets held in non-Merrill Lynch accounts are recognized ("External Assets"), the price is as of the "Close of Business" date shown. You have identified a value for all or a portion of these non-Merrill Lynch accounts. Be sure to periodically review these accounts with your Financial Advisor, and advise if there have been any changes to the account's holdings or value.

Banking, Credit and Loan information is listed on the Balances and Account List reports and is for information purposes only. All other reports reflect brokerage assets; banking, credit and loan assets are not included in any other reports.

The Loan Management Account® (LMA® account) is a demand line of credit provided by Bank of America, N.A., Member FDIC. Equal Opportunity Lender. The LMA account requires a brokerage account at Merrill Lynch, Pierce, Fenner & Smith Incorporated and sufficient eligible collateral to support the loan. All securities are subject to credit approval. Securities-based financing involves special risks and is not for everyone. When considering a securities-based loan, consideration should be given to individual requirements, portfolio composition and risk tolerance, as well as capital gains, portfolio performance expectations and investment time horizon. A complete description of the loan terms can be found within the LMA agreement. For detailed information, please refer to your loan account statements. Loan Management Account and LMA are registered trademarks of Bank of America Corporation.

This Report is designed to assist you in the evaluation of your account(s). In combination with the ongoing advice and guidance of your Merrill Lynch Financial Advisor, the Report helps you in the portfolio review phase of the Wealth Management Process. Please contact your Financial Advisor if you have any questions regarding the information contained in the Report. This Report provides important information about your account(s), market indices, goals and risk level. The return information for the account(s), market indices and return comparison charts reflect time-weighted rates of return unless the returns are labeled "money weighted rates of return". Time-weighted rates of return should be used to judge the performance of the selected investment manager(s) and the money weighted rate of return should be used to assess overall growth and accumulation of wealth. Both return calculations reflect transaction costs, market appreciation or depreciation and the reinvestment of capital gains, dividends, interest and other income. Partial Month index returns are not available. The treatment of fees is discussed below.

For investment advisory account programs (including Unified Managed Account ("UMA"), Consults, Mutual Fund Advisor ("MFA"), Merrill Lynch Personal Advisor ("MLPA"), Strategic Portfolio Advisor ("SPA"), Personal Investment Advisory ("PIA") and BlackRock Private Investors ("BlackRock"), client agreements, disclosure statements, and profiles (if applicable) can provide additional information about these programs, including applicable fees, restrictions and other terms. Merrill Lynch is both a broker-dealer and an investment adviser, and it offers both brokerage and investment advisory services. There are important differences between these services, including the type of advice and assistance provided, the fees charged, and the rights and obligations of the parties. Brokerage services are also regulated under different laws and rules than advisory services. It is important for you to understand these differences, particularly when determining which service or investments you might select.

## Pricing of Securities

Pricing of securities is provided for your information. Your Account Statement is your official record of holdings, balances and security values. Unless otherwise indicated, values reflect current information as of the "Close of Business" date shown at the top of each report. External Account holdings that are not recognized by Merrill Lynch, and all External Account Proxies indicate a value you have provided. Please review these holdings and values with your Financial Advisor on a regular basis. Annuities and life insurance products are not held in your account. Their values are listed in the reports for your convenience. Life Insurance Cash Values and Annuity Contract Values are used to calculate Total Portfolio Value. These values are as of "close of one business" day prior to the "as of" date shown. Cash Values may not reflect immediately available funds due to loan balances and/or policy changes. Annuity Contract Values may not reflect immediately available funds due to contract charges. Reports using time periods prior to and including April 30, 2011 will not reflect accrued interest in market

values displayed in allocation and position exhibits. For reports using data after May 6, 2011, all market values include accrued interest, unless otherwise indicated.

## Performance

Account values, cash flows and returns may differ from other sources due to differing methods of pricing, accounting or calculation. This Report is prepared on a trade date basis using accrued income when sufficient data is available and thus will differ from a report prepared on a settlement date basis (e.g., your Merrill Lynch account statement). From time to time, asset valuation or transaction data may be adjusted, which in turn may impact the portfolio performance calculations and other information shown in the report. In addition, if your account(s) holds "when issued securities," which are not valued by Merrill Lynch until the settlement date, your asset allocation may not be accurately reflected.

Account returns presented "Net of Fees" reflect the deduction of account fees, including advisory fees and transaction costs. Account returns presented "Gross of Fees" are shown before the deduction of advisory fees where applicable in order to make them comparable to the returns of the market indices. Account returns are presented "Net of Fees" unless noted as "Gross of Fees." Market indices or other benchmark returns are shown for comparison purposes only, and there is no assurance or guarantee that such performance will be achieved. Depending on how account fees are paid (see below), the account returns may be shown after the deduction of fees for certain periods. When the fee is deducted directly from this account(s), information will be shown before and after the deduction of fees. When the fee is deducted directly from another account(s), information will be shown before the deduction of fees. When the fee is paid via invoice:
- For periods prior to September 1998, information will be shown before the deduction of fees.
- For periods after September 1998, information will be shown both before and after the deduction of fees.

It is very important that you provide Merrill Lynch with current information regarding the management of your account(s). We encourage you to contact your Financial Advisor(s) if there have been any changes in your financial situation or investment objectives, or if you wish to impose any reasonable restrictions on the management of your account(s) or reasonably modify existing restrictions. If you are enrolled in a dual-contract investment advisory program where you separately contract with a third-party investment manager, it is also important to notify your investment manager with respect to any changes in your financial situation, investment objectives and/or restrictions. If you would like to receive a free copy of the current Form ADV Brochure(s) for the investment advisory program(s) in which your account(s) is enrolled, please send a written request with your account number(s) to: Managed Accounts Processing and Services, 4800 Deer Lake Drive West, Building 1, 3rd Fl., Jacksonville, FL 32246. You may also obtain a copy of the various Merrill Lynch advisory program brochures by accessing the Securities and Exchange Commission ("SEC") website at www.adviserinfo.sec.gov.

The valuation of hedge funds is prepared based upon information from third party sources. The information has not been verified and cannot be guaranteed. This data may include estimates and is subject to revision.

If an account has been managed by more than one manager, the manager name in the Report reflects the current manager. However, return and standard deviation information may be calculated using the entire history of each account. This Report may also include information for account(s) that are not managed by an investment manager (i.e., where you make the investment decisions).

## Classification of Securities

For Asset Class, Sector or Size and Style Analysis reports, securities are generally classified by asset class, sector, size and style and, for Fixed Income, maturity.
- For Size and Style, security classification is as follows: a capitalization breakpoint of $12.91 billion defines the size (Large Cap or Small/Mid Cap) classification for domestic equity securities. The style (Growth or Value) for these securities is defined by a proprietary procedure which utilizes a series of quantitative and qualitative metrics (e.g., expected earnings growth, analyst coverage, etc.).
- For Sector, security classifications are based on Global Industry Classification Standard ("GICS"). Source: Morgan Stanley Capital International ("MSCI") and Standard & Poor's ("S&P"), a division of the McGraw Hill Companies, Inc.
- For fixed income, maturity breakpoints are as follows: Short-Term: 0-5 years, Intermediate-Term: 5-15 years, Long-Term greater than 15 years.

---

**Accounts included in this report:** Please refer to the Account List for accounts included in this report.

# Important Information About This Report



**Merrill Lynch**
**Wealth Management**
Bank of America Corporation

- For Region, security classifications are based on country of domicile and mapped to Merrill Lynch's RIC (Research Investment Committee) global regions.
- Convertible securities and options are classified as Equities. Preferred stock is classified as Fixed Income. Life Insurance products are classified as Other.
- External Accounts and External Accounts Proxy where available, by asset class, sector, size and style and maturity. If a classification is not available, the External Account or External Account Proxy is classified as Other.
- Classification details for mutual funds, closed end funds, certain managed accounts, annuities and External Account Proxies are identified in "Details for Managed Assets and Pooled Investments" ("Details Section").
- When available, Market-Linked Investments are classified by the reference security associated with that market-linked investment for asset class, sector, size and style or maturity. The reference security may be an individual security, index or other investment such as a mutual fund or exchange traded fund.
- For mutual funds, exchange traded funds, closed end funds and the investment options of underlying annuities, the fund may be shown by holdings or, optionally, by profile (fund objective). When shown by holdings, the fund is classified by the asset class, sector, size and style or maturity breakdown of those holdings. When shown by profile, the fund is classified by the asset class, sector, or size and style provided by vendors and mapped to Merrill Lynch's RIC (Research Investment Committee) allocation schema in order to report the industry's or Merrill Lynch's interpretation of the objective of the fund/pooled investment vehicle. Note that the data used for this classification is obtained from a variety of sources and may not be current (see "Data As Of" date shown in the Details Section for the date the portfolio holdings were reported by the fund). Mutual funds, exchange traded funds, closed end funds and the investment options of underlying annuities may change their portfolio holdings on a regular (often daily) basis. Accordingly, any analysis that includes mutual funds, exchange traded funds, closed end funds, and the investment options of underlying annuities may not accurately reflect the current composition of these funds. The classification of these securities may differ from other sources due to differing methods of classification (e.g. shown and classified by holdings versus by profile). As such, this Report may differ from other reports (e.g., your Merrill Lynch account statement, in which these funds are always shown by profile) depending on whether the funds are shown by holdings or by profile in this Report. In particular, Non-Traditional Funds (NTFs), mutual funds and exchange traded funds that pursue alternative strategies or provide alternative asset exposure, may be classified as alternative investments when shown by profile, but when shown by holdings, the NTF will be classified by the asset class, sector, size and style or maturity breakdown of its holdings, which may reflect no allocation to alternative investments.
- If the holdings or profile data for mutual funds, exchange traded funds, or closed end funds is not available, the fund is classified by its predominant asset class ("Data As Of" date shown as "N/A" in the Details Section). If the holdings or profile data for the investment options of underlying annuities is not available, fixed annuities and market value adjusted annuities are classified as Fixed Income and variable annuities are classified as Equities. Note that annuities and life insurance products are not held in your account but are included here for your information.
- The Details Section may also provide summary information regarding accounts enrolled in managed account programs such as Consults, BlackRock Private Investors and MFA (i.e., classification detail for the managed account is not based on your actual holdings but on the investment style that has been identified for the specific investment manager/style. Your Financial Advisor can also provide a report based upon the account's actual holdings.
- "External Account Proxy" are External Accounts that you have generally identified in the aggregate and not by specific holdings. Be sure to periodically review these accounts with your Financial Advisor and advise if there have been any changes to the holdings in or value of these Accounts.

If "Portfolio Detail" reports are included, the value shown for mutual funds, exchange traded funds, closed end funds and the investment options of underlying variable annuities is the proportionate dollar value of a fund's holdings, as classified by asset class, sector, size and style or maturity, respectively.

## Asset Allocation Models
Where a Merrill Lynch asset allocation model is presented, it is an allocation model developed by the investment strategy group in BofA Merrill Lynch Global Research and the Investment Management & Guidance Group for Merrill Lynch Global Wealth Management use with clients. These models represent asset allocation approaches based on a client's profile and investment objectives and are subject to change as market conditions change in the future. In addition, Merrill Lynch asset allocation models including alternative investments consider liquidity needs as an important factor in the formation of an asset allocation strategy. Liquidity refers to the ability or timeliness with which assets can be converted into cash. Depending on your personal financial needs and objectives, it is important to consider whether you may need to sell investments to raise cash over varying time horizons.

Alternatively, your Financial Advisor may have customized an asset allocation for your specific situation. Regularly review your asset allocation with your Financial Advisor. Asset Allocation does not assure a profit or protect against a loss in declining markets. Asset allocation cannot eliminate the risk of fluctuating prices and uncertain returns.

### The Merrill Lynch Personal Advisor (MLPA) Program
The MLPA program is a non-discretionary investment advisory and brokerage program in which your Financial Advisor will provide ongoing advice and guidance regarding your account's investment objective, asset allocation and investment guidelines, including individual security recommendations consistent with the program's investment policies. The MLPA program also provides monitoring relating to your account's investment objective, asset allocation, investment guidelines, the program's investment policies and your reasonable investment restrictions, if any. Please see the MLPA Client Agreement & MLPA Disclosure Statement for further information.

Merrill Lynch is both a broker-dealer and an investment adviser, and it offers both brokerage and investment advisory services. This report is part of an investment advisory service. There are important differences between brokerage and advisory services, including the type of advice and assistance provided, the fees charged, and the rights and obligations of the parties. Brokerage services are also regulated under different laws and rules than advisory services.

Among its many obligations as a broker dealer, Merrill Lynch will execute transactions upon your instruction, deal fairly with you, and make recommendations that are suitable in light of your stated overall risk tolerance, financial needs and investment objectives. As an investment adviser, Merrill Lynch must act solely in your best interest, provide certain specific disclosures and generally act in accordance with the standards of a fiduciary as that term is interpreted under applicable law.

Of course, the above is an exceedingly brief summary, and numerous laws and regulations apply to each capacity as well as to the specific products or services being provided. It is important for you to understand these differences, particularly when determining which service or services you might select. Your Financial Advisor can provide you with additional information.

It is important for you to understand that this report is not a comprehensive financial plan. If you are interested in a formal analysis of your entire financial situation, ask your Financial Advisor about Merrill Lynch's financial planning services, including the fees that may be applicable.

### Tax Considerations
Any information presented about tax considerations affecting client financial transactions or arrangements is not intended as tax advice and should not be relied upon for the purpose of avoiding any tax penalties. Neither Merrill Lynch nor its Financial Advisors provide tax, accounting or legal advice. Clients should review any planned financial transactions or arrangements that may have tax, accounting or legal implications with their personal professional advisors.

### Glossary of Selected Terms
**Alternative Investments:** Investments whose risks and returns are generally not correlated with more traditional investments (i.e. equities, fixed income and cash) which can include Managed Futures, Hedge Funds, Private Equities, income producing Real Estate, Precious Metals, Non-Traditional Funds (which are mutual funds and exchange-traded funds that are classified as alternative investments because their principal investment strategies utilize alternative investment strategies or provide for alternative asset exposure as the means to meet their investment objectives) and Market-Linked Investments. Alternative investments should be carefully considered based on an investor's investment objectives, risk tolerance, time horizon, liquidity needs and net worth. Some alternative investments, such as hedge funds and private equities, require a net worth of $5 million or more and are often long-term, illiquid investments that are not easily valued.

---

**Accounts included in this report:** Please refer to the Account List for accounts included in this report.

Report created June 13, 2013
for MENSE, RAPHAEL

For Informational Purposes Only - Account Statement is Official Record of Holdings, Balances and Security Values

Page 5

# Important Information About This Report



**Merrill Lynch**
**Wealth Management**

Bank of America Corporation

**Cash:** Refers to the positive number resulting from the aggregation of each account's Cash, short positions and margin balance. Where multiple accounts are included in the analysis, both Cash and Net Debit Balance may be reflected.

**Managed Assets Short Allocations:** When a managed asset has a negative allocation in one or more of its asset categories.

**Margin Balance:** A balance represents either a debit balance (the amount owed to Merrill Lynch as a result of such transactions as trade commitments or Visa charges) or a credit balance (the amount held in your account after all trade commitments or Visa charges have been paid in full).

**Net Debit Balance:** Refers to the negative number resulting from the aggregation of each account's Cash, short positions and margin balance. Where multiple accounts are included in the analysis, both Cash and Net Debit Balance may be reflected.

**Short Position:** When an investor sells a borrowed security in anticipation of a price decline or to protect profit in a long position. This activity involves risk because an increase in the price of the stock will result in the investor having to cover the position by, among other things, selling securities or depositing additional funds. Investors should fully understand these risks. Note that short positions are included as part of the Cash calculation. Where a Net Debit Balance exists, the Short Position value is shown. Your Financial Advisor can provide additional detail regarding short positions in your account.

©2013 Bank of America Corporation. All rights reserved.

**Accounts included in this report:** Please refer to the Account List for accounts included in this report.

Report created June 13, 2013
for MENSE, RAPHAEL

For Informational Purposes Only - Account Statement is Official Record of Holdings, Balances and Security Values

Page 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "2"

[Cottonsmith's Balance Sheet As Of August 31, 2013]

11:03 AM
10/16/13
Accrual Basis

Greensmith, LLC
**Balance Sheet**
As of August 31, 2013

|  | Aug 31, 13 |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Checking/Savings** | |
| 10185 · Cash - Checking- IDB | 609,358.46 |
| 10275 · Special - Time deposit Account | 961,847.07 |
| **Total Checking/Savings** | 1,571,205.53 |
| | |
| **Other Current Assets** | |
| 14000 · Prepaid Expenses | 1,366.00 |
| **Total Other Current Assets** | 1,366.00 |
| | |
| **Total Current Assets** | 1,572,571.53 |
| | |
| **Fixed Assets** | |
| 15000 · Machinery & Equipment | 3,956.54 |
| 15025 · Furniture & Fixtures | 9,416.34 |
| 15205 · L/H Imprv.- R. Mense Home off. | 38,394.54 |
| 15300 · Computers | 13,015.53 |
| 16000 · Accum Deprec - Furn & Fixtures | -9,416.34 |
| 16150 · Accum Deprec - Mach. & Equip. | -3,956.54 |
| 16205 · Acc. Amr. - L/H R. Mense home | -38,394.54 |
| 16300 · Accum Deprec - Computers | -13,015.53 |
| **Total Fixed Assets** | 0.00 |
| | |
| **TOTAL ASSETS** | **1,572,571.53** |
| | |
| **LIABILITIES & EQUITY** | |
| **Equity** | |
| 39005 · Retained Earnings | 7,476,441.37 |
| 39006 · Capital Contributions | 400,000.00 |
| 39007 · Distribution to partners | -6,541,014.03 |
| 39008 · Additional Capital Contrib. | 179,103.18 |
| Net Income | 58,041.01 |
| **Total Equity** | 1,572,571.53 |
| | |
| **TOTAL LIABILITIES & EQUITY** | **1,572,571.53** |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **EXHIBIT "3"**

[Cottonsmith's 7-Day Package]

Attorney or Party Name, Address, Telephone and FAX

Douglas M. Neistat (SBN 55961)
Greenberg & Bass, LLP
16000 Ventura Blvd., Ste 1000
Encino, CA 91436
(818) 382-6200
(818) 986-6534 Fax

☐ Pro Se Debtor

| OFFICE OF THE UNITED STATES TRUSTEE<br>LOS ANGELES DIVISION | SUBMIT TO UNITED STATES<br>TRUSTEE - Do not file with the Court |
|---|---|
| In Re:<br><br>**Cottonsmith, LLC**<br><br><br><br>Debtor-In-Possession | Case Number: **2:14-bk-11194-PC**<br><br>**Attorney's 7 Day Package Checklist**<br><br>☐ Check this box to indicate that this checklist amends or supplements a previously filed checklist<br>Amendment No. _____ |

**You must attach each of the following documents or a satisfactory explanation of your failure to attach a document. Failure to submit these documents in a timely fashion may result in a motion to convert or dismiss the case. The submission of documents that are incomplete or not prepared in accordance with UTSP guidelines and requirements will be treated as a failure to submit.**

| Document Attached | Previously Submitted | Explanation Attached | REQUIRED DOCUMENTS |
|---|---|---|---|
| X | | | 1.  Declaration of Debtor Regarding Compliance with UST Guidelines and Requirements for Chapter 11 Debtors in Possession |
| N/A | | | 1.1.    Real Property |
| X | | | 1.2.    Bank Account Information |
| N/A | | | 1.3.    Insurance Coverage |
| N/A | | | 1.4.    Proof of Required Certificates and Licenses |
| X | | | 1.5.    List of Insiders |
| N/A | | | 1.6.    Financial Statements |
| N/A | | | 1.7.    Health Care Business |
| N/A | | | 1.8.    Trust Agreements |
| N/A | | | 1.9.    Recordation of Chapter 11 Petition |
| X | | | 1.10.   Federal and State Tax Returns |
| N/A | | | 1.11.   Employee Benefit Plans |
| *TO BE PROVIDED* | | | 2.  Projected cash flow statement for the first ninety (90) days from the initial filing date |
| X | | | 3.  Statement of Major Issues and Timetable Report |

■ I have read and understood the Guidelines and Requirements for Chapter 11 Debtors In Possession.

Dated: _1/31/2014_

**Greenberg & Bass, LLP**
Law Firm Name

By: Douglas M. Neistat _[signature]_

Attorney for Debtor or Debtor In Pro Per

Dated: _____

I HEREBY APPROVE THE ATTACHED

*TO BE PROVIDED*
Signature of Debtor

**(Image of Original Signatures Required)**

In re Cottonsmith, LLC
Case No: 2:14-bk-11194-PC
7 Day Package

1.   **Declaration of Debtor Regarding Compliance with UST Guidelines and Requirements for Chapter 11 Debtors in Possession**

Attorney or Party Name, Address, Telephone and FAX

Douglas M. Neistat (SBN 55961)
Greenberg & Bass, LLP
16000 Ventura Blvd., Ste 1000
Encino, CA 91436
(818) 382-6200
(818) 986-6534 Fax

☐ Pro Se Debtor

| OFFICE OF THE UNITED STATES TRUSTEE<br>LOS ANGELES DIVISION | SUBMIT TO UNITED STATES TRUSTEE<br>– DO NOT FILE WITH COURT |
|---|---|
| In Re:<br><br>Cottonsmith, LLC<br><br><br>Debtor-In-Possession. | Case Number:<br>2:14-bk-11194-PC |
| | DECLARATION OF DEBTOR REGARDING<br>COMPLIANCE WITH UNITED STATES<br>TRUSTEE GUIDELINES AND<br>REQUIREMENTS FOR CHAPTER 11<br>DEBTORS IN POSSESSION |

**Privacy Policy [Privacy Act of 1974, as amended (5 U.S.C 552a) and LBR 1002-1(e)].**

*Declarant acknowledges that they have redacted all personally identifiable information contained in this declaration and its attachments and further acknowledges that is the responsibility of the filing party, not the United States Trustee Program, to ensure compliance with this policy.*

*(1)    All "personal identifiers" must be redacted from documents filed with the USTP, including attachments. "Personal identifiers" are considered to be the following:*

    *(A)    Social Security Numbers. If an individual's Social Security number (SSN), or Individual Tax Payer Identification Numbers (ITIN) must be included in the document, only the last four digits of that number should be used.*

    *(B)    Financial Account Numbers. Only the last four digits of these numbers should be used;*

    *(C)    Dates of Birth. If an individual's date of birth must be included in the document, only the year should be used; and*

    *(D)    Names of Minor Children. If the name of a minor child must be mentioned, only the initials of that child should be used.*

## 1.   REAL PROPERTY

1.1.    For each property that debtor owns, leases, has an interest in, or is in the process of purchasing, including debtor's personal residence, declarant has attached the following documentation:

**Check All That Apply:** None, the Debtor does not own or lease any real property

☐    1.1.1.    Debtor owns a personal residence.  A Real Property Questionnaire for Principal Residence (USTLA-5.1) is attached hereto.

☐    1.1.2.    Debtor owns, leases, has an interest in, or is in the process of purchasing a total of **four (4) or less** parcels of real property.  For each such property, declarant has attached a Real Property Questionnaire (USTLA-5.2).

☐    1.1.3.    Debtor owns, has an interest in, or is in the process of purchasing a total of **five (5) or more** parcels of real property.  Attached is an Owned Property Summary Sheet (USTLA-5.3) which identifies all such parcels of real property.

☐    1.1.4.    Debtor leases **five (5) or more** parcels of real property.  Attached is a Leased Properties Summary Sheet (USTLA-5.4).

| In Re: Cottonsmith, LLC | Case No.: |
|---|---|
| Debtor. | **2:14-bk-11194-PC** |

## 2. BANK ACCOUNT INFORMATION

2.1.  Debtor has closed all pre-petition bank accounts indicated below. For each account that is closed, Debtor has attached a copy of a bank statement evidencing that the account has been closed. For each account that has not been closed, debtor has provided a detailed explanation as to why each account has not been closed.

2.1.1.  Account Name:  To be provided
Depository: _____
Last 4 digits of Account Number: _____
Date of Closure: _____
Closing Balance: _____
Explanation if account has not been closed:
_____
_____

2.1.2.  Account Name: _____
Depository: _____
Last 4 digits of Account Number: _____
Date of Closure: _____
Closing Balance: _____
Explanation if account has not been closed:
_____
_____

2.1.3.  Account Name: _____
Depository: _____
Last 4 digits of Account Number: _____
Date of Closure: _____
Closing Balance: _____
Explanation if account has not been closed:
_____
_____
_____

☐  Additional sheets are attached hereto, marked Attachment 2.1, and incorporated herein by reference.

2.2.  All funds from the above-referenced pre-petition bank accounts were transferred to the following Chapter 11 debtor in possession bank accounts:

2.2.1.  Account Name:  Cottonsmith, LLC, Debtor-in-Possession, Checking Account
Depository:  Wells Fargo
Last 4 digits of Account Number:  2859
Opening Date:  1/24/14
Initial Deposit:  $500
The beginning balance of this account differs from the ending balance of the pre-petition account because:
In process, the managing member of the Debtor is currently out of the Country.

2

| In Re: Cottonsmith, LLC | Case No.: 2:14-bk-11194-PC |
|---|---|
| Debtor. | |

2.2.2.  Account Name: _____
Depository: _____
Last 4 digits of Account Number: _____
Opening Date: _____
Initial Deposit: _____
The beginning balance of this account differs from the ending balance of the pre-petition account because:

_____

2.2.3.  Account Name: _____
Depository: _____
Last 4 digits of Account Number: _____
Opening Date: _____
Initial Deposit: _____
The beginning balance of this account differs from the ending balance of the pre-petition account because:

_____

[ ]  Additional sheets are attached hereto, marked Attachment 2.2, and incorporated herein by reference.

## 3. **INSURANCE COVERAGE**

3.1.  Debtor will maintain appropriate insurance coverage for all estate property, including vacant land, throughout the pendency of this proceeding.

3.2.  Debtor has named the United States Trustee, 725 S. Figueroa Street, Suite 2600, Los Angeles, CA 90017, as an *additional interest party* on each and every insurance policy listed herein and any other policies, throughout the pendency of this proceeding.

3.3.  If, for any reason, an insurance policy shall lapse, not be renewed, or fails to be in full force and effect, debtor will *immediately* provide updated proof of insurance to the United States Trustee.

3.4.  The following policies are in effect as of the date of this declaration.

|  | Name of Insurance Carrier | Type of Insurance | Policy Number |
|---|---|---|---|
| 3.4.1. | None, Debtor is not currently operating | | |
| 3.4.2. | | | |
| 3.4.3. | | | |
| 3.4.4. | | | |

3.5.  *COPIES OF THE DECLARATION PAGE(S) for each policy listed herein are attached hereto as Attachment 3.5. Each declaration page(s) reflects (1) the name of insured, the additional interest party(ies), type and extent of coverage; policy expiration date; and the account or policy number (or other identifying information).*

| In Re: Cottonsmith, LLC | Case No.: 2:14-bk-11194-PC |
|---|---|
| Debtor. | |

### 4. PROOF OF REQUIRED CERTIFICATES AND LICENSES

4.1.    Debtor will maintain all appropriate certificates and licenses required by federal, state and local law for the lawful operation of debtor's business.

4.2.    The following certificates and licenses are in effect as of the date of this declaration:

| | Type of Certificate or License | Issuing Authority |
|---|---|---|
| 4.2.1. | None, Debtor is not currently operating | |
| 4.2.2. | | |
| 4.2.3. | | |
| 4.2.4. | | |

4.3.    *Attached hereto as Attachment 4 is a copy, or other proof, of each license or certificate listed above.*

### 5. LIST OF INSIDERS

The following constitutes a complete list of all insiders of the debtors, as that term is defined by 11 U.S.C. Section 101(31):

| | Name of Person | Relationship to Debtor |
|---|---|---|
| 5.1.1. | See Attached List | |
| 5.1.2. | | |
| 5.1.3. | | |

☑ Additional sheets are attached hereto, marked Attachment 5, and incorporated herein by reference.

### 6. FINANCIAL STATEMENTS

Debtor has the following financial statements that were issued in the two year period prior to the filing of this bankruptcy:

| | Audited | Unaudited |
|---|---|---|
| 6.1.1. | None, Debtor is not currently operating | |
| 6.1.2. | | |
| 6.1.3. | | |
| 6.1.4. | | |
| 6.1.5. | | |
| 6.1.6. | | |
| 6.1.7. | | |

☑ Debtor **HAS NOT** issued any financial statements in the two year period prior to the filing of this bankruptcy.

### 7. HEALTH CARE BUSINESS

☑ Debtor **IS NOT** a health care business as defined by 11 U.S.C. Section 101(27A).

☐ Debtor **IS** a health care business as defined by 11 U.S.C. Section 101(27A).

Effective September 1, 2011

*USTLA-3*

| In Re: Cottonsmith, LLC | Case No.: 2:14-bk-11194-PC |
|---|---|
| Debtor. | |

## 8. TRUST AGREEMENTS

☑ Debtor **IS NOT** a party to a trust agreement or a beneficiary under a trust agreement that holds property.

☐ Debtor **IS** a party to a trust agreement, or is a beneficiary under a trust agreement that holds property. Copies of all such trust agreements are attached hereto as Attachment 8.

## 9. RECORDATION OF CHAPTER 11 PETITION

☑ Debtor **DOES NOT** hold an interest in real property.

☐ Debtor **HAS** recorded a copy of the Chapter 11 petition in all counties in which it holds an interest in real property. Copies (or conformed copies) of each recorded petition are attached hereto as Attachment 9.

☐ Debtor has not been able to fulfill this requirement because:

_____

_____

## 10. FEDERAL AND STATE TAX RETURNS

Debtor has filed the following tax returns (list last two years for which returns have been filed). ***Copies will be provided at the Initial Debtor Interview.***

| Tax Year | Form Number and Name of Return *(i.e., 1040, Individual Income Tax Return)* | Taxing Agency's Name *(i.e., IRS)* |
|---|---|---|
| 2012 | 1065 | IRS |
| 2012 | 568 | FTB |
| 2011 | 1065 | IRS |
| 2011 | 568 | FTB |

☐ Current tax returns have not been filed because:

_____

_____

_____

## 11. EMPLOYEE BENEFIT PLANS

Attached hereto and marked Attachment 11 is a fully executed Employee Benefit Plan Questionnaire.

☑ **BUSINESS ENTITIES:** I, am the authorized agent of the debtor named in this case, declare under penalty of perjury that I have read the foregoing Declaration, and the information provided is true and correct to the best of my knowledge, information, and belief. I further declare that I have been authorized to file this declaration on behalf of the debtor.

DATED: _____    _____
                                   Signature of Authorized Individual
                                   **Rafi Mense, Managing Member**

                                   _____
                                   Printed Name of Authorized Individual

5

In re Cottonsmith, LLC
Case No: 2:14-bk-11194-PC
7 Day Package

## Attachment 2.2

Attached please find proof of establishment of DIP account along with
the signature card.  A copy of the voided check will be provided as soon
as checks are received.

# Business Account Application



| Bank Name: | | Store Name: | |
|---|---|---|---|
| WELLS FARGO BANK, N.A. | | BEVERLY HILLS | |

| Banker Name: | | Officer/Portfolio Number: | Date: |
|---|---|---|---|
| MIHAIL NAUMOVSKI | | B4467 | 01/24/2014 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 310/550-7183 | 04418 | 0000645 | E2102-011 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

[X] New Deposit Account(s) Only        [ ] New Deposit Account(s) and Business Credit Card

Account 1 Product Name:

Platinum Business Services Package

| COID: | Product: | Account Number: | Opening Deposit: | Type of Funds: |
|---|---|---|---|---|
| 114 | DDA | ███5595 | $500.00 | CKS |

New Account Kit:

B20131007-0000022859

## Related Customer Information

| Customer 1 Name: | Account Relationship: |
|---|---|
| COTTONSMITH, LLC | Sole Owner |

Enterprise Customer Number (ECN):

324573441751316

| Customer 2 Name: | Account Relationship: |
|---|---|
| RAPHAEL MENSE | Signer |

Enterprise Customer Number (ECN):

136023941726516



2W02-000623304606-01

Business Account Application

## Checking/Savings Statement Mailing Information

| Name(s) and Information Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| COTTONSMITH, LLC | 6380 WILSHIRE BLVD | |
| | Address Line 2: | |
| DEBTOR IN POSSESSION | SUITE 1020 | |
| | City: | State: |
| CH11 CASE 14-11194(CCA) | LOS ANGELES | CA |
| | ZIP/Postal Code: | Country: |
| | 90048-5003 | US |

## Customer 1 Information

| Customer Name: | | | Street Address: | |
|---|---|---|---|---|
| COTTONSMITH, LLC | | | 6380 WILSHIRE BLVD | |
| Account Relationship: | | | Address Line 2: | |
| Sole Owner | | | SUITE 1020 | |
| Taxpayer Identification Number (TIN): | TIN Type: | | Address Line 3: | |
| 95-4840014 | EIN | | | |
| Business Type: | | | City: | State: |
| Limited Liability Company | | | LOS ANGELES | CA |
| Business Sub-Type/Tax Classification: | | Non-Profit: | ZIP/Postal Code: | Country: |
| | | No | 90048-5003 | US |
| Date Originally Established: | Current Ownership Since: | Number of Employees: | Business Phone: | Fax: |
| 01/18/2000 | | 1 | 310/528-3161 | |
| Annual Gross Sales: | Year Sales Reported: | Fiscal Year End: | Cellular Phone: | Pager: |
| $1,200,000.00 | 01/01/2010 | | 310/273-6886 | |
| Primary Financial Institution: | Number of Locations: | | e-Mail Address: | |
| | 1 | | | |
| Primary State 1: | Primary State 2: | Primary State 3: | Website: | |
| CA | | | | |
| Primary Country 1: | Primary Country 2: | Primary Country 3: | Sales Market: | |
| | | | REGIONAL | |
| Industry: | | | | |
| Food/Textile Manufacturing | | | | |
| Description of Business: | | | | |
| | | | | |
| Major Suppliers/Customers: | | | | |
| | | | | |

## Bank Use Only

| Name/Entity Verification: | | Address Verification: | | | BACC Reference Number: | |
|---|---|---|---|---|---|---|
| Secretary of State | | FP/FD | | | 6140240002335 | |
| Document Filing Number/Description: | | Filing Country: | Filing State: | Filing Date: | Expiration Date: | |
| 200002010047 | | US | CA | 01/18/2000 | | |
| Country of Registration: | State of Registration: | International Transactions: | | | Check Reporting: | |
| US | CA | | | | NO RECORD | |
| Customer 1 Name: | | | Internet Gambling Business?: | | | |
| COTTONSMITH, LLC | | | No | | | |



2W02-000623304606-02

Business Account Application

## Owner/Key Individual 1 Information

| Customer Name: | | | Residence Address: | |
|---|---|---|---|---|
| RAPHAEL MENSE | | | 10146 BAYWOOD CT | |
| Position/Title: | Date of Birth: | Enterprise Customer Number (ECN): | Address Line 2: | |
| SELF | 07/12/1945 | 136023941726516 | | |
| Taxpayer Identification Number (TIN): | TIN Type: | | Address Line 3: | |
| ▉▉▉▉▉ | SSN | | | |
| Primary ID Type: | Primary ID Description: | | City: | State: |
| DLIC | C4762069 | | LOS ANGELES | CA |
| Primary ID St/Ctry/Prov: | Primary ID Issue Date: | Primary ID Expiration Date: | ZIP/Postal Code: | Country: |
| CA | 07/29/2010 | 07/12/2015 | 90077-2132 | US |
| Secondary ID Type: | Secondary ID Description: | | Check Reporting: | |
| OTHR DC | VISA | | NO RECORD | |
| Secondary ID State/Country: | Secondary ID Issue Date: | Secondary ID Expiration Date: | | |
| | | 02/01/2016 | | |
| Country of Citizenship: | | | | |
| US | | | | |

## Certificate of Authority

Each person who signs the "Certified/Agreed To" section of this Application certifies that:

**A. The Customer's use of any Bank deposit account, product or service will confirm the Customer's receipt of, and agreement to be bound by, the Bank's applicable fee and information schedule and account agreement that includes the Arbitration Agreement under which any dispute between the Customer and the Bank relating to the Customer's use of any Bank deposit account, product or service will be decided in an arbitration proceeding before a neutral arbitrator as described in the Arbitration Agreement and not by a jury or court trial.**

B. Each person who signs the "Certified/Agreed To" section of this Application or whose name, any applicable title and specimen signature appear in the "Authorized Signers - Signature Capture" section of this Application is authorized on such terms as the Bank may require to:

    (1) Enter into, modify, terminate and otherwise in any manner act with respect to accounts at the Bank and agreements with the Bank or its affiliates for accounts and/or services offered by the Bank or its affiliates (other than letters of credit or loan agreements);

    (2) Authorize (by signing or otherwise) the payment of Items from the Customer's account(s) listed on this Business Account Application (including without limitation any Item payable to (a) the individual order of the person who authorized the Item or (b) the Bank or any other person for the benefit of the person who authorized the Item) and the endorsement of Deposited Items for deposit, cashing or collection (see the Bank's applicable account agreement for the definitions of "Item" and "Deposited Item");

    (3) Give instructions to the Bank in writing (whether the instructions include the manual signature or a signature that purports to be the facsimile or other mechanical signature including a stamp of an Authorized Signer as the Customer's authorized signature without regard to when or by whom or by what means or in what ink color the signature may have been made or affixed), orally, by telephone or by any electronic means in regard to any Item and the transaction of any business relating to the Customer's account(s), agreements or services, and the Customer shall indemnify and hold the Bank harmless for acting in accordance with such instructions; and

    (4) Delegate the person's authority to another person(s) or revoke such delegation, in a separate signed writing delivered to the Bank.

C. If a code must be communicated to the Bank in order to authorize an Item, and the code is communicated, the Item will be binding on the Customer regardless of who communicated the code.

D. Each transaction described in this Certificate of Authority conducted by or on behalf of the Customer prior to delivery of this Certificate is in all respects ratified.

E. If the Customer is a tribal government or tribal government agency, the Customer waives sovereign immunity from suit with respect to the Customer's use of any Bank account, product or service referred to in this Certificate.

F. The information provided in this Application is correct and complete, each person who signs the "Certified/Agreed To" section of this Application and each person whose name appears in the "Authorized Signers-Signature Capture" section of this Application holds any position indicated, and the signature appearing opposite the person's name is authentic.

G. The Customer has approved this Certificate of Authority or granted each person who signs the "Certified/Agreed To" section of this Application the authority to do so on the Customer's behalf by:

    (1) resolution, agreement or other legally sufficient action of the governing body of the Customer, if the Customer is not a trust or a sole proprietor;

    (2) the signature of each of the Customer's trustee(s), if the Customer is a trust; or

    (3) the signature of the Customer, if the Customer is a sole proprietor.

## Certified/Agreed To

| Owner/Key Individual 1 Name | Position/Title: |
|---|---|
| RAPHAEL MENSE | SELF |

Owner/Key Individual 1 Signature

RAPHAEL MENSE *(signature)*

☐ Submit manually
☐ Signature not required

Date: 01/24/2014

Business Account Application

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and
2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).
3. I am a U.S. citizen or other U.S. person.      ☐ I am subject to backup withholding      ☒ I am exempt from backup withholding

**Note: The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding.**

| Tax Responsible Customer Name: | Taxpayer Identification Number (TIN): |
|---|---|
| COTTONSMITH, LLC | 95-4840014 |

TIN Certification Signature:

RAPHAEL MENSE *(signature)*

☐ Submit manually
☐ Signature not required

Date:
01/24/2014

## Authorized Signers - Signature Capture

| Authorized Signer 1 Name | Position/Title: |
|---|---|
| RAPHAEL MENSE | SELF |

Authorized Signer 1 Signature

RAPHAEL MENSE *(signature)*

☐ Submit manually
☐ Signature not required

Date:
01/24/2014

**In re Cottonsmith, LLC**
**Case No: 2:14-bk-11194-PC**
**7 Day Package**

# Attachment 5

## List of Insiders

1. Rafi Mense – Managing Member
2. Vicky Mense – Wife
3. Daniel Mense – Son
4. Natalie Taylor – Daughter
5. Steven Taylor – Son in Law
6. Fred Kayne – Member

**In re Cottonsmith, LLC**
**Case No: 2:14-bk-11194-PC**
**7 Day Package**

# Attachment 10

## Federal and State Tax Returns

To be provided at the Initial Debtor Interview as required

**In re Cottonsmith, LLC**
**Case No: 2:14-bk-11194-PC**
**7 Day Package**

2.    **Projected cash flow statement for the first 90 days from filing.**

TO BE PROVIDED

In re Cottonsmith, LLC
Case No: 2:14-bk-11194-PC
7 Day Package

## 3.    Statement of Major Issues and Timetable Report.

The filing of Chapter 11 cases for Raphael Mense and Cottonsmith, LLC was precipitated

by a judgment obtained by Fred Kayne, individually as Trustee of the Fred and Lenore Kayne

Family Trust in the Los Angeles Superior Court. The action was filed on August 24, 2011 and

was tried on May 8, 2013. While no judgment has yet been entered, it appears that upon entry,

it will be a sum in excess of $4 million.

After extensive consultation with appellate counsel, it was concluded that there exist

several bases for appeal. A decision was made by both Raphael Mense and Cottonsmith to

prosecute an appeal  Hillel Chodos, Esq. has been retained for this purpose. Notice of Appeal

will be filed immediately upon entry of the judgment. Given the amount of the judgment, neither

party had the liquidity with which to post an appellate bond. Filing of Chapter 11 cases was the

only means by which to avoid the consequences of enforcement of writs of execution.

The initial sequence of events will likely be a motion filed by the Debtors seeking a court

order to modify the automatic stay (11 USC Section 362) in order to permit the filing of Notice

of Appeal and all of those tasks necessary to further the appellate process.   Applications will

also be filed to permit the estates to employ special appellate counsel, namely, Hillel Chodos,

Esq.

Raphael Mense is a business man who, for many years, owned and operated a T-shirt

business, selling very large quantities of T-shirts at the commodity level. In addition, Mr. Mense

is involved as a real estate investor and developed with certain projects in various stages of

construction and completion. Efforts will be undertaken to ensure that these projects are not

In re Cottonsmith, LLC
Case No: 2:14-bk-11194-PC
7 Day Package

interrupted and that they can finished and sold.  Other real estate interests are held in partnership

or co-tenancy form and these will continue to be operated based on management arrangements in

place prior to the filing of the underlying state court case.

The outcome of the appeal will have a material bearing on the outcome of these Chapter

11 filings.  It is estimated by Appellate Counsel that the period of time from Notice of Appeal to

appellate opinion, would be in the range of 18 months to 24 months.   During that period, the

Debtor will continue to oversee projects now in place and of course, will report all activity on a

monthly basis.

The nature of plans of reorganization in these cases will turn on the outcome of the

appeal.  A win could mean a re-trial or reversal of judgment.  Such a result would allow for a

dismissal of the Chapter 11 cases.    A loss on appeal would dictate a different result and would

likely necessitate the liquidation of assets in order to meet the requirements of the judgment.

At the early stage of these cases, it appears that the only professionals needed will be

Bankruptcy Counsel, Special Appellate Counsel and Certified Public Accountant.

There may be cash collateral issues involving loans obtained by Raphael Mense which

are secured by various properties, held in the form of co-tenancy or other entities.   It is believed

that no such loans are now in default.  Other forms of obligation exist in the form of personal

guaranties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "4"

[Mense's 7-Day Package]

| Attorney or Party Name, Address, Telephone and FAX |
|---|
| Douglas M. Neistat (SBN 55961)<br>Greenberg & Bass, LLP<br>16000 Ventura Blvd., Ste 1000<br>Encino, CA 91436<br>(818) 382-6200<br>(818) 986-6534 Fax |
| ☐ Pro Se Debtor |

| OFFICE OF THE UNITED STATES TRUSTEE<br>LOS ANGELES DIVISION | SUBMIT TO UNITED STATES<br>TRUSTEE - Do not file with the Court |
|---|---|
| In Re:<br><br>**Raphael Mense**<br><br>Debtor-In-Possession | Case Number: **2:14-bk-11195-PC**<br><br>**Attorney's 7 Day Package Checklist**<br><br>☐ Check this box to indicate that this checklist amends or supplements a previously filed checklist<br>Amendment No. ____ |

**You must attach each of the following documents or a satisfactory explanation of your failure to attach a document. Failure to submit these documents in a timely fashion may result in a motion to convert or dismiss the case. The submission of documents that are incomplete or not prepared in accordance with UTSP guidelines and requirements will be treated as a failure to submit.**

| Document Attached | Previously Submitted | Explanation Attached | REQUIRED DOCUMENTS |
|---|---|---|---|
| X | | | 1.   Declaration of Debtor Regarding Compliance with UST Guidelines and Requirements for Chapter 11 Debtors in Possession |
| x | | | 1.1.    Real Property |
| x | | | 1.2.    Bank Account Information |
| x | | | 1.3.    Insurance Coverage |
| N/A | | | 1.4.    Proof of Required Certificates and Licenses |
| x | | | 1.5.    List of Insiders |
| To be provided | | | 1.6.    Financial Statements |
| N/A | | | 1.7.    Health Care Business |
| x | | | 1.8.    Trust Agreements |
| To be provided | | | 1.9.    Recordation of Chapter 11 Petition |
| x | | | 1.10.   Federal and State Tax Returns |
| N/A | | | 1.11.   Employee Benefit Plans |
| To be provided | | | 2.   Projected cash flow statement for the first ninety (90) days from the initial filing date |
| x | | | 3.   Statement of Major Issues and Timetable Report |

☑ I have read and understood the Guidelines and Requirements for Chapter 11 Debtors In Possession.

Dated:   January 31, 2014          Greenberg & Bass, LLP
_____          _____
                                                Law Firm Name

                        By:   Douglas M. Neistat    _/s/_____

                        Attorney for Debtor or Debtor In Pro Per

Dated: _____          I HEREBY APPROVE THE ATTACHED

                              TO  BE  PROVIDED
                              _____
                                        Signature of Debtor

**(Image of Original Signatures Required)**

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

1. **Declaration of Debtor Regarding Compliance with UST Guidelines and Requirements for Chapter 11 Debtors in Possession**

| Attorney or Party Name, Address, Telephone and FAX |
|---|
| Douglas M. Neistat (SBN 55961)<br>Greenberg & Bass, LLP<br>16000 Ventura Blvd., Ste 1000<br>Encino, CA 91436<br>(818) 382-6200<br>(818) 986-6534 Fax |

☐ Pro Se Debtor

| OFFICE OF THE UNITED STATES TRUSTEE<br>LOS ANGELES DIVISION | SUBMIT TO UNITED STATES TRUSTEE<br>– DO NOT FILE WITH COURT |
|---|---|
| In Re:<br><br>**Raphael Mense**<br><br>Debtor-In-Possession. | Case Number:<br>2:14-bk-11195-PC |
| | **DECLARATION OF DEBTOR REGARDING<br>COMPLIANCE WITH UNITED STATES<br>TRUSTEE GUIDELINES AND<br>REQUIREMENTS FOR CHAPTER 11<br>DEBTORS IN POSSESSION** |

**Privacy Policy [Privacy Act of 1974, as amended (5 U.S.C 552a) and LBR 1002-1(e)].**

*Declarant acknowledges that they have redacted all personally identifiable information contained in this declaration and its attachments and further acknowledges that is the responsibility of the filing party, not the United States Trustee Program, to ensure compliance with this policy.*

*(1)     All "personal identifiers" must be redacted from documents filed with the USTP, including attachments. "Personal identifiers" are considered to be the following:*

*(A)     Social Security Numbers. If an individual's Social Security number (SSN), or Individual Tax Payer Identification Numbers (ITIN) must be included in the document, only the last four digits of that number should be used.*

*(B)     Financial Account Numbers. Only the last four digits of these numbers should be used;*

*(C)     Dates of Birth. If an individual's date of birth must be included in the document, only the year should be used; and*

*(D)     Names of Minor Children. If the name of a minor child must be mentioned, only the initials of that child should be used.*

1. **REAL PROPERTY**

1.1.     For each property that debtor owns, leases, has an interest in, or is in the process of purchasing, including debtor's personal residence, declarant has attached the following documentation:

**Check All That Apply:**

☑ 1.1.1.   Debtor owns a personal residence.  A Real Property Questionnaire for Principal Residence (USTLA-5.1) is attached hereto.

☐ 1.1.2.   Debtor owns, leases, has an interest in, or is in the process of purchasing a total of **four (4) or less** parcels of real property.  For each such property, declarant has attached a Real Property Questionnaire (USTLA-5.2).

☑ 1.1.3.   Debtor owns, has an interest in, or is in the process of purchasing a total of **five (5) or more** parcels of real property.  Attached is an Owned Property Summary Sheet (USTLA-5.3) which identifies all such parcels of real property.

☐ 1.1.4.   Debtor leases **five (5) or more** parcels of real property.  Attached is a Leased Properties Summary Sheet (USTLA-5.4)

| In Re: Raphael Mense | Case No.: 2:14-bk-11195-PC |
|---|---|
| Debtor. | |

## 2. **BANK ACCOUNT INFORMATION**

2.1.    Debtor has closed all pre-petition bank accounts indicated below. For each account that is closed, Debtor has attached a copy of a bank statement evidencing that the account has been closed. For each account that has not been closed, debtor has provided a detailed explanation as to why each account has not been closed.

2.1.1.    Account Name:  Vicky and Raphael Mense
Depository:  Bank of America
Last 4 digits of Account Number:  8879
Date of Closure:
Closing Balance:
Explanation if account has not been closed:
Waiting for Social Security Administration re automatic deposit of monthly check

2.1.2.    Account Name:
Depository:
Last 4 digits of Account Number:
Date of Closure:
Closing Balance:
Explanation if account has not been closed:

2.1.3.    Account Name:
Depository:
Last 4 digits of Account Number:
Date of Closure:
Closing Balance:
Explanation if account has not been closed:

☐    Additional sheets are attached hereto, marked Attachment 2.1, and incorporated herein by reference.

2.2.    All funds from the above-referenced pre-petition bank accounts were transferred to the following Chapter 11 debtor in possession bank accounts:

2.2.1.    Account Name:  Raphael Mense, Debtor-in-Possession Checking Account
Depository:  Wells Fargo Bank, N.A.
Last 4 digits of Account Number:  7274
Opening Date:  01/24/2014
Initial Deposit:  $0
The beginning balance of this account differs from the ending balance of the pre-petition account because:
Waiting for closure of pre-petition account.

| In Re: Raphael Mense | Case No.: 2:14-bk-11195-PC |
|---|---|
| Debtor. | |

2.2.2.   Account Name: _____

Depository: _____

Last 4 digits of Account Number: _____

Opening Date: _____

Initial Deposit: _____

The beginning balance of this account differs from the ending balance of the pre-petition account because: _____

2.2.3.   Account Name: _____

Depository: _____

Last 4 digits of Account Number: _____

Opening Date: _____

Initial Deposit: _____

The beginning balance of this account differs from the ending balance of the pre-petition account because: _____

[✔] Additional sheets are attached hereto, marked Attachment 2.2, and incorporated herein by reference.

## 3.   INSURANCE COVERAGE

3.1.   Debtor will maintain appropriate insurance coverage for all estate property, including vacant land, throughout the pendency of this proceeding.

3.2.   Debtor has named the United States Trustee, 725 S. Figueroa Street, Suite 2600, Los Angeles, CA 90017, as an *additional interest party* on each and every insurance policy listed herein and any other policies, throughout the pendency of this proceeding.   - In Process

3.3.   If, for any reason, an insurance policy shall lapse, not be renewed, or fails to be in full force and effect, debtor will *immediately* provide updated proof of insurance to the United States Trustee.

3.4.   The following policies are in effect as of the date of this declaration.

|  | Name of Insurance Carrier | Type of Insurance | Policy Number |
|---|---|---|---|
| 3.4.1. | See Attached List | | |
| 3.4.2. | | | |
| 3.4.3. | | | |
| 3.4.4. | | | |

3.5.   *COPIES OF THE DECLARATION PAGE(S) for each policy listed herein are attached hereto as Attachment 3.5.  Each declaration page(s) reflects (1) the name of insured, the additional interest party(ies), type and extent of coverage; policy expiration date; and the account or policy number (or other identifying information).*

| In Re: Raphael Mense | Case No.: 2:14-bk-11195-PC |
|---|---|
| Debtor. | |

## 4. PROOF OF REQUIRED CERTIFICATES AND LICENSES

4.1.  Debtor will maintain all appropriate certificates and licenses required by federal, state and local law for the lawful operation of debtor's business.

4.2.  The following certificates and licenses are in effect as of the date of this declaration:

|  | Type of Certificate or License | Issuing Authority |
|---|---|---|
| 4.2.1. | | |
| 4.2.2. | | |
| 4.2.3. | | |
| 4.2.4. | | |

4.3.  *Attached hereto as Attachment 4 is a copy, or other proof, of each license or certificate listed above.*

## 5. LIST OF INSIDERS

The following constitutes a complete list of all insiders of the debtors, as that term is defined by 11 U.S.C. Section 101(31):

|  | Name of Person | Relationship to Debtor |
|---|---|---|
| 5.1.1. | See Attached | |
| 5.1.2. | | |
| 5.1.3. | | |

☑  Additional sheets are attached hereto, marked Attachment 5, and incorporated herein by reference.

## 6. FINANCIAL STATEMENTS

Debtor has the following financial statements that were issued in the two year period prior to the filing of this bankruptcy:

|  | Audited | Unaudited |
|---|---|---|
| 6.1.1. | To Be Provided | |
| 6.1.2. | | |
| 6.1.3. | | |
| 6.1.4. | | |
| 6.1.5. | | |
| 6.1.6. | | |
| 6.1.7. | | |

☐  Debtor **HAS NOT** issued any financial statements in the two year period prior to the filing of this bankruptcy.

## 7. HEALTH CARE BUSINESS

☑  Debtor **IS NOT** a health care business as defined by 11 U.S.C. Section 101(27A).

☐  Debtor **IS** a health care business as defined by 11 U.S.C. Section 101(27A).

4

| In Re: Raphael Mense | Case No.: 2:14-bk-11195-PC |
|---|---|
| Debtor. | |

## 8.  TRUST AGREEMENTS

☐  Debtor **IS NOT** a party to a trust agreement or a beneficiary under a trust agreement that holds property.

☑  Debtor **IS** a party to a trust agreement, or is a beneficiary under a trust agreement that holds property.  Copies of all such trust agreements are attached hereto as Attachment 8.

## 9.  RECORDATION OF CHAPTER 11 PETITION

☐  Debtor **DOES NOT** hold an interest in real property.

☐  Debtor **HAS** recorded a copy of the Chapter 11 petition in all counties in which it holds an interest in real property.  Copies (or conformed copies) of each recorded petition are attached hereto as Attachment 9.

☑  Debtor has not been able to fulfill this requirement because:

Currently in process

## 10.  FEDERAL AND STATE TAX RETURNS

Debtor has filed the following tax returns (list last two years for which returns have been filed).  *Copies will be provided at the Initial Debtor Interview.*

| Tax Year | Form Number and Name of Return *(i.e., 1040, Individual Income Tax Return)* | Taxing Agency's Name *(i.e., IRS)* |
|---|---|---|
| 2012 | 1040 | IRS |
| 2012 | 540 | FTB |
| 2011 | 1040 | IRS |
| 2011 | 540 | FTB |

☐  Current tax returns have not been filed because:

## 11.  EMPLOYEE BENEFIT PLANS

Attached hereto and marked Attachment 11 is a fully executed Employee Benefit Plan Questionnaire.

☐  **BUSINESS ENTITIES:** I, am the authorized agent of the debtor named in this case, declare under penalty of perjury that I have read the foregoing Declaration, and the information provided is true and correct to the best of my knowledge, information, and belief.  I further declare that I have been authorized to file this declaration on behalf of the debtor.

DATED: _____

_____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

In Re: Raphael Mense

Debtor.

Case No.:
**2:14-bk-11195-PC**

---

Title of Authorized Individual

---

☑ **INDIVIDUAL DEBTORS:** I declare under penalty of perjury that the information provided in the foregoing Declaration is true and correct to the best of my knowledge, information and belief.

DATED: _____

TO BE PROVIDED
Signature of Individual Debtor

Raphael Mense
Printed Name of Individual Debtor

DATED: _____

Signature of Joint Debtor

Printed Name of Joint Debtor

6

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 1.1.1

## Real Property Questionnaire for Principal Residence

| | |
|---|---|
| Attorney or Professional Name, Address, Telephone and Email<br>Douglas M. Neistat (SBN 55961)<br>Greenberg & Bass, LLP<br>16000 Ventura Blvd., Ste 1000<br>Encino, CA 91436        (818) 382-6200    (818) 968-6534 fax | File with U.S. Trustee.  Do not file with the Bankruptcy court. |

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT<br>CENTRAL DISTRICT OF CALIFORNIA** | |
| In  re:<br><br>              Raphael Mense<br><br>                                                      Debtor | Chapter 11 Case Number<br>2:14-bk-11195<br><br>**REAL PROPERTY<br>QUESTIONNAIRE<br>DEBTOR'S PRINCIPAL<br>RESIDENCE ONLY** |

THIS QUESTIONAIRE IS TO BE FILLED OUT BY DEBTOR(S) FOR THEIR <u>PRINCIPAL RESIDENCE ONLY</u>.  USTLA-5 MUST BE USED FOR ALL OTHER OWNED OR LEASED REAL PROPERTY.  THE QUESTIONAIRE IS DUE WITHIN 7 DAYS FROM THE FILING OF A BANKRUPTY PETITION.  IF ADDITIONAL TIME IS NEEDED, DEBTORS AND THEIR ATTORNEYS SHOULD CONTACT THE U.S. TRUSTEE TRIAL ATTORNEY ASSIGNED TO THEIR CASE TO REQUEST A REASONABLE EXTENSION OF TIME FOR GOOD CAUSE SHOWN.

| **SECTION ONE:  PROPERTY OWNED OR BEING PURCHASED BY DEBTOR** |
|---|
| A.      Address of property including county and state in which it is located:<br><br>10146 Baywood Ct.<br>Los Angeles, CA 90077<br><br>Los Angeles County  (APN: 4382-029-137) |
| B.      Percentage interest in the property owned by the Debtor: 100% |
| C.      Date of Debtor's Acquisition of the Property: July 1986<br>         Purchase Price: $ 850,000 |
| D.      Present Fair Market Value: $ 1,200,000 |
| E.      State source and basis of the above fair market value: estimate from comparable sales |
| |
| F.      State the name of the titleholder of record as of the date of filing the Petition: Raphael and Vicky Mense |

| In re: | **Raphael Mense** | | CHAPTER | 11 |
| --- | --- | --- | --- | --- |
| | | Debtor(s) | CASE NUMBER | 2:14-bk-11195 |

## SECTION TWO: FINANCIAL STATUS OF OWNED PROPERTY

A.      List encumbrances of record against the property (e.g. mortgages, judgments):

| Creditor Name | Current Principal Balance | Installment Amount | Frequency (Mo/Qtr/Yr) |
| --- | --- | --- | --- |
| 1st: Merrill Lynch | $ 611,300 | $4,284 | Mo. |
| 2nd: | | | |
| 3rd: | | | |
| 4th: | | | |

| Maturity Date | Date of Last Payment | Number of Delinquent Installments | |
| --- | --- | --- | --- |
| 1st: May 2028 | January 2014 | none | |
| 2nd: | | | |
| 3rd: | | | |
| 4th: | | | |

I declare under penalty of perjury that the answers contained in the foregoing Real Property Questionnaire are true and correct to the best of my knowledge, information and belief.

Dated:

Rafael Mense
_____
Print Name of Debtor

To Be Provided
_____
Signature of Debtor

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 1.1.3

## Owned Property Summary Sheet

Attorney or Party Name, Address, Telephone and FAX

Douglas M. Neistat (SBN 55961)
Greenberg & Bass, LLP
16000 Ventura Blvd., Ste. 1000
Encino, CA 91436

(818) 382-6200
(818) 968-6534 fax

☐ Pro Se Debtor

| OFFICE OF THE UNITED STATES TRUSTEE<br>LOS ANGELES DIVISION | SUBMIT TO UNITED STATES TRUSTEE<br>– DO NOT FILE WITH COURT |
|---|---|
| In Re:<br><br>Raphael Mense<br><br>Debtor-In-Possession. | Case Number: 2:14-bk-11195<br><br>OWNED PROPERTY SUMMARY SHEET |

| | Property No. __1 | Property No. __2 |
|---|---|---|
| Address | 1008 N.Ogden Dr, W.Hollywd, CA | 1016 Ogden Dr, W.Hollywd, C |
| Type of Property | duplex | SFR |
| Fair Market Value on Real Estate Questionnaire and Schedules | $670,000 | $670,000 |
| Amount of Secured Claim | $324K 1st TD + $185K 2nd TD | $510,000 |
| Name of Secured Creditor | US Bank (both 1st + 2nd TD) | Union Bank |
| Monthly Debt Service | $1,470 + $798 | $1,438 |
| Number of Delinquent Payments | 0 | 0 |
| Amount of Delinquent Taxes | 0 | 0 |
| Monthly Income Generated | $4,560 | $3,100 |
| Debtor's intent regarding property | hold | hold |
| Percentage Owned | 50% | 50% |
| Insurance expiration date | 11/17/14 | 6/17/14 |
| Date property acquired and amount paid | 6/24/11  $665,000 | 10/11/11  $630,000 |

☐ __2__ Continuation sheets attached

I declare under penalty of perjury that the answers contained in the foregoing Owned Property Summary Sheet are true and correct to the best of my knowledge, information and belief.

Dated:

**Rafael Mense**
_____
Print Name of Debtor

TO BE PROVIDED
_____
Signature of Debtor

| In Re: | Raphael Mense | Case No.: | 2:14-bk-11195 |
|--------|---------------|-----------|---------------|
|        | Debtor.       |           |               |

|  | Property No. __3 | Property No. __4 |
|---|---|---|
| Address | 1020 N.Ogden Dr, W.Hollywd, CA | 1013 Genesee, W.Hollywd, CA |
| Type of Property | SFR | SFR |
| Fair Market Value on Real Estate Questionnaire and Schedules | $670,000 | $670,000 |
| Amount of Secured Claim | $463,100 | $442K 1st TD + $85K 2nd TD |
| Name of Secured Creditor | Quicken Loans | Quicken Loans + US Bank |
| Monthly Debt Service | $2,415 | $2,365 + $1,114 |
| Number of Delinquent Payments | 0 | 0 |
| Amount of Delinquent Taxes | 0 | 0 |
| Monthly Income Generated | $4,050 | $4,000 |
| Debtor's intent regarding property | hold | hold |
| Percentage Owned | 50% | 50% |
| Insurance expiration date | 10/2/14 | 12/20/14 |
| Date property acquired and amount paid | 5/31/11  $645,000 | 12/20/10  $615,000 |
|  | Property No. __5 | Property No. __6 |
| Address | 505 N. Hayworth Av, LA, CA | 7164 Melrose Av, LA, CA |
| Type of Property | duplex | COMMERCIAL |
| Fair Market Value on Real Estate Questionnaire and Schedules | $875,000 | $2,300,000 |
| Amount of Secured Claim | $534K 1st TD + $133K 2nd TD | $1,827,000 |
| Name of Secured Creditor | Ocwen (both 1st + 2nd TD's) | California United Bank |
| Monthly Debt Service | $1,390 + $831 | $11,731 |
| Number of Delinquent Payments | 0 | 0 |
| Amount of Delinquent Taxes | 0 | 0 |
| Monthly Income Generated | $5,093 | $16,950 |
| Debtor's intent regarding property | hold | hold |
| Percentage Owned | 50% | 50% |
| Insurance expiration date | 1/10/15 | 10/24/14 |
| Date property acquired and amount paid | 12/31/07  $750,000 | 10/19/10  $2,100,000 |

Effective September 28, 2011

*USTLA-5.2*

| In Re: | Raphael Mense | Case No.: | 2:14-bk-11195 |
|--------|---------------|-----------|----------------|
|        | Debtor.       |           |                |

|  | Property No. __7__ | Property No. __8__ |
|--|--------------------|--------------------|
| Address | 8255 Las Vegas Bl, Las Vegas,NV | Block 11, Tel Aviv, Israel |
| Type of Property | condo | BUILDINGS + LAND |
| Fair Market Value on Real Estate Questionnaire and Schedules | $280,000 | $1 million (est) |
| Amount of Secured Claim | $384,000 | TBD |
| Name of Secured Creditor | CitiBank | Bank of Israel |
| Monthly Debt Service | $1,851 | TBD |
| Number of Delinquent Payments | 0 | TBD |
| Amount of Delinquent Taxes | 0 | TBD |
| Monthly Income Generated | $1,650 | TBD |
| Debtor's intent regarding property | hold | hold and develop |
| Percentage Owned | 50% | TBD |
| Insurance expiration date | 2/10/14 | TBD |
| Date property acquired and amount paid | 6/13/08  $594,158 | 1985, price TBD |
|  | Property No. __9__ | Property No. __10__ |
| Address | Block 4, Tel Aviv, Israel | Western Part, Tel Aviv, Israel |
| Type of Property | land | LAND |
| Fair Market Value on Real Estate Questionnaire and Schedules | TBD | TBD |
| Amount of Secured Claim | TBD | TBD |
| Name of Secured Creditor | TBD | TBD |
| Monthly Debt Service | TBD | TBD |
| Number of Delinquent Payments | TBD | TBD |
| Amount of Delinquent Taxes | TBD | TBD |
| Monthly Income Generated | TBD | TBD |
| Debtor's intent regarding property | hold and develop | hold and develop |
| Percentage Owned | TBD | TBD |
| Insurance expiration date | TBD | TBD |
| Date property acquired and amount paid | 1985, price TBD | 1985, and price TBD |

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 2.2

Attached please find proof of establishment of DIP account along with the signature card.  A copy of the voided check will be provided as soon as checks are received.

# Consumer Account Application



**WELLS FARGO**

| Bank Name: | Store Name: |
|---|---|
| WELLS FARGO BANK, N.A. | BEVERLY HILLS |

| Banker Name: | Officer/Portfolio Number: | Date: |
|---|---|---|
| MIHAIL NAUMOVSKI | B4467 | 01/24/2014 |

| Banker Phone: | Store Number: | Banker AU: | Banker MAC: |
|---|---|---|---|
| 310/550-7183 | 04418 | 0000645 | E2102-011 |

To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## New Account Information

| Product Name: | Minor: | COID: | Product: | Account Number: |
|---|---|---|---|---|
| PMA Premier Checking | | 114 | DDA | |

| New Account Kit: |
|---|
| Printed |

## Related Customers

| Customer Name: | Account Relationship: |
|---|---|
| RAPHAEL MENSE | Sole Owner |

## Statement Mailing Information

| Customer(s) Listed on Statement: | Statement Mailing Address: | |
|---|---|---|
| RAPHAEL MENSE | 10146 BAYWOOD CT | |
| DEBTOR IN POSSESSION | Address Line 2: | |
| CH11 CASE 14-11195(CCA) | City: | State: |
| | LOS ANGELES | CA |
| | ZIP/Postal Code: | Country: |
| | 90077-2132 | US |



2W02-000623320054-01

Consumer Account Application

## Customer 1 Information

| | |
|---|---|
| Customer Name: | Street Address: |
| RAPHAEL MENSE | 10146 BAYWOOD CT |
| Account Relationship: | Address Line 2: |
| Sole Owner | |
| Taxpayer Identification Number (TIN):   TIN Type:   Date of Birth: | Address Line 3: |
| SSN   07/12/1945 | |
| Primary ID Type:   Primary ID Description: | City:   State: |
| DLIC   C4762069 | LOS ANGELES   CA |
| Primary ID St/Ctry/Prov:   Primary ID Issue Date:   Primary ID Expiration Date: | ZIP/Postal Code:   Country:   Time at this address: |
| CA   07/29/2010   07/12/2015 | 90077-2132   US   19 Year(s)   0 Month(s) |
| Secondary ID Type:   Secondary ID Description: | Directional Address: |
| OTHR DC   VISA | (Document when no physical residence, business or alternate street address.) |
| Secondary ID State/Country:   Secondary ID Issue Date:   Secondary ID Expiration Date: | |
|     02/01/2016 | |
| Home Phone:   Business Phone: | Previous Street Address: |
| 310/528-3161   310/528-3161 | |
| Current Employer: | City:   State: |
| SELF | |
| Check Reporting: | ZIP/Postal Code:   Country:   Time at this address: |
| RECORD | Year(s)   Month(s) |
| Country of Citizenship: | |
| US | |

## Request for Taxpayer Identification Number and Certification

(Substitute Form W-9)

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. UNLESS I HAVE CHECKED ONE OF THE BOXES BELOW, I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding (does not apply to real estate transactions, mortgage interest paid, the acquisition or abandonment of secured property, contributions to an Individual Retirement Arrangement (IRA), and payment other than interest and dividends).

3. I am a U.S. citizen or other U.S. person.     ☐ I am subject to backup withholding     ☐ I am exempt from backup withholding

| Tax Responsible Customer Name: | Taxpayer Identification Number (TIN): |
|---|---|
| RAPHAEL MENSE | |

**TIN Certification Signature**



RAPHAEL MENSE

☐ Submit manually
☐ Signature not required

Date:
01/24/2014

## Customer Signatures

Everything I have stated in this application is correct. You are authorized to make any inquiries that you consider appropriate to determine if you should open or maintain the account. This may include ordering a credit report or other report (i.e. information from any motor vehicle department or other state agency) on me. **I have received a copy of the applicable account agreement, the privacy policy, and the *Direct Deposit Advance Service Agreement and Product Guide*** *(as each may be amended from time to time) and agree to be bound by their terms. I also agree to the terms of the dispute resolution program described in the foregoing agreements. **Under the dispute resolution program, our disputes will be decided before one or more neutral persons in an arbitration proceeding and not by a jury trial or a trial before a judge.**

*The Direct Deposit Advance service is not currently available in all states.

Consumer Account Application

Customer 1 Name

RAPHAEL MENSE

Customer 1 Signature

RAPHAEL MENSE

☐ Submit manually
☐ Signature not required

Date:

01/24/2014



DSG8921 (11-13 SVP )    2W02-000623320054-03

In re Raphael Mense
Case No: 2:14-bk-11195-PC
7 Day Package

# Attachment 3.4

## The following insurance policies are in effect:

| Property Insured | Company Name | Policy Number | Type of Insurance |
|---|---|---|---|
| 1006 N. Ogden Dr. | Safeco Insurance Co. | OA3860764 | Fire Policy |
| 1016 N. Ogden Dr. | First American Specialty | CASD 166527 | Dwelling Property |
| 1020 N. Ogden Dr. | First American Specialty | CASD 159798 | Dwelling Property |
| 1013 N. Genesse Ave. | Safeco Insurance Co. | | Dwelling Fire |
| 7951 Rosewood Ave. 505 N. Hayworth Ave. | Safeco Insurance Co. | OA3873321 | Dwelling Fire |
| 7164 Melrose Ave. | Allied Insurance | ACP7825326316 | Commercial General Liability |
| 8255 S. Las Vegas Blvd. | State Farm Insurance | 98-CV-3646-7 | General Liability |
| 10146 Baywood Ct. | State Farm Insurance | 71-YE-3320-0 | Homeowners Policy |
| 10146 Baywood Ct. | Zurich American Insurance Co. | ZEQ5772983 | Earthquake Policy |

**The Debtor is in the process of having the OUST added as an interested party to the policies.**

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 3.5

Copies of Proof of Insurance are attached.

The Debtor is in the process of having the OUST added as an interested party to each of the policies and will obtain updated declaration polices once complete


## Safeco Insurance™

A Liberty Mutual Company

STEVE TAYLOR

**Billing Statement**

| | |
|---|---|
| **Due Date** | **11/20/13** |
| **Amount Due** | **$275.00** |
| Account Number | 7135-3860764 |
| Statement Date | 10/27/13 |

### Account Activity

| Date | Description | Amount |
|---|---|---|
| 10/28/12 | Previous account balance | $271.00 |
| 11/12/12 | Payment received - Thank you! | 271.00- |
| 09/18/13 | Renewal Fire policy OA3860764 | 275.00 |
| | *effective 11/17/13 - 11/17/14* | |
| **10/27/13** | **Account balance** | **$275.00** |

### ☎ Contact Us

BENEFITSOURCE INS SERVICES INC

| | |
|---|---|
| Agent Telephone | **(877) 215-5431** |
| 24-Hour Claims | **1-800-332-3226** |
| Make a Payment | **www.safeco.com** |
| | **or 1-888-723-3260** |

### Billing Detail

| Description | Bill Plan | Account Balance | Amount Due |
|---|---|---|---|
| Fire policy OA3860764 effective 11/17/13 - 11/17/14 | Full Pay | $275.00 | $275.00 |
| *1006 N ODGEN DR* | | | |
| *SAFECO Insurance Company of America* | | | |
| | **TOTAL** | **$275.00** | **$275.00** |

 If you want to change your billing plan please call 1-877-215-5431 or visit www.safeco.com. For billing and payment options see the back of this notice.

---

**1006-1008 N. Ogden Drive.**

Safeco Insurance Company of America                      11/5/2013                                          85
            Acct#7135-3860764 Fire Policy (11/17/13-11/17/14)                 275.00

---

1006-1008 N. Ogden    Acct#7135-3860764 Fire Policy (11/17/13-11/17/    275.00

VersaCheck Form 1000 Classic (01/08)                                                         www.versacheck.com



**First American
Specialty Insurance Company**

DWELLING PROPERTY
AMENDED DECLARATIONS

POLICY NO:  CASD   166527

Customer Service
888-474-7500 / www.fapcig.com
114 East 5th Street, Santa Ana, CA 92701
A California domiciled company

BROKER NUMBER: 002808    BROKER PHONE: (949)215-5431
BROKER NAME:

**NAMED INSURED:**

JV PROPERTIES LLC
RAPHAEL AND VICKY MENSE LIVING TRUST
6380 WILSHIRE BLVD
SUITE 1020
LOS ANGELES, CA 90048

BENEFITSOURCE INSURANCE SRVCS
28 ARGONAUT, SUITE 100
ALISO VIEJO, CA 92656

Location of property insured:
1016 N OGDEN DRIVE
LOS ANGELES, CA 90046

**REMARKS:** AMEND MORTGAGE ADDRESS PER BROKER

Due to the change noted in Remarks, coverage shown on this Declaration page is effective 08/07/2013

Insurance is provided only with respect to the following coverages for which a limit of liability and/or premium is specified, subject to all conditions of this policy. The deductible applies per occurrence. Based on the information available to us, the premium shown is the lowest we offer for which you qualify.

Policy Period:  12 months From: **06/17/2013** To: **06/17/2014**    12:01 a.m.,  STANDARD TIME at the location of property insured.

| Coverage Description | Coverage/ Limit Amount | Policy Deductible | Coverage Premium | Forms and Endorsements made part of this policy at time of issue: |
|---|---|---|---|---|
| COVERAGE A-DWELLING | $250,000 | | $426.00 | DP 00 03 12 02 |
| COVERAGE B-OTHER STRUCTURES | $25,000 | | INCL. | DP 01 04 09 06 |
| COVERAGE D-FAIR RENTAL VALUE | $25,000 | | INCL. | FSF 06 12 09 |
| COVERAGE L-PERSONAL LIABILITY | $300,000 | | $51.00 | FSF 09 01 05 |
| COVERAGE M-MEDICAL PAYMENTS | $5,000 | | INCL. | FSF 46 01 05 |
| ANIMAL LIABILITY SUB-LIMIT | $50,000 | | INCL. | 438 BFU NS 05 42 |
| DEDUCTIBLE | | $1,000 | $-66.00 | DL 24 82 12 02 |
| ORDINANCE OR LAW | $25,000 | | $39.00 | FSF 10 01 05 |
| FIRE DEPT SERVICE CHARGE COVERAGE | $500 | | INCL. | DL 24 01 12 02 |
| WORKERS COMPENSATION-OCCASIONAL | | | $5.00 | DL 24 11 12 02 |
| | | | | DL 24 16 12 02 |
| | | | | DL 24 33 05 04 |

25% EXTENDED REPLACEMENT COST COVERAGE A – DWELLING

\* New or Revised Form

Countersigned: 08/15/13  Santa Ana, CA  By:

Dirk R. McNamee, President
Authorized Representative

TOTAL PREMIUM:        $455.00
A $5.00 per installment service charge
applies if you pay in installments. Payment
in full will avoid this service charge.

*VICKY*
*Automatic Draw*

**NOTICE: THIS POLICY DOES NOT PROVIDE COVERAGE FOR THE PERIL OF EARTHQUAKE**

**First American**
**Specialty Insurance Company**

DWELLING PROPERTY
RENEWAL DECLARATIONS

POLICY NO:   CASD   159798

Customer Service
888-474-7500 / www.fapcig.com
114 East 5th Street, Santa Ana, CA 92701
A California domiciled company

BROKER NUMBER: 002808     BROKER PHONE: (949)215-5431
BROKER NAME:

BENEFITSOURCE INSURANCE SRVCS
28 ARGONAUT, SUITE 100
ALISO VIEJO, CA 92656

**NAMED INSURED:**

STEVEN TAYLOR
RAPHAEL MENSE
6380 WILSHIRE BLVD #1020
LOS ANGELES, CA 90048

Location of property insured:
1020 N OGDEN DRIVE
WEST HOLLYWOOD, CA 90046

Annual Renewal coverage under this policy will become effective provided the premium is paid as indicated on the enclosed Renewal Invoice. Insurance is provided only with respect to the following coverages for which a limit of liability and/or premium is specified, subject to all conditions of this policy. The deductible applies per occurrence. Based on the information available to us, the premium shown is the lowest we offer for which you qualify.

Policy Period:  12 months From: **10/02/2013** To: **10/02/2014**    12:01 a.m.,  STANDARD TIME at the location of property insured.

| Coverage Description | Coverage/ Limit Amount | Policy Deductible | Coverage Premium | Forms and Endorsements made part of this policy at time of issue: |
|---|---|---|---|---|
| COVERAGE A-DWELLING | $178,200 | | $320.00 | DP 00 03 12 02 |
| COVERAGE B-OTHER STRUCTURES | $17,820 | | INCL. | DP 01 04 09 06 |
| COVERAGE D-FAIR RENTAL VALUE | $21,600 | | $9.00 | DP 04 41 12 02 |
| COVERAGE L-PERSONAL LIABILITY | $300,000 | | $51.00 | FSF 06 12 09 |
| COVERAGE M-MEDICAL PAYMENTS | $5,000 | | INCL. | FSF 08 01 05 |
| ANIMAL LIABILITY SUB-LIMIT | $50,000 | | INCL. | FSF 09 01 05 |
| DEDUCTIBLE | | $1,000 | $-48.00 | 438 BFU NS 05 42 |
| ORDINANCE OR LAW | $17,820 | | $28.00 | DL 24 10 12 02 |
| FIRE DEPT SERVICE CHARGE COVERAGE | $500 | | INCL. | DL 24 82 12 02 |
| INFLATION GUARD | | | $7.00 | FSF 10 01 05 |
| WORKERS COMPENSATION-OCCASIONAL | | | $5.00 | DP 04 11 12 02 |
| | | | | DL 24 01 12 02 |
| | | | | DL 24 11 12 02 |
| | | | | DL 24 16 12 02 |
| | | | | DL 24 33 05 04 |
| 25% EXTENDED REPLACEMENT COST COVERAGE A – DWELLING | | | | New or Revised Form |

TOTAL PREMIUM:        $372.00
A $5.00 per installment service charge applies if you pay in installments. Payment in full will avoid this service charge.

Countersigned: 08/03/13   Santa Ana, CA   By:

Dirk R. McNamee, President
Authorized Representative

**NOTICE: THIS POLICY DOES NOT PROVIDE COVERAGE FOR THE PERIL OF EARTHQUAKE**

## Steven and Natalie Taylor

## Basic Policy Information

| | |
|---|---|
| **Policy #:** | OA3763952 |
| **Term:** | 12/20/2013 - 12/20/2014 |
| **Tran Date:** | 12/20/2013 |
| **Tran Type:** | Policy change |
| **Tran Description:** | DNLD/Policy change |
| **Policy Type:** | Dwelling Fire |
| **Business Unit:** | **Division:**  BenefitSource Division |
| | **Department:** Department one |
| **Primary Service Group:** | **Account Executive:** Travis Von Bartheld |
| | **Account Representative:** BenefitSource |
| **Parent Company:** | Safeco |
| **Writing Company:** | Safeco Ins. Co of America |
| **Bill Method/Pay Plan:** | Direct bill |

### First Named Insured

| | |
|---|---|
| **Name:** | |
| **Firm Name:** | |
| **DBA:** | |
| **Dec Name:** | STEVE TAYLOR |
| **Address:** | 6380 WILSHIRE BLVD STE 1020 |
| | LOS ANGELES CA 900485026 |
| **Business:** | |
| **Residence:** | (323)761-7701 |
| **Cell:** | |
| **Fax:** | |
| **Email:** | |

### Coinsured

| Name | Bus Phone | Res Phone |
|---|---|---|
| STEVE TAYLOR | | |

### Location Information

**Loc #0001:**        1013 N GENESEE AVE, WEST HOLLYWOOD, CA, 90046-6201

### Additional Interests

| Name | Type | Address | Phone | Fax | Email | Interest In | Payor | Loan/Ref # | Description | Rank |
|---|---|---|---|---|---|---|---|---|---|---|
| US BANK NATIONAL ASSOCIATION | Mortgagee | P O BOX 200027, KENNESAW, GA, 301569246 | | | | Loc #0001 | | 463525931 | | 02 |
| QUICKEN LOANS INC ITS SUCCESSORS AND/OR | Mortgagee | PO BOX 461, ST LOUIS, MO, 631666750 | | | | Loc #0001 | | QCK00013316573080 | | 03 |
| GMAC MORTGAGE, LLC ITS SUCCESSORS AND/OR | Mortgage servicing agency | PO BOX 4025, CORAOPOLIS, PA, 151086942 | | | | Loc #0001 | | 5901-0000-0603038874 | | |
| JV FUNDING PROPERTIES LLC | Additional Interest | 6380 WILSHIRE BLVD SUITE 1020, LOS ANGELES, CA, 90048 | | | | Loc #0001 | | | | |
| RAPHAEL AND VICKY MENSE LIVINGTRUST UAD OCT 05,2000 | Co-owner/non-occupant | 6380 WILSHIRE BLVD SUITE 1020, LOS ANGELES, | | | | Loc #0001 | | | | |

**Safeco** Insurance™

*A Liberty Mutual Company*

**POLICY NUMBER:** OA3873321

### SAFECO INSURANCE COMPANY OF AMERICA
Home office: Safeco Plaza, Seattle, WA 98185-0001  (A stock insurance company.)

### LANDLORD PROTECTION POLICY DECLARATIONS - SPECIAL FORM

**INSURED:**
STEVE TAYLOR
6380 WILSHIRE BLVD STE 1020
LOS ANGELES CA  90048-5026

**AGENT:**
BENEFITSOURCE INS SERVICES INC
28 ARGONAUT STE 100
ALISO VIEJO    CA    92656-1426

TELEPHONE:  (877) 215-5431

**DESCRIBED LOCATION:**
7951 ROSEWOOD AVE
505 N HAYWORTH AVE
LOS ANGELES CA  90048-2710

**POLICY PERIOD FROM:** JAN. 10 2014
**TO:** JAN. 10 2015

**MORTGAGE SERVICING AGENCY:**
OCWEN LOAN SERVICING, LLC
ITS SUCCESSORS AND/OR ASSIGNS
P.O. BOD 6723
SPRINGFIELD OH  45501-6723

**1ST MORTGAGEE:**
OCWEN LOAN SERVICING, LLC

**OCCUPANCY:** TENANT

**LOAN NO.:** 713026613

| COVERAGES FOR THIS LOCATION | | LIMITS | DEDUCTIBLE | PREMIUM |
|---|---|---|---|---|
| **** THIS POLICY DOES NOT PROVIDE EARTHQUAKE COVERAGE **** | | | | |
| A DWELLING | FIRE | $ 451,900 | $ | 449.00 |
|  | SPECIAL | | | 323.00 |
| B OTHER STRUCTURES | FIRE | $ 45,190 | | INCL |
|  | SPECIAL | | | |
| C PERSONAL PROPERTY | | DECLINED | | |
| D LOSS OF RENT, RENTAL VALUE, & ADDL LIVING EXP. | | $ 45,190 | | INCL |

**INCLUDED:**
438  B.F.U.
ADDL INTEREST

**OPTIONS:**

| | | | | |
|---|---|---|---|---|
| A-EXTENDED DWELLING COVERAGE AMT | $ 225,950 | | $ | 23.00 |
| H-PREMISES LIABILITY (EACH OCCURRENCE) | $ 300,000 | | $ | 47.00 |
| PERS. INJURY, WRONGFUL EVICTION, PRIVACY INVASION | | | | INCL |
| MEDICAL PAYMENTS (EACH PERSON) | $ 1,000 | | | INCL |
| G-LOSS ASSESSMENT | $ 10,000 | | $ | 10.00 |
| ORDINANCE OR LAW COVERAGE | $ 45,190 | | | INCL |

**DEDUCTIBLES:**
PROPERTY COVERAGES, EXCEPT AS OTHERWISE NOTED          $ 1,000

**DWELLING ANNUAL PREMIUM**    $    852.00

You may pay your premium in full or in installments. There is no installment fee for
the following billing plans: Full Pay, Annual 2-Pay. Installment fees for all other
billing plans are listed below. If more than one policy is billed on the installment
bill, only the highest fee is charged. The fee is:
    $0.00 per installment for recurring automatic deduction (EFT)
    $0.00 per installment for recurring credit card or debit card
    $2.00 per installment for all other payment methods

The limit of liability for this structure (Coverage A) is based on an estimate of
the cost to rebuild your home, including an approximate cost for labor and materials
in your area, and specific information that you have provided about your home.

ORIGINAL

# JV PROPERTIES LLC

## Basic Policy Information

| | |
|---|---|
| Policy #: | ACP7825326316 |
| Term: | 10/24/2013 - 10/24/2014 |
| Tran Date: | 10/24/2013 |
| Tran Type: | Renew policy |
| Tran Description: | DNLD/Renew policy |
| Policy Type: | BOP |
| Business Unit: | Division:   BenefitSource Division |
| | Department: Department one |
| Primary Service Group: | Account Executive: Travis Von Bartheld |
| | Account Representative: BenefitSource |
| Parent Company: | Allied Insurance |
| Writing Company: | AMCO Insurance Co. |
| Bill Method/Pay Plan: | Direct bill |

## First Named Insured

| | |
|---|---|
| Name: | |
| Firm Name: | JV PROPERTIES LLC |
| DBA: | |
| Dec Name: | JV PROPERTIES LLC |
| Address: | 6380 WILSHIRE BLVD STE 1020 |
| | LOS ANGELES CA 900485026 |
| Business: | (323)933-0018 |
| Residence: | (323)933-0018 Ext.7701 |
| Cell: | |
| Fax: | (213)341-2235 |
| Email: | staylor@nessholdings.com |

### Location Information

Loc #00001 Bldg #00001 LRO – 7164–    7164 MELROSE AVE, LOS ANGELES, CA, 90046-7626
7168 MELROSE AVE, LOS ANGELES CA
90046 (59470):

### Additional Interests

| Name | Type | Address | Phone Fax Email Interest In Payor Loan/Ref # Description Rank |
|---|---|---|---|
| RAPHAEL MENSE | Additional insured | | Policy Level |
| VICKY MENSE | Additional insured | | Policy Level |
| CALIFORNIA UNITED BANK | Loss payee | INSURANCE SERVICE CENTER, PO BOX 863329, PLANO, TX, 750863329 | Loc #00001 |
| PREMIER COMMERCIAL BANK | Mortgagee | 2400 E KATELLA AVE STE 200, ANAHEIM, CA, 928066900 | Loc #00001 |
| THE RAPHAEL & VICKY MENSE LIVING TRUST DATED OCT. 5 | Additional insured | | Policy Level |

### Additional Policy Coverages

| Coverages | Limit 1 | Limit 2 | Ded Type/Amt | Miscellaneous Information |
|---|---|---|---|---|
| Persistency | | | | |
| Individual Risk Mod Prem | | | | |

## Lines of Business

### BOP Liability

#### Liability Coverage Type: Commercial General Liability

##### Coverages

| Coverage | Limit | Ded Type/Amt | Ded Basis | Ded Applies To | Miscellaneous Information |
|---|---|---|---|---|---|
| General Aggregate | 2,000,000 | | | | |
| Fire Damage | 300,000 | | | | |
| Medical Expense | 5,000 | | | | |
| Products/Completed Ops Aggregate | 2,000,000 | | | | |
| Personal & Advertising Injury | 1,000,000 | | | | |
| Each Occurrence | 1,000,000 | | | | |

#### Schedule of Hazards

| Loc # | Classification | Class | Premium Basis | Exposure | Prem/Ops Rate | Prem/Ops Premium | Products Rate | Products Premium |
|---|---|---|---|---|---|---|---|---|
| 00001 | LRO - 7164-7168 MELROSE AVE, LOS ANGELES CA 90046 | 59470 | | | | | | |

statefarm.com

State Farm Fire and Casualty Company

LOAN NUMBER

| EFFECTIVE DATE | EXPIRATION DATE | POLICY NUMBER |
|---|---|---|
| 02/10/2013 | 02/10/2014 | 98-CV-3646-7 |

THIS REPLACES PRIOR EVIDENCE DATED:

CONTINUED UNTIL
TERMINATED IF CHECKED [X]

SCHEDULE FORMS

THIS IS ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED,
NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS
EVIDENCE OF INSURANCE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS
SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| AMOUNT OF INSURANCE | DEDUCTIBLE |
|---|---|
| $300,000 | $1,000 |
| $2,100 | |
| $5,000 | $1,000 |

MITCHELL

LOSS PAYEE:

MORTGAGEE
LOAN #

ADDITIONAL INSURED

BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE
PROVISIONS.

**BALANCE DUE NOTICE**

POLICY NUMBER          98-CV-3646-7
Rental Condominium Unitowners Policy
FEB 10 2014 to FEB 10 2015

DATE DUE
FEB 10 2014

PLEASE PAY THIS AMOUNT
$143.00

83 3503 0327

EP-6131
EPT RC
EE-1228
EE-5310
EE-5900
EE-5486
EE-5801
EE-6858
EE-6541
FIE-2402

## Coverages and Limits

### Section I

| | | |
|---|---|---|
| A | Building Property | $3,100 |
| B | Personal Property | 2,100 |
| C | Loss of Rents | Actual Loss |
| D | Loss Assessments | 1,000 |

**Deductibles - Section I**

| | |
|---|---|
| Basic | 1,000 |

Other deductibles may apply - refer to policy

### Section II

| | | |
|---|---|---|
| L | Business Liability | |
| | (Each Occurrence) | $300,000 |
| | Annual Aggregate | 600,000 |
| M | Premises Medical Payments | 5,000 |
| | (Each Person) | |

**Annual Premium**
Forms, Opts, & Endrsmnt  $133.00
**Amount Due**  10.00
$143.00

**Premium Reductions**
Residential Alert Disc

Inflation Coverage Index:  151.4

neral premium tax paid to the State of Nevada.

r policy language is included.  Please call your agent if

**DECLARATIONS**

We will provide the
insurance described in
this policy in return for the premium
and compliance with all applicable
provisions of this policy.

| Coverage afforded by this policy is
| provided by:
|
| STATE FARM GENERAL INSURANCE COMPANY
| 900 OLD RIVER ROAD
| BAKERSFIELD CA 93311-9501
|

71-YE-3320-0 **Policy Number**

| A Stock Company with Home Offices in
| Bloomington, Illinois.

**Named Insured and Mailing Address**
MENSE, RAPHAEL & VICKY
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

---

The Policy Period begins and ends at
12:01 a.m. Standard Time at the residence
premises.

07/05/2013 **Effective Date**
**12months-Policy Period**
07/05/2014 **Expiration of Policy Period**

**Limit of Liability – Section 1**
$ 2,054,400 Dwelling (Coverage A)

**Policy Type**
Homeowners Policy
Dwell Repl Cost – Similar Construction
Increase Dwlg Up to $410,880 – Option ID

**Location of Premises**
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

| **Automatic Renewal** – If the **Policy
| Period** is shown as **12 months**, this
| policy will be renewed auto-
| matically subject to the premiums,
| rules and forms in effect each
| succeeding policy period. If this
| policy is terminated, we will give
| you and the Mortgagee/Lienholder
| written notice in compliance with
| the policy provisions or as
| required by law.
|
| **Deductibles – Section 1** $2000
| ALL LOSSES In case of loss under
| this policy, the deductible will be
| applied per occurrence and will be
| deducted from the amount of the
| loss. Other deductibles may apply
| – refer to your policy.
|
|
| **Policy Premium** $6,023.00

**Forms, Options, & Endorsements ,**

| | | | |
|---|---|---|---|
| FP-7955.CA | HOMEOWNERS POL | LSP A1 | SMLR CONST-A |
| LSP B1 | LMT RPLC COST-B | OPT ID | COV A-INCR DWLG |
| OPT OL | BLD ORD/LAW-10% | FE-5256.1 | LOSS ASSESSMNT |
| FE-3560 | BACK-UP | FE-1313 | LNDR LOSS PAY |
| ~~FE-3422~~ | ~~HO-W POL END~~ | | |

| **Mortgagee** | **Agent Name & Address** |
|---|---|
| BANK OF AMERICA NA | TOM NUNEZ INSURANCE AGEN |
| ITS SUCC AND/OR ASSIGNS ATIMA | 690 S BREA BLVD |
| PO BOX 5954 | BREA, CA |
| SPRINGFIELD, OH 45501-5954 | 92821 (714)256-0111 |

Loan Number: 7104538173

Prepared: December 17, 2013

0814
Agent's Code

559-916.5 **MORTGAGEE COPY**

**PREMIUM NOTICE**
**STATE FARM INSURANCE COMPANIES**
**AGENT ISSUED DECLARATIONS**

| POLICY NUMBER | BILLING PERIOD | | AGENT CODE |
|---|---|---|---|
| 71-YE-3320-0 | FROM 07/05/2013 | TO 07/05/2014 | 0814 |

**LOCATION**
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

**INSURED**                                         PREMIUM $ 6,023.00
MENSE, RAPHAEL & VICKY
10146 BAYWOOD CT                          AMOUNT PAID $ 6,023.00
LOS ANGELES, CA 90077-2132
                                                         AMOUNT DUE  $      .00

                                                              DATE DUE

**MORTGAGEE**                                    AGENT NAME & ADDRESS
BANK OF AMERICA NA                         TOM NUNEZ INSURANCE AGEN
ITS SUCC AND/OR ASSIGNS ATIMA    690 S BREA BLVD
PO BOX 5954                                         BREA, CA
SPRINGFIELD, OH 45501-5954           92821          (714)256-0111
Loan Number: 7104538173


**STATE FARM INSURANCE COMPANIES**
900 OLD RIVER ROAD
BAKERSFIELD CA 93311-9501

## DECLARATIONS

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

Coverage afforded by this policy is provided by:

STATE FARM GENERAL INSURANCE COMPANY
900 OLD RIVER ROAD
BAKERSFIELD CA 93311-9501

---

71-YE-3320-0     **Policy Number**

A Stock Company with Home Offices in Bloomington, Illinois.

---

**Named Insured and Mailing Address**
MENSE, RAPHAEL & VICKY
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

---

The Policy Period begins and ends at 12:01 a.m. Standard Time at the residence premises.

07/05/2013  **Effective Date**
            **12months-Policy Period**
07/05/2014  **Expiration of Policy Period**

---

**Limit of Liability - Section 1**
$ 2,054,400   Dwelling (Coverage A)

**Policy Type**
Homeowners Policy
 Dwell Repl Cost - Similar Construction
 Increase Dwlg Up to $410,880 - Option ID

---

**Location of Premises**
10146 BAYWOOD CT
LOS ANGELES, CA 90077-2132

**Automatic Renewal** - If the **Policy Period** is shown as **12 months**, this policy will be renewed automatically subject to the premiums, rules and forms in effect each succeeding policy period.  If this policy is terminated, we will give you and the Mortgagee/Lienholder written notice in compliance with the policy provisions or as required by law.

---

**Deductibles - Section 1** $2000
ALL LOSSES    In case of loss under this policy, the deductible will be applied per occurrence and will be deducted from the amount of the loss.  Other deductibles may apply - refer to your policy.

---

**Policy Premium**   $6,023.00

---

**Forms, Options, & Endorsements**

| | | | |
|---|---|---|---|
| FP-7955.CA | HOMEOWNERS POL | LSP A1 | SMLR CONST-A |
| LSP B1 | LMT RPLC COST-B | OPT ID | COV A-INCR DWLG |
| OPT OL | BLD ORD/LAW-10% | FE-5256.1 | LOSS ASSESSMNT |
| FE-3560 | BACK-UP | FE-1313 | LNDR LOSS PAY |
| FE-3422 | HO-W POL END | | |

---

**Additional Insured**
BEL AIR RIDGE HOMEOWNERS
ASSOCIATION
2760 CLARAY DR
LOS ANGELES, CA 90077-2018

**Agent Name & Address**
TOM NUNEZ INSURANCE AGEN
690 S BREA BLVD
BREA, CA
92821       (714)256-0111

---

Loan Number:

---

Prepared:      December 17, 2013

0814
Agent's Code

559-916.5

**MORTGAGEE COPY**

# Superior EQ Earthquake Policy Declarations

**ZURICH**®

**Policy Number:** ZEQ5772983       **Renewal Term:** N/A

Insured by the stock company below and hereinafter called the Company:

Zurich American Insurance Company

Administrative Office: 1400 American Lane, Schaumburg, Illinois 60196-1056

**Named Insured and Mailing Address:**

RAPHAEL and VICKI MENSE
10146 BAYWOOD COURT
LOS ANGELES, CA 90077

**Agent Name and Address:**

Arrowhead General Insurance Agency, Inc.
701 B Street, Suite 2100
San Diego, CA 92101

**Agent Code:** 34828000

The residence premises covered by this policy is located at the above address unless otherwise stated here:

**Policy Period: From:** 10/04/2013    **To:** 10/04/2014     12:01 AM local time at the address shown above.

Insurance against the risk of direct physical loss by earthquake is provided for the following types of property at the indicated limits of insurance subject to the deductible amount stated below which is **15%** of the limits of insurance stated for each coverage:

| Coverages, Limits of Insurance and Deductibles | Limit: | Deductible: |
|---|---|---|
| Dwelling | $ 2,151,152 | $ 322,673 |
| Appurtenant Structures | $ 215,115 | $ 32,267 |
| Personal Property | $ 1,075,576 | $ 161,336 |
| Loss of Use | $ 25,000 | $ 3,750 |
| Limited Building Code Upgrade | $ 10,000 | $ 1,500 |

Policy Premium:      $    4,733.00
Policy Fee:           $      150.00

**Forms and Endorsements attached to and forming a part of the policy:**

U-ARW-102-A CW (06-12), U-ARW-108-A CW (06-12),
U-GU-319-F (01-09), U-ARW-D-102-A CW (06-12)

Date Issued: 08/05/2013

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 4

## Proof of Required Certificates and Licenses

## N/A

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 5

## List of Insiders

1.    Vicky Mense – Wife
2.    Daniel Mense – Son
3.    Natalie Taylor – Daughter
4.    Steven Taylor – Son in Law
5.    Cottonsmith, LLC – Debtor is 90% Owner.
6.    Fred Kayne – 10% Owner of Cottonsmith, LLC and Member Manager (as per Cottonsmith tax return)  (Fred and Raphael are "General partners" as per 11 USC 101(31)(A)(i) and (iii))

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 6

## Pre-Petition Financial Statements

To be provided

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 8

Trust Agreements

Copy of Amended and Restated Raphale and Vicky Mense Living Trust

# AMENDED AND RESTATED RAPHAEL AND VICKY MENSE LIVING TRUST

THIS IS AN AMENDMENT AND RESTATEMENT OF THE RAPHAEL AND VICKY MENSE LIVING TRUST executed on October 5, 2000, by and between RAPHAEL MENSE ("RAPHAEL") and VICKY MENSE ("VICKY"), husband and wife, as Trustors and as Trustees.

The RAPHAEL AND VICKY MENSE LIVING TRUST is hereby amended and restated in its entirety (and sometimes referred to as this "Trust") as follows:

## ARTICLE I
## FAMILY CIRCUMSTANCES

As of the date of this Trust, the Trustors have two (2) children of their marriage; namely, DANIEL MENSE ("DANIEL") and NATALIE TAYLOR ("NATALIE"). The Trustors have no other living children nor any issue of deceased children.

## ARTICLE II
## TRUST PROPERTY

2.1 **Agreement to Accept Property**. The Trustee acknowledges the receipt of the assets previously transferred to the Trustee of the RAPHAEL AND VICKY MENSE LIVING TRUST, and agrees to perform the duties of a Trustee. The Trustee further agrees to hold any other property which subsequently may be transferred to the Trustee in accordance with the terms of this Trust.

2.2 **Character of Assets Transferred to Trust**. The Trustors agree that any assets transferred to the Trustee while both Trustors are living shall be listed in an appropriate record. This record shall indicate whether an asset, at the time of its transfer to the Trust, is community property, separate property or quasi-community property. If an asset is the quasi-community property or separate property of a Trustor, the record shall indicate to which Trustor the

**THIS IS A COPY ONLY**
The original is in the possession of
WEINSTOCK, MANION, REISMAN, SHORE & NEUMAN'
A LAW CORPORATION
1875 CENTURY PARK EAST, SUITE 2000
LOS ANGELES, CALIFORNIA 90067
Phone: (310) 553-8844 Fax: (310) 553-5165

## ARTICLE V
## TRUSTEE PROVISIONS

5.1    **Designation of Trustee**. RAPHAEL and VICKY shall act as Trustees of this Trust.

5.2    **Designation of Successor Trustees**. If either RAPHAEL or VICKY ceases to act or for any other reason, including incapacity, is unable to act as a Trustee, then the other shall act alone as the sole Trustee. If both RAPHAEL and VICKY cease to act or for any other reason, including incapacity, are unable to act as Trustees, then DANIEL and NATALIE shall act as Co-Trustees. If either DANIEL or NATALIE ceases to act or for any other reason, including incapacity, is unable to act as a Co-Trustee, then the other shall act alone as the sole Trustee. If both DANIEL and NATALIE cease to act or for any other reason, including incapacity, are unable to act as Trustees, then WELLS FARGO BANK, N.A. shall act as Trustee.

5.3    **Spouse to Act as Sole Trustee of Spouse's Separate Property**. Notwithstanding anything contained in Paragraph 5.1 to the contrary, during each Trustor's lifetime, each Trustor shall act as the sole Trustee with respect to any of his or her separate property which is part of the trust estate. With regard to such separate property, each Trustor shall have the exclusive management, control and right of disposition over his or her own separate property and may hold title to any such separate property solely in his or her name as Trustee. If either Trustor ceases to act or for any other reason, including incapacity, is unable to act as such Trustee of his or her separate property interest in the trust estate, then the provisions of Paragraph 5.2 shall be followed with respect to the designation of a Trustee.

5.4    **Removal of Trustee; Designation of Alternate Trustee by Survivor**. With respect to any trust created under this instrument, the Survivor shall have the power, at any time and from time to time:

(a)    To remove any then acting Trustee (the "Survivor's Removal Power"); and/or

-4-

(b)   To designate one or more Trustees to act in place of: (i) any then acting Trustee; or (ii) any designated successor Trustee (the "Survivor's Designation Power").

The Survivor's Designation Power shall extend to all trusts created under this Trust including any trust created pursuant to the exercise of a power of appointment by a person other than the Survivor.

5.4.1   **Exercise of Survivor's Removal Power.** The exercise of the Survivor's Removal Power shall be effective upon the delivery to the Trustee being removed of a duly acknowledged instrument which specifically refers to the existence of the Survivor's Removal Power, executed by the Survivor, containing a notice to such Trustee that the Survivor has exercised the Survivor's Removal Power.

5.4.2   **Exercise of Survivor's Designation Power.** The exercise of the Survivor's Designation Power shall be made in a duly acknowledged instrument which specifically refers to the existence of the Survivor's Designation Power, executed by the Survivor, the original of which shall be attached to the original of this Trust, and a copy of which shall be delivered to the then acting Trustee of any trust that is affected by the exercise of the Survivor's Designation Power.

5.4.3   **Default Designation.** If the Survivor and all Trustees designated pursuant to the exercise of the Survivor's Designation Power cease to act or for any other reason, including incapacity, are unable to act as Trustees, then the provisions of Paragraph 5.2 shall be followed with respect to the designation of a Trustee.

5.5   **Removal of Corporate Trustee; Designation of Alternate Corporate Trustee by Income Beneficiaries.** The majority of the adult Income Beneficiaries shall have the right to remove any then acting Corporate Trustee of such trust, but only if they concurrently replace such Trustee with a Corporate Trustee.

The removal of any then acting Corporate Trustee shall be effective upon the delivery to such Trustee of a duly acknowledged instrument executed by each member of the majority of the adult Income Beneficiaries who voted in favor of the Trustee's removal,

containing a notice to such Trustee that a majority of the adult Income Beneficiaries has exercised such power of removal. Such notice also shall contain the name of the new Corporate Trustee designated by a majority of the adult Income Beneficiaries.

The designation of an alternate Corporate Trustee or Trustees shall be made in a duly acknowledged instrument executed by each member of the majority of the adult Income Beneficiaries who voted in favor of the Trustee's designation, the original of which shall be attached to the original of this Trust, and a copy of which shall be delivered to the Trustee then acting under this Trust.

Any Corporate Trustee designated by a majority of the adult Income Beneficiaries in accordance with the provisions of this Paragraph, whether or not such designation occurs contemporaneously with the removal of an existing Corporate Trustee, shall be a bank or trust company duly qualified to act as a Trustee in the State of California or in any state in which any Income Beneficiary may then reside.

5.6    **Resignation of Trustee.** Any Trustee may resign at any time by complying with the provisions of this Paragraph. If either or both Trustors are then living, the Trustee shall give the Trustors or the surviving Trustor written notice of its resignation. If neither Trustor is then living, the Trustee shall give written notice of its resignation to the Income Beneficiaries (or if they are legally incapacitated, to their conservators, guardians and other fiduciaries, if any). The Trustee shall mail its notice of resignation by certified mail to the last-known addresses of those persons entitled to receive the notice, at least thirty (30) days before the Trustee's resignation is to take effect.

5.7    ~~Vacancy in Office.~~ Whenever a Trustee resigns or is unable to act, and no designated successor Trustee is willing or able to act, or no successor Trustee is designated, a Trustee shall be appointed in the following manner: Each beneficiary entitled to receive a Trustee's notice of resignation under the immediately preceding paragraph of this Article shall have one vote. Each beneficiary shall submit such beneficiary's vote for Trustee, in writing, to the resigning Trustee. The person receiving a majority of votes shall be appointed Trustee. If no person shall receive a majority of votes, the resigning Trustee shall appoint a Trustee. If the

-6-

resigning Trustee does not exercise this power, or if there is no then acting Trustee, the resigning Trustee or any beneficiary may request a court of competent jurisdiction to appoint a Trustee, at the expense of the trust estate.

5.8    **Limitation of Liability**. No Trustee shall be responsible for the acts or omissions of any prior Trustee. Furthermore, any Trustee may accept as correct the accounting records of any prior Trustee. No Trustee shall have the duty to investigate or review the actions of any prior Trustee, unless the Trustee, within sixty (60) days of its appointment, receives a written request to conduct such an investigation from any beneficiary of this Trust.

5.9    **Definition of Trustee**. Except where the context should indicate otherwise, the term "Trustee," as used in this Trust, shall mean any Trustee or Co-Trustees, whether original or successor, duly acting under this Trust.

5.10    **Incapacity of a Trustee**. For the purposes of this Article, the terms "incapacity" and "incapacitated" shall mean a Trustee's inability to perform his or her duties under this Trust as a consequence of a physical or mental impairment. If any Trustee is determined to be incapacitated under the provisions of this Paragraph 5.10, such Trustee immediately shall cease to act as Trustee of this Trust and all trusts created under this Trust.

If a Trustor, a Trustee or a beneficiary of this Trust reasonably believes that an acting Trustee is incapacitated (the "Incapacitated Trustee"), such person shall notify the Incapacitated Trustee, in writing, as to the Incapacitated Trustee's inability to perform the Trustee's duties. Any notice so given shall be referred to as the "Incapacity Notice."

If the Incapacitated Trustee and a majority of the adult income and remainder beneficiaries of this Trust cannot agree within thirty (30) days after the date of the Incapacity Notice as to the existence of such incapacity, the determination shall be made by two physicians, one designated by the Incapacitated Trustee and one designated by the remaining Trustee, or if there is no remaining Trustee, then by a majority of the adult income and remainder beneficiaries of this Trust; provided, however, that if the Incapacitated Trustee also is a current income or

-7-

remainder beneficiary, the Incapacitated Trustee shall have no vote in connection with the designation of a physician by the majority of the current income and remainder beneficiaries.

If these two physicians cannot agree on the existence of such incapacity, they shall appoint a third physician, and the determination of the majority of the three physicians shall be conclusive and binding on all of the Trustees and on all of the beneficiaries of any trust created under this Trust.

All costs incurred in connection with the determination of a Trustee's incapacity shall be paid pro rata out of the principal of the trusts in effect as of the date of the applicable Incapacity Notice.

Notwithstanding the foregoing, if the Incapacitated Trustee fails for any reason to designate a physician under this Paragraph within ten (10) days after the expiration of the thirty (30) day period referred to above, then the Incapacitated Trustee conclusively shall be deemed to be incapacitated for all purposes under this Article, and no physician determination of incapacity shall be necessary.

5.11  **Majority Action Required of Trustees**. The provisions of this Paragraph shall apply only if: (i) neither Trustor is acting as a Trustee, and (ii) there are two or more Trustees acting concurrently under any trust created under this Trust. Subject to the provisions of Paragraph 18.7, only the act of both then acting Trustees, if only two Trustees are then acting, or the act of a majority of such Trustees, if there are more than two Trustees then acting, shall be valid and binding on all then acting Trustees, all beneficiaries of any trust created under this Trust, and all third parties dealing with the Trustees.

# ARTICLE VI
# SPECIFIC GIFTS

6.1  **Gift Upon Death of Survivor**. Upon the death of the Survivor, the Trustee shall make the following distribution, outright and free of trust:

provided, however, that such transactions shall be permissible with the written consent of the Trustee, which consent may be given if the Trustee (in the exercise of the Trustee's absolute discretion) determines that such transaction would be beneficial to the respective beneficiary and would not have a serious adverse effect on the interest of any other beneficiary of the trust. The Trustee shall not be under any obligation whatsoever to consent to any such transaction and need not justify any refusal to do so.

The interest of any beneficiary in principal or income of such beneficiary's trust shall not in any manner be subject to the claims of his or her creditors, liable to attachment, execution, or to any other processes of law, including bankruptcy proceedings. If any creditor shall threaten or attempt to attach, garnish or seize any such interest, the Trustee, so long as said threat or effort on the part of such creditor continues, instead of paying the principal or income due hereunder to said beneficiary, shall apply the same for such beneficiary's health, support, maintenance and education.

Notwithstanding anything contained in this Trust to the contrary, the Trustee shall not have any powers or authority that will cause the foregoing spendthrift provision to lose its status as such within the meaning of sections 15300, et seq. of the California Probate Code and Section 541(c)(2) of the U.S. Bankruptcy Act.

Notwithstanding anything contained in this Trust to the contrary, the Survivor shall have the right to assign or encumber the income interest of the Survivor in the MARITAL TRUST.

## ARTICLE XVIII
## POWERS OF TRUSTEE

18.1  __Listing of Trustee's Powers__. The Trustee shall have the following powers with respect to any and all property held under this Trust, in addition to those powers which may now or in the future be conferred upon the Trustee under the laws of the State of California:

18.1.1  __General Investment Directive__. To invest and reinvest the trust funds in any kind of property (real, personal or mixed) and every kind of investment appropriate under the then-prevailing circumstances, specifically including, but not limited to, corporate

-28-

obligations of any kind; preferred or common stocks; shares of investment trusts, investment companies, and mutual funds; notes, real estate, bonds, debentures, mortgages, deeds of trust, mortgage participations, market funds and index funds.

Among the circumstances that are appropriate to consider in investing and managing trust assets are the following:

(a)   General economic conditions;

(b)   The possible effect of inflation or deflation;

(c)   The expected tax consequences of investment decisions or strategies;

(d)   The role that each investment or course of action plays within the overall trust portfolio;

(e)   The expected total return from income and the appreciation of capital;

(f)   The need for liquidity, regularity of income and preservation or appreciation of capital; and

(g)   An asset's special relationship or special value, if any, to the purposes of the trust or to one or more of the beneficiaries.

In exercising the Trustee's powers, the Trustee shall exercise care, skill and caution to attain the Trustors' goals under this Trust. The Trustee shall consider individual investments as part of an overall investment strategy, having risk and return objectives reasonably suited to the purposes of the trust. The Trustee's investments may include stock in, or any common trust fund administered by, the Trustee. In making and implementing investment decisions, the Trustee shall diversify the investments of the trust unless, under the circumstances, it is prudent not to do so.

18.1.2    **Additional Securities Transactions**. To purchase securities on margin, borrow money using securities or any trust property as collateral, purchase and sell commodities, purchase and sell securities options, sell short, and engage in any transaction involving any combination of these powers.

18.1.3    **Income-Producing Property**. To continue to hold any income-producing property that the Trustee receives or acquires under this Trust as long as the Trustee deems advisable.

18.1.4    **Unproductive Property**. To retain, purchase, or acquire unproductive property.

18.1.5    **Life Insurance**. To retain, purchase, or acquire life insurance policies on the life of any person and to exercise all rights of ownership contained in those policies.

18.1.6    **Stock and Securities Powers**. To have all rights, powers and privileges of an owner of the securities held in trust, including, but not limited to, the power to vote, give proxies, and pay assessments; to participate in voting trusts, pooling agreements, foreclosures, reorganizations, consolidations, mergers, liquidations, sales, and leases, and in connection with such participation, to deposit securities with and transfer title to any protective or other committee, as the Trustee may deem advisable; and to exercise or to sell stock subscriptions or conversion rights.

18.1.7    **Title Holding to Trust Assets**. To hold securities or other property in the Trustee's name as Trustee under this Trust or in the name of a nominee. The Trustee may also hold securities that are unregistered in such condition that ownership will pass by delivery.

18.1.8    **Business Interests Held in Trust**. To continue to hold and operate, to sell, or to liquidate, at the risk of the trust estate, and at the Trustee's discretion, any interest in any business entity that the Trustee receives or acquires under any trust established under this Trust, including but not limited to, any sole proprietorship, limited liability company, partnership or capital stock of any corporation. In connection with the powers given the Trustee under this

-30-

Paragraph, the Trustee shall have the power to guarantee any indebtedness incurred by any such business entity, to execute and deliver evidences of such guarantee, and to pledge, hypothecate or otherwise encumber any part or all of the trust estate to secure payment of any indebtedness or guarantee, and to repay such indebtedness out of the trust estate. In addition, the Trustee shall have the power to loan funds or assets belonging to the trust estate to any business entity held and operated by the trust estate, upon such equitable terms and in such amounts as the Trustee deems advisable.

18.1.9   **Real and Personal Property--General Powers**. To manage, control, grant options on, sell (for cash or on deferred payments, with or without security), convey, exchange, partition, divide, improve, repair and otherwise exploit and develop all real and personal trust property.

18.1.10  **Leases of Trust Property**. To lease trust property for terms within or beyond the term of the trust and for any purpose, including but not limited to, exploration for and removal of gas, oil, and other minerals; and to enter into community oil leases, pooling, and unitization agreements.

18.1.11  **Trust Debts--General Powers**. To borrow money, and to encumber or hypothecate trust property by mortgage, deed of trust, pledge, or otherwise, for the debts of the trust or the joint debts of the trust and a co-owner of trust property; while both Trustors are living, to guarantee any indebtedness incurred by either or both of them; and in connection with any guarantee, to execute and deliver promissory notes or other evidences of such indebtedness or guarantee of the Trustee.

18.1.12  **Litigation on Behalf of Trust**. To commence or defend such litigation in connection with the trust or any property of the trust estate as the Trustee may deem advisable, at the expense of the trust estate. The Trustee shall also have the power to compromise, submit to arbitration, abandon, or otherwise adjust any claims or litigation against or in favor of the trust estate.

-31-

18.1.13  **Employment of Trust Agents**. To employ investment advisors, attorneys, accountants and any other agents or advisors to assist the Trustee in the administration of the trust estate.

18.1.14  **Liability Insurance**. To carry insurance of such kinds and in such amounts as the Trustee deems advisable, at the expense of the trust estate, in order to protect the trust estate against any damage or loss, and to protect the Trustee personally against any liability arising from actions taken in good faith by the Trustee on behalf of the trust estate.

18.1.15  **Transactions Between Trust and Trustee**. To loan or advance the Trustee's own funds to the trust for any trust purpose, with interest at current rates; to receive security for such loans in the forms of a mortgage, pledge, deed of trust, or other encumbrance of any assets of the trust; to purchase assets of the trust at their fair market value as determined by an independent appraisal of those assets; to sell the Trustee's own property to the trust at a price not in excess of its fair market value as determined by an independent appraisal; and to lease assets to or from the trust for fair rental value as determined by an independent appraisal.

18.1.16  **Loans to and from Probate Estate of a Trustor or Trust Created by Either Trustor**. To loan funds or assets belonging to the trust estate to the probate estate of either Trustor, from one trust to any other trust created under this Trust, or to any trust created by either or both of the Trustors, upon such equitable terms and in such amounts as the Trustee deems advisable.

18.1.17  **Purchases from Probate Estate of a Trustor or from Trust Created by Either Trustor**. To purchase property from the probate estate of either Trustor, or from any trust created by either or both of the Trustors, at its fair market value.

18.1.18  **Segregation of Assets of Each Trust**. There need be no physical segregation or division of the various trusts created under this Trust, except as segregation or division may be required by the termination of any of the trusts; however, the Trustee shall keep separate accounts for the different undivided interests.

18.1.19  **Pro Rata or Non-Pro Rata Division of Trust Assets**. In any case in which the Trustee is required or authorized, pursuant to the provisions of this Trust, to divide any trust property into parts or shares for the purpose of distribution, or otherwise, the Trustee is authorized, in its discretion, based on fair market values at the time of the division or distribution, to make the division and distribution in identical interests, in kind, including undivided interests in any property, or partly in kind and partly in money, on a pro rata or non-pro rata basis, and for this purpose, to make such sales of the trust property as the Trustee may deem necessary on such terms and conditions as the Trustee shall determine.

With respect to the division of the trust estate on the death of the Decedent, the Trustee is instructed to adhere to that certain Property Agreement executed by the Trustors on the same date as this trust instrument. Pursuant to that Property Agreement, all of the community property of the Trustors, including community property that is held outside of the trust estate, may be divided by the Survivor, or the agent or legal representative of the Survivor, on the basis of a non-pro rata division of the aggregate value of the community property, rather than on the basis of a division of each individual item of the community property.

In addition, the Trustee is authorized to allocate property exempt from the federal Generation-Skipping Transfer Tax proportionately or disproportionately among such parts or shares; however, if the power to allocate such property disproportionately would constitute a general power of appointment to the holder thereof under Internal Revenue Code §2041, such power shall be exercised only by those other acting Trustees with respect to whom the power to allocate such property will not constitute a general power of appointment, and if there are no such other Trustees, then the power to allocate disproportionately may be exercised only with the consent of all the living children of the Trustors and the living issue of any deceased children of the Trustors who are beneficiaries of the trust estate and whose interests may be adversely affected by the exercise of such power.

18.1.20  **Payments to Minor or Disabled Beneficiary**. To make payments to a minor or other disabled beneficiary by making payments to the beneficiary's parent, guardian, or conservator, or the Trustee may apply payments directly for the beneficiary's benefit. The

Trustee also may make payments directly to a minor if, in the Trustee's judgment, the minor is of sufficient age and maturity to spend the money properly.

18.1.21  **Modification of Trustee Powers.** To release or to restrict any power held by the Trustee in connection with any trust created under this Trust, whether such power is expressly granted in this Trust or is implied by law. Any release or restriction of any power shall be made in a written instrument specifying the power to be released or restricted. Any power released by the Trustee shall be extinguished except to the extent this Trust expressly provides that such power shall pass to another.

18.1.22  **Generation-Skipping Transfer Tax Powers.** To assist the Trustee in administering those trusts created hereunder which may be subject to the federal Generation-Skipping Transfer Tax, and in preserving and maximizing the exemptions allowable in computing such tax, the Trustee is authorized and, where specifically indicated, is directed:

(a)  To allocate each Trustor's unused Generation-Skipping Transfer Tax exemption ("GST Exemption") under Internal Revenue Code §2631 to any property or to any trust with respect to which such Trustor is the transferor for the purpose of such tax, and to exclude any of such property from such allocation. However, if the power to allocate such exemption would constitute a general power of appointment to the holder thereof under Internal Revenue Code §2041, such power shall be exercised only by those other acting Trustees with respect to whom the power to allocate such exemption will not constitute a general power of appointment. If there are no such other Trustees, such exemption shall be allocated as specified in Internal Revenue Code §2632(c).

(b)  The Trustee is directed to divide any trust created hereunder which may be subject to the federal Generation-Skipping Transfer Tax (hereinafter referred to as a "Potential Generation-Skipping Trust") and which has an Inclusion Ratio (as defined in Internal Revenue Code §2642) of other than 0 or 1, into two separate trusts (hereinafter referred to as "Divided Trusts") with the same terms and the same beneficiaries, so that one of such Divided Trusts has an Inclusion Ratio of 0 (the "Exempt Trust") and the other of 1 (the "Non-Exempt Trust"). After such division, the Trustee is authorized, in its discretion, to make any distributions

-34-

of principal and any discretionary distributions of income otherwise provided for under the terms of the Potential Generation-Skipping Trust first from the Non-Exempt Trust and, only when that trust is depleted, then from the Exempt Trust.

(c)    Anything in this Paragraph to the contrary notwithstanding, if on the death of the Decedent, the election under Internal Revenue Code §2652(a)(3) is made, and all or any part of the Decedent's GST Exemption is allocated to the MARITAL TRUST, the Trustee is directed to divide the MARITAL TRUST into two separate trusts with the same terms and with the same beneficiaries. One of such trusts shall have an Inclusion Ratio of 0 (the "Exempt Marital Trust"), and the other trust shall have an Inclusion Ratio of 1 (the "Non-Exempt Marital Trust").

The Trustee shall allocate to the Exempt Marital Trust that portion of the MARITAL TRUST to which the allocation of the Decedent's GST Exemption was made; the Trustee shall allocate the remaining portion of the MARITAL TRUST to the Non-Exempt Marital Trust. After such division, the Trustee is authorized, in its discretion, to make any distributions of principal to the Survivor provided for under the terms of the MARITAL TRUST first from the Non-Exempt Marital Trust, and only when that trust is depleted, then from the Exempt Marital Trust.

(d)    In the event that any of the Survivor's death taxes are chargeable to the MARITAL TRUST, pursuant to the provisions of this Trust or the Survivor's Will, or to the beneficiaries of the MARITAL TRUST pursuant to Internal Revenue Code §2207A, such death taxes shall be paid as follows:

(1)    First, from that portion of the MARITAL TRUST, if any, to which no part of either Trustor's GST Exemption under Internal Revenue Code §2631 has been allocated, until such portion is completely exhausted;

(2)    Second, from that portion of the Non-Exempt Marital Trust, if any, to which no portion of the Survivor's GST Exemption has been allocated, until such portion is completely exhausted;

-35-

(3)     Third, from that portion of the Non-Exempt Marital Trust, if any, to which any portion of the Survivor's GST Exemption has been allocated, until such portion is completely exhausted; and

(4)     Fourth, from the Exempt Marital Trust.

(e)   In dividing any "Potential Generation-Skipping Trust" under this Paragraph, the Trustee shall allocate to the Non-Exempt Trust created from such Potential Generation-Skipping Trust the minimum fractional share of the assets contained in such Potential Generation-Skipping Trust that is necessary to leave the Exempt Trust with an Inclusion Ratio of 0.

18.1.23   **Delayed Division or Distribution of Trust**. Notwithstanding that, under the terms of any trust created under this Trust, such trust may terminate or a distribution or division may be required by reason of the death of a Trustor or for any other reason, and subject to any final termination clause contained in this Trust, the Trustee may defer or delay termination, distribution or division for a reasonable period of time in order to:

(a)   receive assets made payable to the Trustee upon or by reason of a Trustor's death;

(b)   sell assets of the trust when the Trustee deems such action advisable to accomplish its orderly distribution or other reasonable objectives;

(c)   complete the orderly administration of the trust, including the payment of all taxes due upon or by reason of a Trustor's death; or

(d)   avoid adverse tax consequences which may arise by reason of such action, such as creating a "disposition" which would adversely affect an election available for federal estate tax purposes.

In determining what is a reasonable period of time, due consideration shall be given to the period of time required for final determination of federal estate taxes and state inheritance taxes, and, in any event, a delay until the federal estate tax and state death tax returns of a Trustor have been filed shall be deemed reasonable.

Notwithstanding the foregoing, however, the provisions of this Paragraph shall not be construed in any way which would adversely affect the qualification of a trust for the federal estate tax marital deduction. All rights of the Survivor to the income from any trust intended for such qualification shall vest immediately in the Survivor, effective as of the date of the Decedent's death.

18.1.24 **Discretionary Distribution of Trust Income to Reduce Income Tax Liability**. The provisions of this Paragraph shall apply to any and all discretionary trusts created under this Trust. For the purposes of this Paragraph, a discretionary trust is a trust which provides, in relevant part, that the Trustee has the power to determine whether the net income of such trust, and how much of such net income, shall be paid to or applied on behalf of a beneficiary of such trust.

The Trustee also may pay to or apply on behalf of a beneficiary of a discretionary trust so much of the net income of the discretionary trust as the Trustee, in its discretion, deems advisable for the purpose of reducing the overall income tax liability on such income. The Trustee shall have no liability to any beneficiary of such discretionary trust for failing to exercise the power described in this Paragraph, even if such failure causes the overall income tax liability on the net income of such discretionary trust to be greater than such income tax liability would have been if any portion or all of the net income of the discretionary trust had been distributed to the beneficiary (or beneficiaries) of such discretionary trust.

Notwithstanding anything contained in this Paragraph to the contrary, any Trustee who is also a beneficiary of such discretionary trust shall have no right or power, acting under the provisions of this Paragraph, to cause income to be distributed to or on behalf of himself or herself as a beneficiary of such discretionary trust, or to a person such Trustee is legally obligated to support. Nothing contained in this Paragraph, however, shall be deemed to

restrict a Trustee who is also a beneficiary of a discretionary trust from making discretionary distributions to or for the benefit of himself or herself as a beneficiary, or to a person such Trustee is legally obligated to support, if such distributions are otherwise permitted under any other provision of this Trust.

18.1.25 **Division and Consolidation of Trusts.** Subject to the provisions of Paragraph 18.1.22, the Trustee, in its discretion, may divide any trust created under this Trust into two or more separate trusts that have the same terms.

The Trustee, in its discretion, also may combine any trust created under this Trust with any other trust otherwise created, so long as:

(a)   The Trustee determines that administration as a single trust will be consistent with the intent of the persons who established the trusts, including the intent with respect to the tax consequences of the trusts, and will facilitate trust administration without defeating or impairing any beneficial interests;

(b)   The trusts to be combined have the same Inclusion Ratios for generation-skipping transfer tax purposes, unless the Trustee determines, in its discretion, that economic efficiency or other considerations justify combining trusts with different Inclusion Ratios; and

(c)   The terms of the various trusts are substantially identical.

18.2   **Sale of Unproductive Assets in SURVIVOR'S TRUST and MARITAL TRUST.** Notwithstanding anything contained in this Trust to the contrary, the Survivor shall at all times have the power to compel the Trustee to sell any unproductive assets in the SURVIVOR'S TRUST and in the MARITAL TRUST, and to use the proceeds from such sale for the acquisition of income-producing assets.

18.3   **Marital Deduction Savings Clause.** The Trustee shall exercise the powers and discretions granted by this Trust only in a manner consistent with the allowance of the federal

estate tax marital deduction to which the estate of the Decedent is entitled. Any powers and discretions which are inconsistent with the allowance of such marital deduction shall not apply to any trust which would otherwise qualify for the marital deduction.

18.4    **Allocation of Receipts and Expenses to Income and Principal**. The determination of all matters with respect to what is principal and income of the trust estate and the apportionment and allocation of receipts and expenses between principal and income shall be governed by the provisions of the California Uniform Principal and Income Act, as amended from time to time. Any such matter not provided for either in this Trust or in the California Uniform Principal and Income Act shall be determined by the Trustee, in its discretion.

Notwithstanding anything contained in this Paragraph to the contrary:

18.4.1    A Trustor's entire interest, as of such Trustor's date of death, in any Benefit Plan shall be allocated to principal for trust accounting purposes.

18.4.2    Any receipts from copyrights, royalties or similar rights relating to creative works shall be allocated to income; provided, however, that any proceeds received from the sale or other disposition of such copyrights, royalties or similar rights shall be allocated to principal.

18.5    **Waiver of Bond**. No bond shall be required of any person acting as Trustee under any trust established under this Trust.

18.6    **Community Property Powers**. Anything in this Trust to the contrary notwithstanding, while both Trustors are living, the Trustee shall have no powers which are more extensive than those possessed by a husband or wife under Sections 1100 and 1102 of the Family Code of the State of California, with respect to any community property contained in the trust estate.

18.7    **Delegation of Trustee Powers**. A Trustee may delegate to the other Trustee or Trustees then acting, or to one or more agents, administrative and ministerial duties relating to

the trusts established under this Trust. Pursuant to such delegation, one Trustee acting alone, or a designated agent, shall have the power to handle administrative matters of the trust, including, without limitation, the power to perform all acts necessary to transfer any real and personal property contained in such trusts and to execute all documents in connection therewith; to open accounts of any type, in one or more financial institutions; to authorize the deposit or withdrawal of funds from any or all of such accounts and to sign checks on such accounts; and to enter into trust safe deposit boxes.

All transfer agents, corporations and financial institutions dealing with a single Trustee or an agent pursuant to the provisions of this Paragraph shall not be under any responsibility to see to the performance of the trusts created under this Trust.

18.8    **Installment Notes--Delayed Distribution**. If the trust estate includes a promissory note or notes for which gain would be accelerated under Internal Revenue Code §453B if distributed to a beneficiary, the note or notes shall not be distributed at the time as otherwise provided for by this trust, but shall continue to be held in trust, and the payments received by the Trustee on the note or notes shall be distributed as received to the beneficiary or beneficiaries who would otherwise receive the promissory note or notes, or to their respective successors-in-interest.

18.9    **"S Corporation" Stock**. If any trust created hereunder has distributed or payable to it stock in an "S corporation" (as defined in §1361 of the Internal Revenue Code) and such trust, if it receives or continues to hold such stock, will not be a permitted stockholder of such S corporation, the Trustee, no later than the "mandatory distribution date" (as hereinafter defined), shall distribute such stock outright and free of trust to the Income Beneficiary, or if there is more than one Income Beneficiary, then to each such Income Beneficiary in the proportions in which such Income Beneficiaries are entitled to receive the income, or if there is no Income Beneficiary, then in equal shares to those persons who are then entitled to receive the income in the Trustee's discretion.

The term "mandatory distribution date," as used in this Trust, shall be deemed to mean the last day within the applicable time period specified in Internal Revenue Code §1361(c)

-40-

in which such stock must be removed from said trust in order for said corporation not to lose its S corporation status. The Trustors direct that the Trustee carry out these instructions in compliance with Internal Revenue Code §1361(c) and any and all regulations promulgated thereunder.

Notwithstanding anything contained in this Trust to the contrary, if any distributee under this Paragraph is of an age permitting assets to be held for such person under the California Uniform Transfers to Minors Act, then the Trustee shall distribute the aforesaid stock to a custodian, selected by the Trustee, for such distributee until the maximum age permitted under the California Uniform Transfers to Minors Act.

18.10 **Restrictions on Distributions Discharging Support Obligation of a Trustee.** Notwithstanding anything contained in this Trust to the contrary, after the death of the Decedent, the Trustee shall have no right or power to make any trust distribution which would have the effect of discharging any legal obligation of the Trustee relating to the support of any beneficiary of any trust created under this Trust. Such a distribution shall be referred to for the purposes of this Trust as a "Sensitive Distribution."

For the purpose of making any such Sensitive Distribution, the person designated to act as successor Trustee under the applicable provisions of Article V, if the then acting Trustee were to cease to act as Trustee, shall act as a Special Trustee. The power of such Special Trustee shall be limited to making the determination of whether or not such Sensitive Distribution should be made, and executing any documents necessary to effectuate such Sensitive Distribution.

18.11 **Termination of Trust with Principal Under $250,000.** Notwithstanding any provision in this Trust to the contrary, if at any time the fair market value of any separate trust held by the Trustee under this Trust is less than Two Hundred Fifty Thousand Dollars ($250,000), then the Trustee, in its discretion, may terminate such trust. Upon the termination of such trust, the Trustee shall distribute the assets held under such trust free of trust, in equal shares, to each of the persons then entitled to mandatory or discretionary income distributions from such trust; provided, however, that in the case of a beneficiary under age twenty-five (25) at the time of such termination, the Trustee shall distribute the assets held under such trust

pursuant to the provisions of Article XIII of this Trust. For the purposes of this Paragraph 18.11, the distributions described in this Paragraph shall be referred to as "Termination Distributions."

Notwithstanding anything contained in this Paragraph to the contrary, the Trustee shall have no right or power to terminate any trust (the "Applicable Trust") and make the Termination Distributions, to the extent that the exercise of the Trustee's power to terminate the Applicable Trust and distribute its assets would itself constitute the exercise of a general power of appointment in favor of the Trustee. If the Trustee's exercise of such power to terminate the Applicable Trust would constitute the exercise of a general power of appointment in favor of the Trustee, then the person designated to act as successor Trustee under the applicable provisions of Article V, if the then acting Trustee were to cease to act as Trustee, shall act as a "Special Trustee" of the Applicable Trust.

The power of such Special Trustee shall be limited to making the determination of whether or not the Applicable Trust may be terminated under this Paragraph 18.11. The Special Trustee shall have no obligation to exercise such power, regardless of the value of the assets contained in the Applicable Trust. The Special Trustee shall exercise its power under this Paragraph by delivering written notice of such exercise to the then acting Trustee of the Applicable Trust. Upon its receipt of such written notice, the Trustee forthwith shall make the Termination Distributions, in the manner described in the first full paragraph of this Paragraph 18.11.

## ARTICLE XIX
## REVOCATION AND AMENDMENT

19.1    **Revocation by Either Trustor**. Either Trustor may revoke this Trust at any time while both Trustors are living, by delivering written notice of revocation to the Trustee and to the other Trustor. Upon revocation, the Trustee shall promptly distribute to the Trustors their community property trust assets, and to each, respectively, his or her quasi-community and separate property trust assets.

23.13 **Trust Estate**. The term "trust estate" shall mean all property subject to the provisions of any particular trust established under this Trust (including any property added to the Trust on the death of a Trustor), and shall include accrued and undistributed income, whether or not such income is added to principal.

## ARTICLE XXIV
## GOVERNING LAW

All questions relating to the validity, construction and administration of this Trust shall be determined in accordance with the laws of the State of California.

## ARTICLE XXV
## NAME OF TRUST

The name of this trust shall be the "RAPHAEL AND VICKY MENSE LIVING TRUST."

The Trustors and Trustee have executed this amended and restated Trust Agreement on *FEB 10 2009* .

RAPHAEL MENSE

Trustor and Trustee

*FEB 10 2009*

VICKY MENSE

Trustor and Trustee

-48-

State of California

County of Los Angeles

On *Feb. 10, 2009* _____, before me, CYNTHIA L. BURGESS _____, a Notary Public, personally appeared RAPHAEL MENSE and VICKY MENSE, who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature *Cynthia L. Burgess* _____

CYNTHIA L. BURGESS
Commission # 1802879
Notary Public - California
Los Angeles County
My Comm. Expires Jun 21, 2012



**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

## Attachment 9

Recorded Chapter 11 Petition

To be provided

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

# Attachment 10

Federal and State Tax Returns


To be provided at the Initial Debtor Interview as required

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

## 2.     Projected cash flow statement for the first 90 days from filing.

To be provided

In re Raphael Mense
Case No: 2:14-bk-11195-PC
7 Day Package

## 3.      Statement of Major Issues and Timetable Report.

The filing of Chapter 11 cases for Raphael Mense and Cottonsmith, LLC was precipitated by a judgment obtained by Fred Kayne, individually as Trustee of the Fred and Lenore Kayne Family Trust in the Los Angeles Superior Court. The action was filed on August 24, 2011 and was tried on May 8, 2013. While no judgment has yet been entered, it appears that upon entry, it will be a sum in excess of $4 million.

After extensive consultation with appellate counsel, it was concluded that there exist several bases for appeal. A decision was made by both Raphael Mense and Cottonsmith to prosecute an appeal  Hillel Chodos, Esq. has been retained for this purpose. Notice of Appeal will be filed immediately upon entry of the judgment. Given the amount of the judgment, neither party had the liquidity with which to post an appellate bond. Filing of Chapter 11 cases was the only means by which to avoid the consequences of enforcement of writs of execution.

The initial sequence of events will likely be a motion filed by the Debtors seeking a court order to modify the automatic stay (11 USC Section 362) in order to permit the filing of Notice of Appeal and all of those tasks necessary to further the appellate process.   Applications will also be filed to permit the estates to employ special appellate counsel, namely, Hillel Chodos, Esq.

Raphael Mense is a business man who, for many years, owned and operated a T-shirt business, selling very large quantities of T-shirts at the commodity level. In addition, Mr. Mense is involved as a real estate investor and developed with certain projects in various stages of construction and completion. Efforts will be undertaken to ensure that these projects are not

**In re Raphael Mense**
**Case No: 2:14-bk-11195-PC**
**7 Day Package**

interrupted and that they can finished and sold.  Other real estate interests are held in partnership

or co-tenancy form and these will continue to be operated based on management arrangements in

place prior to the filing of the underlying state court case.

The outcome of the appeal will have a material bearing on the outcome of these Chapter

11 filings.  It is estimated by Appellate Counsel that the period of time from Notice of Appeal to

appellate opinion, would be in the range of 18 months to 24 months.   During that period, the

Debtor will continue to oversee projects now in place and of course, will report all activity on a

monthly basis.

The nature of plans of reorganization in these cases will turn on the outcome of the

appeal.  A win could mean a re-trial or reversal of judgment.  Such a result would allow for a

dismissal of the Chapter 11 cases.   A loss on appeal would dictate a different result and would

likely necessitate the liquidation of assets in order to meet the requirements of the judgment.

At the early stage of these cases, it appears that the only professionals needed will be

Bankruptcy Counsel, Special Appellate Counsel and Certified Public Accountant.

There may be cash collateral issues involving loans obtained by Raphael Mense which

are secured by various properties, held in the form of co-tenancy or other entities.   It is believed

that no such loans are now in default.  Other forms of obligation exist in the form of personal

guaranties.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT "5"

[Section 341(a) Meetings Transcript]

1                    UNITED STATES BANKRUPTCY COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4   In Re:                          )   Case No. 2:14-bk-11194-PC
                                    )
5   COTTONSMITH, LLC,               )   Chapter 11
                                    )
6           Debtor.                 )   Los Angeles, California
    _____)
7                                   )
    In Re:                          )
8                                   )
    RAPHAEL MENSE,                  )   Case No. 2:14-bk-11195-PC
9                                   )
            Debtor.                 )
10  _____)

11                                      341(a) MEETING

12                    TRANSCRIPT OF PROCEEDINGS

13  APPEARANCES:

14  For Cottonsmith, LLC            DOUGLAS M. NEISTAT, ESQ.
      and Raphael Mense:           Greenberg & Bass, LLP
15                                  16000 Ventura Boulevard
                                    Suite 1000
16                                  Encino, California 91436
                                    (818) 382-6200
17

18  For the United States          KENNETH G. LAU, ESQ.
      Trustee:                     Office of the United States
19                                     Trustee
                                    915 Wilshire Boulevard
20                                  Suite 1850
                                    Los Angeles, California 90017
21                                  (213) 894-4480

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

ii

1  APPEARANCES:  (cont'd.)

2  For the United States          GARY B. BADDIN, Analyst
     Trustee:                     Office of the United States
3                                    Trustee
                                  915 Wilshire Boulevard
4                                 Suite 1850
                                  Los Angeles, California 90017
5                                 (213) 894-1450

6  For Fred Kayne:                JULIET Y. OH, ESQ.
                                  Levene, Neale, Bender, Yoo
7                                    & Brill, LLP
                                  10250 Constellation Boulevard
8                                 Suite 1700
                                  Los Angeles, California 90067
9                                 (310) 229-1234

10 For Pacific Western Bank:      KIM DAVIS
                                  Pacific Western Bank
11

12 Transcriber:                   Briggs Reporting Company, Inc.
                                  4455 Morena Boulevard
13                                Suite 104
                                  San Diego, California 92117
14                                (310) 410-4151

15

16

17

18

19

20

21

22

23

24

25

iii

<u>I N D E X</u>

<u>WITNESSES:</u>                                    <u>EXAMINATION</u>

Raphael Mense                                        3

1

1    LOS ANGELES, CALIFORNIA THURSDAY, MARCH 6, 2014 1:30 PM

2 _____--oOo--

3        (Call to order of the Court.)

4           MR. LAU:  Good afternoon.  This is Thursday, March

5    6, 2014.  We are here today to conduct the Chapter 11 341(a)

6    examination in the jointly administered Chapter 7 -- Chapter

7    11 cases of Cottonsmith, LLC, and Raphael Mense.  Those two

8    case numbers in order are 2:14-bk-11194-PC, and 2:14-bk-

9    1195-PC --

10          MS. OH:  You missed a one.

11          MR. LAU:  Did I?  11195-PC.  These -- the

12   recordings for these two cases will be respectively referred

13   to as tracks number two and three.  I am electing to call

14   the two cases together because they are officially being

15   jointly administered.  I will make a separate announcement

16   at the 4:15 start time for Mr. Mense's separate Chapter 11

17   case, just in case there are creditors who show up just for

18   that particular meeting.  And, obviously, I will allow them

19   to ask questions that they might have at that time.

20          We are running a bit behind schedule right now.

21   It is -- my watch, unlike the clock above, says that it's 10

22   minutes to 4:00, so, we are now commencing with that.

23          My name is Kenneth Lau.  I am trial counsel for

24   the United States Trustee's Office for the Central District

25   of California, Los Angeles Division, and I will be

2

1   conducting today's 341(a).

2          Let's see.  First of all, could I have appearances

3   by everyone in the room?

4          MR. NEISTAT:  I'll lead off with that.  Douglas

5   Neistat of Greenberg and Bass, bankruptcy counsel to Raphael

6   Mense and Cottonsmith, LLC.

7          MR. LAU:  Okay.

8          Sir.

9          MR. MENSE:  I'm Raphael Mense, Chapter 11, or

10  whatever you call that.

11         MR. LAU:  You -- so, Mr. Mense, you are both your

12  own Chapter 11 Debtor, and you are appearing on behalf of

13  Cottonsmith, LLC, is that correct?

14         MR. MENSE:  Yes.

15         MR. LAU:  Okay.  And your title with Cottonsmith,

16  LLC is what?

17         MR. MENSE:  Is president.

18         MR. LAU:  Okay.  Very good.  I will get to you in

19  a second, Mr. Mense.

20         Counsel?

21         MS. OH:  Juliet Oh, Levene, Neale, Bender, Yoo and

22  Brill, on behalf of creditor Fred Kayne.

23         MR. LAU:  Very good.  And I will just note for the

24  record that U.S. Trustee Bankruptcy Analyst Gary Baddin, is

25  also in attendance.

3

1       Okay.  Mr. Mense, if I could please have you raise

2  your right hand.

3            MR. MENSE:  Yes, sir.

4                 RAPHAEL MENSE - DEBTOR - SWORN

5            MR. MENSE:  I do.

6            MR. LAU:  Very good.  Thank you.

7                      EXAMINATION

8  BY MR. LAU:

9  Q    All right.  Mr. Mense, I am presuming that you have

10  given testimony under oath before, is that correct?

11  A    First time in a trial.

12  Q    Okay.

13  A    When I was in a trial for Mr. Kayne.

14  Q    Very good.

15  A    That was my first time.

16  Q    That was your fist time.  Okay.  But that is now in the

17  past, so you have done it before?

18  A    Yes.

19  Q    All right.  So, as you can see, we are in an office

20  building today, rather than a courtroom, but I'm reminding

21  you that your testimony today is being given, especially

22  after -- from this point forward, you having been sworn in,

23  is given under penalty of perjury, the same solemnity and

24  dignity as if you were testifying in a court of law.  Do you

25  understand that?

4

1 A      Yes.

2 Q      Very good.  Okay, Mr. Mense, I will note with great

3 admiration that your regular speaking voice has some

4 assertiveness to it, so I do not need to ask you to speak

5 up.  I think that your regular speaking voice will do just

6 fine.

7 A      Thank you.

8 Q      And that is -- the reason for that is, today's

9 proceedings are being digitally recorded, and the digital

10 recording will become the official record of the 341(a)

11 examinations in both of these Chapter 11 case, okay?

12       So, it's very important for us to create as clear a

13 record as we can.  One of the easiest ways to sort of screw

14 up the record is for more than one person to be talking at

15 the same time.

16 A      I understand.

17 Q      So, if you will wait for me to finish my question

18 before you start to answer, then I will accord you the equal

19 professional courtesy and allow you to finish your answer

20 before starting to ask another question.  Okay?

21 A      I understand.

22 Q      Very good.  The other thing that I do need to remind

23 basically everyone, is what you have in front of you are

24 omni-directional marks, okay.  They do not amplify sound,

25 but they do pick up basically everything that is said,

5

1  including paper shuffling.  So, if counsel could keep paper

2  shuffling to a minimum, that is appreciated.

3      Moreover, it's very easy to forget this because we're

4  sitting a few feet from each other.  I can see you nod your

5  head for yes, and shake your head for no.  But the

6  microphone, it is Government property.  There are

7  restrictions on these sorts of things.  It will not pick

8  that up, okay.  So I need an audible answer, yes, no, or

9  whatever your narrative answer is.  Okay?

10 A    Yes.

11 Q    Very good.  All right.  Let's see here.  So, we can

12 start it.  All right.  All right.  The initial 341(a) is

13 scheduled for Cottonsmith, so I will begin there.  Let's

14 see.  I -- let me just take care of a few administrative

15 things.

16     Mr. Mense, Cottonsmith, LLC is not an operating

17 business, is that correct?

18 A    Correct.

19 Q    Okay.  So, it -- does it have any assets other than

20 cash?

21 A    No.

22 Q    Okay.  All right.  So it does not have a physical

23 facility, like where the records are, anything like that?

24 A    As I explained the other day, there is a small office

25 that they have a space there.  It's the office of my son-in-

6

1  law and my son.

2  Q    Okay.

3  A    And we have a small desk there, and we keep some of the

4  records there.  And most of the records are in a public

5  warehouse.

6  Q    Okay.  But Cottonsmith does not own either the office

7  where some of the records are, nor the public storage unit

8  that --

9  A    Correct.

10  Q    -- you believe the others are?  Okay.  Cottonsmith does

11  not have any vehicles, is that correct?

12  A    It doesn't have now nothing.

13  Q    Okay.  So -- and the reason I'm asking is, Cottonsmith

14  has not produced any proof of any insurance coverage

15  whatsoever.  Is it your testimony then, that the reason that

16  there is no insurance coverage is that there's nothing to

17  insure?

18  A    "Nothing to insure."

19  Q    Okay.  Does Cottonsmith, LLC have directors and DNO

20  insurance coverage?

21  A    I am not clear what is the meaning of "DNO."

22  Q    But it's also called errors and omissions insurance, to

23  cover a company's --

24  A    I think there is no insurances.  Only they're paying my

25  health care, you know, the -- what is that?  For my

7

1  health  --

2  Q    Okay.

3  A    -- insurance.

4  Q    So Cottonsmith pays your health --

5  A    I -- we put on our schedule, right.  I mean, it's

6  indicated, I think, that they pay some of the health

7  insurances or something like that.

8  Q    I -- you know, the -- as a corporate entity,

9  Cottonsmith would not have to fill out a schedule I or J,

10  so.

11  A    Isn't this the health?  Yeah, that's the one.  Aetna

12  Bluecross, Raphe's medical.  That's the only thing.

13  Q    That's the -- counsel, is he referring to the financial

14  statement, the objection?

15          MR. NEISTAT:  I'm not sure what you're referring.

16          MR. LAU:  Is Mr. Mense referring to like the cash-

17  flow statement?

18          MR. NEISTAT:  There's a Cottonsmith budget for the

19  months of March and April and May, 2014, that identifies for

20  the that period time, Anthem Blue Cross coverage for Mr.

21  Mense.

22          MR. LAU:  I see.

23          MR. NEISTAT:  It's looks like it's running 300 a

24  month.

25          MR. LAU:  Okay.

8

1          THE WITNESS:  Yes.  Correct.

2          MR. LAU:  Okay.  Yeah, I didn't see that.  Okay.

3  BY MR. LAU:

4  Q    All right.  Okay.  Mr. Mense, with -- I'm asking these

5  questions in connection with Cottonsmith, LLC in particular

6  only right now, okay?  So you are testifying as the person

7  on behalf of Cottonsmith.  So when I say "you," don't --

8  please try to not answer on behalf of yourself, Raphael

9  Mense, okay?

10 A    Yes, sir.

11 Q    All right.  So, I know sometimes it's tough to --

12 A    Yeah.

13 Q    -- make the --

14 A    Distinguish.

15 Q    "Distinguish" it.  And the distinction, but -- okay.

16 A    "Distinction."

17 Q    All right.  So, in your seven-day -- in the

18 Cottonsmith's seven-day package, when -- in response to the

19 question about pre-petition bank accounts, what you said was

20 that that information about pre-petition bank accounts being

21 closed, would be provided.  And I don't believe I've

22 received any additional information about that.  I'm not

23 really sure.

24 A    I think --

25 Q    I know I got Debtor-in-possession account information

9

1  since then.

2          MR. NEISTAT:  I have that evidence today.

3          MR. LAU:  Okay.

4          MR. NEISTAT:  Which we will file tomorrow.

5          MR. LAU:  Very good.

6          MR. NEISTAT:  That that account at Wells Fargo has

7  been closed -- excuse me.  The account at Israel Discount

8  Bank has been closed.

9          MR. LAU:  Okay.  Right.  I was going to say, Wells

10 Fargo is the Debtor-in-possession account, right?

11         MR. MENSE:  Correct.

12         MR. NEISTAT:  Yes.

13 BY MR. LAU:

14 Q    So, Mr. Mense, where did Cottonsmith, LLC have its pre-

15 petition bank accounts?

16 A    At IDB, Israel Discount Bank.

17 Q    Okay.  And when was that closed?

18 A    Actually, today, I was asked by Mr. Gary --

19 Q    Baddin.

20         MR. NEISTAT:  "Baddin."

21         MR. MENSE:  "Baddin" the other day, that I have to

22 close and transfer the money.  I made all the arrangements.

23 Today I called them.  I faxed them the instructions.  They

24 faxed me.  I filled it up, and instructed them today to

25 close.  Tomorrow they say that the funds should be

10

1  transferred to Wells Fargo.  And I have also a check that I

2  wrote, to complete all the money being transferred from IDB

3  to Wells Fargo account, Cottonsmith's account.

4           MR. LAU:  Okay.  All right.  So, Mr. Neistat, as I

5  understand, that bank account is in the process of being

6  closed, is that right?

7           MR. NEISTAT:  That's correct.

8           MR. LAU:  Okay.  All right.

9           MR. NEISTAT:  There was an initial DIP account

10 opened.

11          MR. LAU:  Right.

12          MR. NEISTAT:  Because of the amount of funds

13 involved, they've been moved over to Wells Fargo.  I think

14 there was a problem with Israel Discount Bank being --

15 accepted as an acceptable depository.

16 BY MR. LAU:

17 Q    Okay.  All right.  So when was the Debtor-in-possession

18 account opened, the present one?

19 A    The exact date, or approximately I would say about a

20 month something, a little bit more than a month.  But we

21 have the actual date.

22 Q    Okay.  I have a platinum business services package bank

23 statement for the account ending in -- let's see, 5595, that

24 shows an opening balance of $500 on January 24th of 2014, is

25 that --

11

1   A    That's properly -- that's the right date, yeah.   I

2   deposited $500 into Cottonsmith account --

3   Q    Uh-huh.

4   A    -- and $1,500 to Raphael Mense account.

5   Q    Okay.

6   A    To open the accounts.

7   Q    Right.  Very good.  And there is just the one account

8   for each of the --

9   A    One account for each.

10  Q    "For each," okay.  All right.  And the pre-petition

11  account for Cottonsmith is in the process of being closed,

12  and those funds will be sent to -- will be wired into the

13  Debtor-in-possession account?

14  A    Yes.  There is one wire of the big sum --

15  Q    Right.

16  A    -- which was in a CD kind of account.

17  Q    Okay.

18  A    And in the checking account about $153,000.  I'm going

19  to go tomorrow and deposit the check in the Cottonsmith DIP

20  account.

21  Q    Okay.

22  A    And I don't know how many days it takes them to clear

23  it, but I will ask them to expedite it.

24  Q    All right.

25          MR. LAU:  Is -- Mr. Neistat, were you saying

12

1  about, like that there was, there's a problem with sending

2  it, you know, station to station, rather than turn Mr. Mense

3  into a career --

4           MR. NEISTAT:  I'm not sure I follow the question.

5           MR. LAU:  I mean, you know, couldn't, couldn't the

6  IDB wire the money from the checking account?

7           MR. NEISTAT:  It's an application for transfer of

8  funds.  It looks like it will be a wire.

9           MR. LAU:  Okay.  Well, I mean, that's the CD,

10 right?

11          MR. NEISTAT:  No, no.  That's the --

12          MR. MENSE:  I will answer.

13          MR. LAU:  Okay.

14          MR. MENSE:  If I may.  The CD account, they said

15 we will do it wire transfer.

16          MR. LAU:  Okay.

17          MR. MENSE:  And the cash account, which the

18 checking account, they say, write out a check --

19          MR. LAU:  Uh-huh.

20          MR. MENSE:  -- and deposit it with Wells Fargo,

21 and they will get the fund this way.  Why they say so, I

22 don't know, but I just followed what they did, and I wrote

23 out the check.  Actually, I have it with me.  I wrote the

24 check for $153,096.66, to Cottonsmith, LLC, debitor

25 (phonetic) in possession.  Tomorrow I intend to go and

13

 1  deposit it, and tell them clear the funds by Monday or

 2  Tuesday.

 3              MR. LAU:  Okay.

 4              MR. MENSE:  To me, it would be a lot easier --

 5              MR. LAU:  Yeah.

 6              MR. MENSE:  -- to do a TT transfer.  But they say

 7  do it this way, I don't argue.

 8              MR. LAU:  I see.  Okay.

 9              Gary, do you have any questions about that?  Okay.

10  All right.  Yeah.  And this will be accounted for -- all

11  right.  Let's see.  Okay.  Don't need that.

12  BY MR. LAU:

13  Q   Mr. Mense, the -- I did not attend the initial debtor

14  interview that you had with Mr. Baddin.  Did you present any

15  preceding -- I'm sorry, tax returns from any preceding year

16  for review?

17              MR. NEISTAT:  Yes, we delivered those tax returns

18  for the previous two years.  I didn't bring them with me

19  today --

20              MR. LAU:  Okay.  All right.

21              MR. NEISTAT:  -- but they were delivered --

22              MR. LAU:  I'm -- they're just marked here that we

23  don't have them, so.

24              MR. NEISTAT:  If you want, I can get them to you

25  tomorrow.

14

1          MR. LAU:  That's okay.

2          Gary, you took a look at them?  Do you remember

3  that?

4          MR. BADDIN:  For Cottonsmith?

5          MR. LAU:  Yeah.  It's just -- I mean, on our

6  report it just says, you know, we don't -- that we don't

7  have those.

8          MR. BADDIN:  They are noted on there.  There's a

9  2011 and a 2012 state and federal tax return, so.

10         MR. NEISTAT:  That's -- yes, those do exist and

11 can be delivered to you.

12         MR. LAU:  Okay.  You know, what Mr. Neistat, I

13 will ask you to file those to the U.S. Trustee, the

14 electronic portal, you know, where you --

15         MR. NEISTAT:  Yes.

16         MR. LAU:  -- put the seven-day package?  And --

17         MR. NEISTAT:  That's two -- that will be 2011 --

18         MR. LAU:  '11 and 2012.

19         MR. NEISTAT:  -- and 2012.  There is no 2013 yet.

20         MR. LAU:  Okay.

21 BY MR. LAU:

22 Q    Mr. Mense, on the Debtor-in-possession account for

23 Cottonsmith, who is the signator?

24 A    I am.

25 Q    Is there any other signator?

15

1  A     No.

2  Q     Okay.  In the context, Mr. Mense, of a hearing that was

3  held yesterday, with respect to Cottonsmith's request for

4  relief from stay to pursue an appeal in the California Court

5  of Appeals, certain references were made by one of your

6  creditors, Mr. Kayne, that the financial statement was given

7  on behalf of Cottonsmith that is materially different from

8  the information that is listed on your -- the petition and

9  schedules for Cottonsmith.  Are you aware of that?

10  A     Can you refer to numbers, so I will --

11  Q     Sure.

12  A     -- try to be specific.

13  Q     You know, actually, I suspect actually, that counsel

14  for Mr. Kayne might have those numbers just at her

15  fingertips.

16          MR. LAU:  Ms. Oh, do you --

17          MS. OH:  I do.  Do you want me to jump in now?

18          MR. LAU:  Yeah, why don't you just jump in now.

19          MS. OH:  Okay.

20  BY MS. OH:

21  Q     Mr. Mense --

22  A     Yes.

23  Q     -- a balance sheet that was provided for Cottonsmith,

24  LLC, as of September 30, 2013 -- I'm not asking you to

25  recall, I'm just representing to you.  It reflected that

16

1  there was cash in bank accounts totaling approximately

2  $1,522,000.  Your schedule -- I'm sorry.  The Debtor's

3  schedule B reflects or lists cash in business checking

4  account in the sum of $1,400,000, which is a difference of

5  about $122,000.  My understanding from the statement of

6  financial affairs by the Debtors -- Debtor, a $25,000

7  retainer payment was paid to counsel, is that correct?

8  A    Correct.

9  Q    Do you know where the rest of the funds --

10 A    Everything that we paid is for legal fees or on regular

11 basis of the schedule that we showed.

12 Q    Are you referring to the budget that was submitted

13 as --

14 A    Yeah, the "budget," or legal fees.  There is even less

15 now.  There was more money paid.

16 Q    How much money is actually in the Cottonsmith accounts

17 currently?

18 A    If I refer to the money we transferred today, which is

19 -- okay.  I'll give you a breakdown if you want.

20 Q    Okay.

21 A    It will be very specific what I know.  Nine-hundred-

22 sixty-five-thousand-four-hundred-ninety-six-and-fifty cents,

23 plus $153,000 -- I'll give you exact -- ninety-six dollars

24 and 66 cents.  That's all I know exactly from IDB.

25 Q    I'm not a very good mathematician, but my calculation

17

1  is that's approximately $1.2 million between those two

2  amounts.

3  A    No, a bit less.

4  Q    Right, approximately.

5  A    Yes, one-point what?

6  Q    Actually, it would be a little more.

7         MR. NEISTAT:  Around 1,000,000.

8         MR. MENSE:  Yeah.

9         MS. OH:  A little more than a million-two, right?

10        MR. BADDIN:  Well, give me the figures, I'll add

11 them up.

12        MR. NEISTAT:  Yes.

13        MS. OH:  About 965,000 --

14        MR. MENSE:  Yes.

15        MS. OH:  -- and about 153,000.

16        MR. MENSE:  I'm even worse in addition.

17        MS. OH:  Yeah, you're even worse than I am.

18        MR. MENSE:  Sorry.

19        MS. OH:  I take my comment back.

20        MR. MENSE:  Yes.

21        MR. NEISTAT:  Nine-sixty-six and 153.

22 BY MS. OH:

23 Q    All right.  Now there's about a million-two.  Let's

24 just round it up.

25 A    Those two numbers, yes.

18

1  Q    Okay.  So between the petition date, when the -- which

2  schedule B reflects there was cash of a million-four, and

3  today, what you represented is approximately a million-two.

4  Where did the $200,000 go?

5  A    Actually, it's all for legal fees, as I said.  We paid

6  to -- it should be more, because I paid check to Chodos, Mr.

7  Hillel Chodos, $250,000.  You have it in the -- some of the

8  statements, correct, counselor?

9        MS. OH:  My understanding, counsel, is that -- and

10 Mr. Mense, is that the $250,000 retainer paid to Chodos came

11 from you personally.

12       MR. NEISTAT:  No.

13 BY MS. OH:

14 Q    Okay.  So it came from this money that was being held

15 by Cottonsmith, is that correct?

16 A    Correct.

17 Q    And that was $250,000?

18 A    Right.

19 Q    So, between September 2013 and today, the money that

20 was spent by Cottonsmith was primarily for legal fees --

21 A    Yes.

22 Q    -- is that your testimony?

23 A    Correct.

24 Q    And what other expenses?  You indicated there were also

25 some expenses reflected in a budget?

19

1  A      Very minor.  We gave a schedule.

2  Q      I'm sorry.  I haven't seen it, but I'll --

3  A      But if you look for --

4           MR. NEISTAT:  If you want to -- this is the 90

5  days.

6           MR. MENSE:  -- for 90 days, we estimating $11,540

7  for 90 days.

8  BY MS. OH:

9  Q      And what are -- can you generally tell me the

10 categories of expenses for that 90 day period?

11 A      Can I give her this?

12          MS. OH:  I can get it.  Or you can get it to me

13 later.  But if you could just --

14          MR. NEISTAT:  Yeah, I can get -- I'll get it to

15 her.

16          MS. OH:  -- if you could just --

17          MR. NEISTAT:  Just read off the categories.

18          MS. OH:  -- read them off.

19          MR. MENSE:  So it says AT&T office phone, AT&T

20 Raphe's phone, Well Care, Raphe's medical, Aetna Blue Cross,

21 the IT for the -- IT services, Travelers, that's the

22 insurance for the car, I guess.  Finance tax bond, Franchise

23 Tax Board, Public Storage.  And then we have outside

24 contractor, Minas Sarafian.  He used to work for

25 Cottonsmith.  No longer.  He's a outside contractor.  He

20

1  comes to do the books and record, and keeps -- he's been

2  doing it for almost 15, 16 years.

3          And then you have legal fees.  And -- for

4  accounting purposes and things like that.  All together it

5  comes to $11,540.

6          MR. NEISTAT:  For 90 days.

7          MR. MENSE:  "For 90 days."

8  BY MS. OH:

9  Q    Is the automobile insurance you I think mentioned

10 through Travelers, is that for your personal vehicle?

11 A    Yes.

12 Q    Okay.

13 A    Until it expires, and then I take it over.

14 Q    And the IT and utility, phone, your cell phone, those

15 are related to --

16 A    This is Cottonsmith been forever, you know.

17 Q    Understood, but --

18 A    It's Cottonsmith phone that I'm using forever.

19 Q    If the -- do you use it for personal --

20 A    Yes, "personal" --

21 Q    -- purposes?

22 A    -- business, lawyers, everything I have to do.

23 Q    But --

24 A    Just like I did it for 20 years.

25 Q    -- but you did testify earlier Cottonsmith is no longer

21

1  an operating business, is that --

2  A    No, but it is lawsuit, litigation, and it's my duty to

3  make sure that I do whatever necessary to protect and defend

4  and Cottonsmith.

5  Q    And when was the last time the Debtor conducted any

6  business?

7  A    Sorry?

8  Q    When was the last time Cottonsmith conducted any

9  business, other than litigation?

10  A    I think in 2010.

11        MS. OH:  Mr. Lau, I don't want to jump in with any

12  of my other questions --

13        MR. LAU:  Okay.  All right.  Thank you.

14        MS. OH:  -- at this point.  If I can reserve time

15  at the end?

16        MR. LAU:  Sure, sure.  Okay.

17        It is now 4:15 p.m., so let me announce to anyone

18  in the audience who wasn't already here.  On behalf of the

19  U.S. Trustee, I am conducting the jointly administered

20  Chapter 11 cases of Cottonsmith, LLC, together with the

21  individual Chapter 11 case of Raphael Mense.

22        I have not asked my initial questions of Mr. Mense

23  personally yet.  We are still conducting the Cottonsmith

24  Chapter 11 341(a) examination.  So, to the extent that

25  you're here for Raphael Mense, you haven't missed anything.

22

1          MS. OH:  All right.  Thank you.

2          MR. LAU:  All right.  So -- okay.

3 BY MR. LAU:

4 Q    Mr. Mense, I have reviewed the statement of major

5 issues and timetable that were filed by your counsel.  But

6 in your own words, can you briefly describe why the Debtor

7 chose to file a Chapter 11 at this time?

8 A    Well, I had a verdict against me of $4,000,000.  In

9 order to file -- to place a bond, which we investigated, et

10 cetera, I have to put 150-percent of the verdict, plus the

11 cost to put it, and et cetera.

12     I could not come up with such an amount of cash.  That

13 would make me impossible to live or whatever, and I didn't

14 have that much cash.  So I have no choice but to file the

15 Chapter 11.  And I think that this verdict is completely

16 incorrect, and I think that it will be reversed, and

17 everything will be fine.

18 Q    So, other than to stay the enforcement of the judgment

19 that was entered against both yourself personally and

20 Cottonsmith, LLC, what else are you intending to accomplish

21 in the Chapter 11 bankruptcy?

22 A    I'm not clear your question.  If you would --

23 Q    Okay.  Sure.  For -- just as an example, you know, some

24 Chapter 11 debtors, you know, are seeking to, you know, file

25 motions to value pieces of their property, so that they

23

1 could be bifurcated and, you know, a secured portion of the

2 debt be taken care of in one instance, you know, in one way,

3 as a secured creditor, and then the remainder is treated as

4 an unsecured claim.

5      It is not clear to me that that -- anything like that

6 is intended here, but just as an example, that would be an

7 example like something else that you would be looking for in

8 a Chapter 11 bankruptcy.

9      So, as I said, other than to prevent enforcement of the

10 judgment, what other goals do you have for Cottonsmith

11 and/or yourself, since you can answer on behalf of yourself,

12 also, in the context of the Chapter 11 bankruptcy process?

13 A   I think the judgment made it impossible for me to put a

14 bond, because it would make impossible for me to continue my

15 life and continue supporting myself, because I have no work.

16 I'm pulling out money from my saving.  And if you look at my

17 record, I don't owe -- I pay all my taxes.  I'm doing

18 everything by the book, and this judgment made it impossible

19 for me.  I cannot come up with so much cash.

20      MR. NEISTAT:  I need to supplement the response.

21      MR. LAU:  Okay.  Go ahead.

22      MR. NEISTAT:  It's not an easy question for a

23 layperson to answer.

24      MR. LAU:  Yeah, I understand.

25      MR. NEISTAT:  Mr. Mense is retired.  His only

24

1  source of income is social security, plus a lifetime of work

2  that translates to a fairly substantial net worth related to

3  a variety of business investments, two of which involve

4  active construction.  And perhaps it's more appropriate for

5  the 341(a) in the Mense case --

6           MR. LAU:  I mean, that's fine.  You know, I

7  will --

8           MR. NEISTAT:  But because they're jointly

9  administered, they let -- the judgment against -- the

10  judgment rendered by the L.A. Superior Court was joint and

11  several.  Mr. Mense has a financial interest in Cottonsmith.

12  There's a small interest also held by Mr. Kayne.  So, any

13  impairment of his liquidity would have a ver serious impact

14  on his ability to meet his responsibilities in a number of

15  different areas, which would, by definition, trigger

16  liabilities.  Those liabilities could be substantial, and

17  would have a potential of completely wiping him out.

18           So, this is more than just filing to obtain a stay

19  to prevent execution.  There is a reorganization component

20  to all of this, which may need to be realized in the form of

21  -- which will be realized in the form of completing these

22  projects, and to some extent, perhaps liquidating assets to

23  meet the liability of the judgment if the appellate court

24  confirms the trial court's verdict.

25           MR. LAU:  Okay.

25

1  BY MR. LAU:

2  Q    Mr. Mense, you've been sitting there listening to Mr.

3  Neistat, your counsel.  Do you agree with everything that he

4  said?

5  A    Yes, I do.

6  Q    Okay.  Do you adopt everything that he said as your own

7  testimony?

8  A    Yes, I do.

9  Q    Very good.  Okay.  Mr. Mense, have you been given a

10  time frame or a time horizon on a possible -- well,

11  actually, you know, since it happened yesterday.  I did

12  attend that hearing.  So, have you already instructed your

13  counsel to file a notice of appeal on your behalf?

14  A    Yes, he did.

15  Q    Okay.  And that was completed yesterday or today?

16  A    I think -- I think, I'm not sure.  He said I'm doing

17  the appeal, maybe yesterday, maybe today.  I can't for sure

18  tell you.

19  Q    Okay.  But as far as you know, it is past tense, it

20  happened already?

21  A    I think so, yes.

22  Q    Okay.  All right.  Have you been given a time horizon

23  for how long an appeal, a now-pending appeal, would take to

24  be fully resolved?

25  A    My understanding, ball park, between 18 to 24 months.

26

1  Q    Okay.  Are you planning at this point -- and we're very

2  early in the case still.  But at this point, are you

3  planning to propose a disclosure statement and plan prior to

4  the appeal being resolved, or is it your intention to wait

5  until the appeal is finally resolved, whichever way it goes,

6  and then propose a plan?

7  A    I would leave it to my counsel to answer.

8         MR. NEISTAT:  I don't know yet.  It's still very

9  early stage.

10        MR. LAU:  Right.

11        MR. NEISTAT:  There are a number of proceedings

12  that are coming up that may impact that decision.

13        MR. LAU:  Right.

14        MR. NEISTAT:  We will be filing certain motions,

15  also, that could have an impact on that decision.

16        MR. LAU:  Okay.

17  BY MR. LAU:

18  Q    All right.  I don't really know how to ask this

19  question other than the way that I'm going to.  So, please

20  don't take an offense, Mr. Mense.  But amongst -- basically,

21  Cottonsmith, Cottonsmith's only expenses at this point,

22  because it's not operating, are to pay certain of your

23  living expenses, like health insurance and car payments and

24  that sort of thing.

25  A    Exactly what it's written there.

27

1  Q    Right.  Is -- are you doing any work for Cottonsmith in

2  exchange for that?

3  A    I think I'm doing the -- involving the legal

4  procedures, that's my work.  If you say I'm running around

5  and doing other work, no, I'm not.

6  Q    Okay.  But there's nothing to run?

7  A    There is "nothing to run."

8  Q    There's nothing to run.  There's --

9         MR. NEISTAT:  No.  But the -- just to interject.

10 There's an appeal process that has started.

11        MR. LAU:  Uh-huh.

12        MR. NEISTAT:  There are 29 boxes of trial

13 transcripts.  Mr. Chodos will be seeking assistance on a

14 very regular basis from Mr. Mense in connection with those

15 issues.  So --

16        MR. MENSE:  Well, that takes a lot of time.  But I

17 mean, I said --

18        MR. LAU:  Right.

19        MR. MENSE:  -- anything to do with lawsuit, I

20 spent days and days and days before, and I'm sure going

21 forward.  I was talking about, do I do business, my

22 understanding, or do I go to sales or meeting, no.

23        MR. LAU:  Okay.

24        MR. MENSE:  Thank you, Mr. Neistat.

25        MR. LAU:  Well, I may have additional questions --

28

1  actually, I do have one additional question before I move

2  on.

3  BY MR. LAU:

4  Q    Is there a particular reason that the account, the pre-

5  petition account at IDB bank account, that that wasn't

6  closed until just now?

7          MR. NEISTAT:  It was in the form of a certificate.

8  It was a certificate of deposit.

9          MR. MENSE:  Yes.

10  BY MR. LAU:

11  Q    And a checking account, right?

12  A    Yes.

13  Q    And you wrote checks from that account?

14  A    For the legal -- for the expenses, yes.

15  Q    Okay.  Since you filed -- since Cottonsmith filed

16  bankruptcy, were any checks written from this IDB account?

17  A    I think there were those legal -- for the lawyers.

18  For --

19          MR. NEISTAT:  Not since, not since the filing.

20  BY MR. LAU:

21  Q    Since the -- the bankruptcy was filed --

22  A    It says January 22nd now --

23  Q    "January 22nd."

24  A    -- now.

25  Q    Okay.  So no checks have been written on the IDB

29

1  account since January 22nd?

2  A    I think you're absolutely correct.

3  Q    Okay.  All right.

4         MR. LAU:  Counsel, if you will produce the --

5  well, you have to produce the final two bank statements for

6  me anyway, right?

7         MR. NEISTAT:  Yes.

8         MR. LAU:  I just need substantiation of that.

9  Okay.

10  BY MR. LAU:

11  Q    And the other expenses from the IDB account came before

12  the 22nd, that is, before Cottonsmith filed bankruptcy?

13  A    Yes.

14  Q    Okay.  All right.  Mr. Mense, it does not appear that,

15  at least from the schedules, that Cottonsmith has any

16  secured creditors or any priority creditors, is that

17  correct?

18  A    Correct.

19         MR. NEISTAT:  I did get a -- I did receive a claim

20  from the State Franchise Tax Board yesterday.

21         MR. LAU:  "Yesterday."  Okay.

22         MR. NEISTAT:  It was relatively small.  It was

23  under $500.

24         MR. LAU:  Okay.  And is that based on what sales

25  -- unpaid sales tax, something like that?

*Briggs Reporting Company, Inc.*

1          MR. NEISTAT:  I don't know what it is.

2          MR. LAU:  Okay.  So you're investigating?

3          MR. NEISTAT:  I'm going to look and see what it

4    is, but we did receive it.

5          MR. LAU:  I see.  Okay.

6    BY MR. LAU:

7    Q    All right.  The legal owed by Cottonsmith to Horvitz

8    and Levy, what is that for?

9    A    I've sent to them the verdict to do -- I was

10   interviewing law firms for appeal.

11   Q    Uh-huh.

12   A    And they asked to look at certain documentations.  And

13   they said they will review and send me a bill.  And that's

14   the bill.  I was shocked to see such a high --

15   Q    They sent you a bill for 12,400 --

16   A    Yes.

17   Q    -- one-hundred-forty-two dollars?

18   A    Yes.

19          MR. NEISTAT:  You'll note that it's disputed.

20          MR. MENSE:  It's disputed.

21   BY MR. LAU:

22   Q    Okay.  For reviewing documents, that's what this is

23   for?

24   A    Yes.

25   Q    Okay.  I see.  Okay.

31

1          MR. LAU:  All right.  I have no additional

2  questions at this point for Cottonsmith.  I am planning to

3  move on to Mr. Mense's individual case.

4          Now, Ms. Oh, do you have any questions?

5          MS. OH:  I have a few.  If I --

6          MR. LAU:    Sure.

7          MS. OH:  -- can have just a few minutes.

8  BY MS. OH:

9  Q    Mr. Mense, you indicated that Cottonsmith cash was held

10 in two separate accounts pre-bankruptcy, a CD account and a

11 checking account, is that correct?

12 A    Correct.

13 Q    Whose names were those accounts under?

14 A    I don't know.  We have to look at the -- the same way

15 it's been always.

16 Q    Okay.  Do you know how the money was divided between

17 the two accounts?

18 A    About, as I said, 900-something-thousand dollars in

19 CD's, and the rest was in the checking account.

20 Q    Okay.  What was this money from, the million --

21 A    Cottonsmith money.

22 Q    Okay.  So, is it money that Cottonsmith had earned, was

23 it the proceeds of liquidation of assets?

24 A    This is money that Cottonsmith earned over the years,

25 and that the money remaining in the account.

32

1  Q    Okay.  After the Debtor stopped conducting business in

2  or about 2010, did you conduct a liquidation of Cottonsmith

3  personal property assets?

4  A    I was incorrect.  I think it was 2011.

5  Q    Okay.

6  A    -- 2010 was still business as usual.  It's 2011.

7  Q    Okay.  In 2011.

8  A    Yes.

9  Q    After the business stopped operating, did you liquidate

10 the assets of Cottonsmith?

11 A    Whatever was possible to liquidate, we liquidated.

12 Q    Do you remember what was liquidated?

13 A    I can't remember.  It was all in the financials of

14 Cottonsmith.

15 Q    Okay.  Do you --

16 A    Cottonsmith didn't have anything really tangible.  I

17 mean, like, we didn't have offices, big computers or things

18 like that.  It always minimum.

19 Q    So, did it have any equipment?

20 A    There was some equipment that was eventually as -- long

21 time before that, was burned, some were sold for a few

22 thousand dollars, and that was it.  Chairs, tables, things

23 like that, whatever, we gave away.  Minimum.

24 Q    So, the proceeds of the liquidation of those assets,

25 that's part of this $1.2 million?

33

1  A     Everything is part of.

2  Q     Okay.  Is Cottonsmith generating any income now?

3  A     No.

4  Q     Okay.

5           MR. NEISTAT:  Just interest --

6           MR. MENSE:  Just the interest on the CD.  I'm

7  sorry.

8  BY MS. OH:

9  Q     Okay.  But that's been closed?

10 A     Sorry?

11 Q     You've opened it -- that's been closed?

12 A     Today.

13 Q     Okay.  Or is being closed?

14 A     Yeah.  I think we still earn some interest today as

15 well.

16 Q     Okay.  Other than the expenses that are reflected in

17 the budget, the 90-day budget that was submitted with the

18 seven-day package, are there any other expenses that

19 Cottonsmith is responsible for paying?

20 A     Not to my knowledge.

21 Q     Does the Debtor have -- when I say "Debtor," I meant

22 Cottonsmith.  Does Cottonsmith have any employees?

23 A     No.

24 Q     Is anybody on payroll?

25 A     As I said, outside contractor, Mr. Minas.

34

1  Q    Okay.  Can you spell Mr. Minas's name?

2  A    M-I-N-A-S.  Sarafian -- only in 20 years that I know

3  him, I never know how to spell his name.

4          MR. NEISTAT:  I don't have it.

5          MS. OH:  That's okay.

6          MR. MENSE:  You have it on there.

7          MR. NEISTAT:  In here.  Sorry.  Minas.

8          MR. MENSE:  Minas, M-I-N-A-S.

9          MS. OH:  Okay.

10          MR. MENSE:  Sarafian, S-A-R-A, F, as a Frank, I-A-

11  N.

12          MS. OH:  Okay.  So it's mister --

13          MR. NEISTAT:  CPA.

14          MR. MENSE:  He is a "CPA," and he used to run

15  Cottonsmith's accounting for maybe 15 years or whatever.

16  And he comes from time to time to do -- check the books,

17  make sure everything is okay.  That's all, as a outside

18  contractor.

19  BY MS. OH:

20  Q    How much is he being paid?

21  A    Sixty-five dollars an hour.  That's my memory.

22  Q    Are you receiving any income from Cottonsmith?

23  A    No.

24  Q    Other than the expenses set forth in the budget?

25  A    I understand your question.

35

1   Q    But no other --

2   A    No income.

3   Q    -- expenses are being paid?

4   A    No.

5   Q    Is the amount that's listed as being owed to Horvitz

6   and Levy -- and I understand it's disputed.  Is that amount

7   owed jointly by Cottonsmith and by you personally?

8   A    I think it's a Cottonsmith responsibility.

9   Q    Why?

10  A    Because Cottonsmith defending Raphael Mense.

11  Q    So -- okay.  So it's your belief that this is a

12  Cottonsmith liability?

13  A    If you asking me, that's my belief, yes.

14  Q    Okay.

15          MR. NEISTAT:  By the way, it's disputed in its

16  entirety.

17          MS. OH:  Understood.

18  BY MS. OH:

19  Q    Did the operating agreement for Cottonsmith require a

20  liquidation of assets and distribution of capital accounts

21  once it stopped doing business?

22  A    You've got a very long question that it's being

23  discussed in the court.

24  Q    Okay.

25  A    So, do you want to go, and I'll try to reconstruct my

*Briggs Reporting Company, Inc.*

36

1  understanding from the beginning, or we leave it to look at

2  what was in the depositions and in the court?

3  Q    Okay.  So is it safe to say that you believe the --

4  that issue has been the subject of this litigation with Mr.

5  Kayne in state court?

6  A    Correct.

7  Q    Okay.

8         MS. OH:  That's all the questions I have, Mr. Lau,

9  for Cottonsmith.

10        MR. LAU:  Okay.  All right.  Thank you very much,

11 Ms. Oh.

12        Miss, do you have any questions --

13        MS. DAVIS:  Yes.

14        MR. LAU:  -- at this point?

15        MS. DAVIS:  I just want to introduce myself first,

16 Mr. Lau.  My name is Kim Davis.  I represent Pacific Western

17 Bank.  We're listed, or kind of listed as a

18 secured/unsecured creditor for Mr. Mense's Chapter 11

19 bankruptcy.

20        MR. LAU:  Very good.  Okay.

21        MS. DAVIS:  I had a couple questions, so --

22        MR. NEISTAT:  Are these Cottonsmith questions or?

23        MS. DAVIS:  These are Mense --

24        MR. NEISTAT:  Mense questions, okay.

25        MR. LAU:  "Mense questions."

37

1          MS. DAVIS:  -- Mense, yeah.

2          MR. LAU:  You know what?  Let me ask you to hold

3   off on that for now then.

4          MS. DAVIS:  Sure.

5          MR. LAU:  Okay?

6          MS. DAVIS:  Uh-huh.

7   BY MR. LAU:

8   Q    All right.  Mr. Mense, let me move on to your

9   individual case now.  First of all, just some, just a few

10  administrative questions.  You have listed, you know, your

11  ownership interest in multiple real properties, including at

12  least -- I can't tell if this is one or two properties.

13  They're referred to as "block 11" and "block four" in Tel

14  Aviv, Israel.  Is that one construction project or two?

15  A    It is one group --

16  Q    Uh-huh.

17  A    -- and the lots are divided.  This is going back to --

18  from 1981.  I bought land in Israel.  And that land was sand

19  by the ocean, sand.

20  Q    Right.

21  A    Over the years I was lucky, and they started doing,

22  gathering all the owners, whoever had 200 square feet or

23  10,000, 100,000 square foot, and they started putting groups

24  together and partnerships.  So, we formed a partnership, a

25  group of us, like 30 people or whatever, and we decided to

38

1   build, go into construction, build apartments.  And we

2   mortgaged the land to the bank, and then we will go and do

3   the building and construction and develop those lots.

4       The first lot was lot number five, that was completed

5   in 2005.  There were units that I was renting for a while,

6   and then I eventually sold them all.  And the last few,

7   three units or whatever, were sold last year.  I -- a full

8   completion of all the sale, and all the money, I transfer

9   all the money to United States.  I paid my taxes in United

10  States on the profit that I gained, and I put the money in

11  Merrill Lynch.

12      Now, the next phase is project lot number 11.  Again,

13  it's land.  They -- according to your ownership they give

14  you, designate finally by lottery and things like that,

15  apartments.  You mortgage all of it to the bank.  They give

16  you a construction loan, and you start building.

17      Lot number four is still way premature.  It's years

18  forward, maybe four years.

19  Q    Uh-huh.

20  A    Eventually they will give us permission to build, and

21  that's, again, they will decide exactly by the percentages

22  how many units I will be entitled for.

23  Q    Uh-huh.

24  A    And that's how it works.  But it's a very long, long

25  investment that started in 1981.

39

1  Q    I see.  Okay.  Let me ask you a pointed question about

2  that then.

3  A    Yes.

4  Q    I understand that the land itself, that the asset

5  itself, both of these, block 11 and block four, are both in

6  Tel Aviv.

7  A    Yes.

8  Q    Is there any kind of general liability insurance

9  coverage for either of those two pieces of your property?

10 A    I -- for the construction, definitely there is

11 insurance.

12 Q    Uh-huh.

13 A    The requirement by the bank, et cetera.  I don't think

14 for the land.  It's just sand.

15 Q    I see.  Okay.  So, I -- you know, I'm not familiar with

16 Israeli law.  If someone were to be jogging on this piece of

17 sand, and fall and break their leg, would you be liable

18 for --

19 A    No, we'll sue him.  Why did you come to run on our

20 land, by the Israeli law.

21      MR. LAU:  Mr. Neistat, this is very entertaining.

22 But, you know, the obvious question is, is whether the

23 estate has exposure.

24      MR. NEISTAT:  Yeah.

25      MR. LAU:  Whether or not -- because they're -- is

40

1  it --

2      MR. NEISTAT:  I'll answer as best I can, after

3  spending many -- several hours trying to understand the

4  nature of this investment.

5      Block 11 appears to be a partnership.  I'm drawing

6  an -- I can only analogize, because I don't know Israeli

7  law.  All of the transactional documents are in Hebrew.

8      MR. LAU:  I see.

9      MR. NEISTAT:  And they're this thick.

10      MR. MENSE:  Thicker.

11      MR. NEISTAT:  "Thicker."  And I'm --

12      MR. MENSE:  Think of 1981.

13      MR. NEISTAT:  -- and I'm guided by Mr. Mense's

14  counsel in Israel.  His name is Gil Hirshman (phonetic) --

15      MR. LAU:  Okay.

16      MR. NEISTAT:  -- who has given me some sense of

17  what this involves.  And the best way to describe it, I

18  think, is as a partnership.  Mr. Mense --

19      MR. MENSE:  It is a "partnership."

20      MR. NEISTAT:  -- Mr. Mense is a partner.  He's

21  entitled to five units in what is identified as the "block

22  11 project."

23      MR. LAU:  Okay.

24      MR. NEISTAT:  Those would be finished as

25  condominium units.  Construction has commenced.  It's on

41

1  time, and it's scheduled for completion in approximately 18

2  months.

3          To date, Mr. Mense has invested in it probably

4  somewhere between 500,000 and --

5          MR. MENSE:  And prior to the --

6          MR. NEISTAT:  -- and prior to that -- I don't know

7  the full amount invested to date, but I do have Mr.

8  Hirshman's estimate, that the finished units will be worth

9  $5,000,000.

10          MR. LAU:  Okay.

11          MR. MENSE:  And that's a conservative, realistic,

12  that the bank accepted as the correct appraisal.

13          MR. LAU:  Okay.

14          MR. NEISTAT:  At the same time, Mr. Mense has a

15  liability associated with that in the form of fund control

16  as the project nears -- as the project is underway, it

17  requires monthly disbursements to meet his financial

18  obligation of the terms of the partnership agreement.

19          I believe -- there has been no disbursement since

20  the filing, but the next scheduled payment will be sometime

21  early in --

22          MR. LAU:  Okay.  However, going back to my

23  question about liability insurance.

24          MR. NEISTAT:  Sorry.  I didn't even address that.

25  I haven't asked the specific question about liability

*Briggs Reporting Company, Inc.*

42

1  insurance for the project.  Mr. Mense has no individual

2  liability policy with regard to this partnership interest.

3          MR. LAU:  Okay.

4          MR. NEISTAT:  That's a partnership entity that

5  would be covered -- I can see what I can do to get --

6          MR. MENSE:  It's all covered.

7          MR. NEISTAT:  -- I can get at least confirmation

8  from Mr. Hirshman.

9          MR. LAU:  Some sort of written confirmation --

10         MR. NEISTAT:  "Confirmation."

11         MR. LAU:  -- that there is some sort of insurance

12  coverage.

13         MR. NEISTAT:  Got it.

14  BY MR. LAU:

15  Q    All right.  Also staying -- so, just trying to stay on

16  administrative matters, Mr. Mense.  You have listed one

17  vehicle, a 2011 Porsche Cayenne.  I have not been provided

18  with insurance coverage for that vehicle yet.

19  A    Yeah.  I thought that that was supposed to be that

20  insurance that you show to the policeman --

21  Q    Yeah -- no.

22  A    -- and then I was told, no.  You have to have the

23  policy.

24  Q    Right.

25  A    So I called up --

43

1  Q    Or the declaration.

2  A    -- Mr. Minas and I said to him, please go to the office

3  and try to find the policy, whatever it is --

4  Q    Yeah.

5  A    -- and he promised to do it in the next couple of days.

6  As soon as I receive it, I'll give it to Mr. Neistat, and he

7  will transfer it to you.

8  Q    Very good.  Okay.  Thank you.  So, to the best of your

9  knowledge, the Porsche Cayenne is insured?

10  A    One-hundred-percent.

11  Q    Okay.  And you are the only driver of that vehicle.

12  A    Yes -- from time to time, my wife drives.

13  Q    I see.  Okay.  All right.  That counts.  Okay.  You

14  already know, I take it, Mr. Mense, about, you know, we will

15  need to the final bank statements for all pre-petition

16  accounts.

17  A    Yes, I requested it.

18  Q    Okay.  And let's see.  I am asking on the record to

19  confirm that you yourself have not had any audited or

20  unaudited financial statements prepared for you in the past

21  two years?

22  A    Yes, correct.

23  Q    Okay.  All right.  Okay.  So far, I have received proof

24  of recordation of the bankruptcy petition for a county in

25  Nevada.  I can't remember which county it is.

44

1  A     Las Vegas.

2            MR. NEISTAT:   Clark County.

3            MR. LAU:   Is it -- "Clark County."   Clark County.

4  Okay.   And I have not yet received any proof of recordation

5  for Los Angeles.

6            MR. NEISTAT:   County of Los Angeles is very slow.

7            MR. LAU:   Okay.

8            MR. NEISTAT:   We did send it in for recordation,

9  but not get the confirmation yet.

10           MR. LAU:   Okay.   So that's --

11           MR. NEISTAT:   It's in process.

12           MR. LAU:   -- "in process."   Okay.   All right.

13  BY MR. LAU:

14  Q    Okay.   So now let me go into more substantive,

15  substantive matters.   I wish I -- I should have put -- okay.

16       So, Mr. Mense, including the Tel Aviv real property,

17  you have listed a total of nine separate pieces of your

18  property in your various real property questionnaires and on

19  your petition and schedules.   Is that, is that your

20  understanding?

21  A    Yes, sir.

22  Q    Okay.   All right.   So you reside at the property

23  located at 10146 Baywood Court in Los Angeles, is that

24  right?

25  A    At this moment I'm residing in a rented place --

45

1  Q    "Rented," okay.

2  A    -- at 2571 Angelo Drive.

3  Q    All right.  Okay.  Right.

4  A    Okay?

5  Q    Right.  Do you have some warm water?

6        MR. NEISTAT:  No -- well, you don't want to drink

7  any of this because I'm getting over a bug.

8        MR. MENSE:  No, no, no.  I don't to share.

9        MR. LAU:  Let's, let's not do that.

10       MS. OH:  Is there a water fountain?

11       MR. NEISTAT:  Do you want to take --

12       MR. MENSE:  It's okay.  It's okay.

13       MR. LAU:  Are you all right?

14       MR. MENSE:  I'm okay.  I just thirsty.

15       MR. LAU:  Well, you're doing most of the talking,

16  so I understand.

17       MR. MENSE:  Okay.

18       MR. LAU:  Okay.

19       MR. NEISTAT:  Next time I'll bring an extra.

20       MR. MENSE:  Next time, I promise you, I'll come

21  with.

22  BY MR. LAU:

23  Q    All right.  Okay.  And you are -- I do remember reading

24  something about that, but why don't we just get it down on

25  the record.  What -- Mr. Mense, why are you living in a

46

1 rental right now?

2 A     We are rebuilding our house.  We started that about

3 over a year-and-a-half maybe, two years ago, with the plans

4 and et cetera.  The house is absolutely unlivable.  I mean,

5 it's all gutted.

6 Q     Okay.

7 A     So, until the end of this year, I have to still live in

8 that rented place.

9 Q     Okay.  All right.  So, let me -- you know, I'll just

10 ask you so I'm sure.  You do not own any interest in the

11 2571 Angelo Drive property?

12 A     No.

13 Q     You're just a renter?

14 A     "Just a renter."

15 Q     And you have a month-to-month or a certain term?

16 A     A year.

17 Q     A one-year lease?

18 A     One year.

19 Q     Okay.  And when does that end?

20 A     In, I think, September or October.  And I pray to God

21 that the house should be ready by then.

22 Q     Okay.  Okay.  So shifting back to the Baywood Court

23 property, on schedule A you have valued this property at

24 $1.2 million.  How did you, how did you come up with that

25 number?

47

1  A    It's gutted house.  I mean, if it was -- as it was

2  before --

3  Q    Uh-huh.

4  A    -- it would be more.  But gutted house, it's land, so

5  the estimated value.

6           MR. NEISTAT:  In its present condition.

7           MR. MENSE:  It's a present condition.

8           MR. LAU:  Okay.  Huh.

9  BY MR. LAU:

10 Q    Okay.  So as a completed project, what do you think

11 it's worth?

12 A    I think that when we finish the project, and if it

13 comes out the way it's supposed to be, I would say three-

14 and-a-half to $4,000,000.

15 Q    Okay.  Now, for the $1.2 million valuation, did you use

16 comps, or did you ask a broker?  How did you come up with

17 that number?

18 A    That was a estimate.

19 Q    Okay.  Your own personal estimate?

20 A    Yeah.  Because the house opposite to us was for sale

21 for about two-and-a-half, $3,000,000.  But that's complete,

22 nice house.  I have a better view.  I have a much nicer lot

23 and everything else.  So I said, well, but my house is

24 destroyed.  It's not a house.

25 Q    Okay.

48

1  A    So I said, take off from two-and-a-half, maybe

2  $1,000,000 for -- to one-and-a-half million.  It's a

3  estimate.

4  Q    Okay.  Okay.  So, is it fair to say that if you were

5  forced to sell the house as-is right now, that it would sell

6  for about $1.2 million you think?

7  A    I don't think I could sell it like that.

8  Q    Okay.  You think -- so even that's too high?

9  A    Yes.  I mean, nobody will come and then, what do they

10 do?  Maybe they don't like it.  They -- to finish it costs

11 -- no, I don't think I could sell it.

12 Q    Okay.  All right.  So let me stay with your, with your

13 nine pieces of real property.  There is a piece of real

14 property -- let's see.  Where is that?  You know, I'll group

15 them at this point.  There -- you have listed six properties

16 where you list yourself as a 50-percent tenant in common.

17 A    With my son-in-law.

18 Q    With your "son-in-law."  That was my first question is,

19 who is the other 50-percent.  So, it's your son-in-law.

20 What is that person's name?

21 A    Steven Taylor (phonetic).

22 Q    "Steven Taylor."  Okay.  Do you -- are those six real

23 properties the only properties that you own together with

24 Steven Taylor?

25 A    Everything that's listed.

49

1  Q    Okay.  All right.  And this is -- when did Mr. Taylor

2  marry your daughter?

3  A    About five years ago.

4  Q    Okay.  Okay.  I very rarely see an asset that shows up

5  on both schedule A and schedule B, because schedule A

6  obviously is real property, and schedule B is personal

7  property.  But you have listed these six real properties,

8  and identified them as, you know, a tenancy in common with

9  Steven Taylor.  On schedule B, you have listed a property or

10 an asset called "co-tenancy real estate with Steve Taylor,"

11 valued at $1,000,000.  Is that $1,000,000 comprised of these

12 six --

13 A    Yes --

14 Q    -- these six real properties?

15 A    -- that's my understanding.  Right, Mr. Neistat?

16       MR. NEISTAT:  Yes.  I believe -- let me see some

17 numbers.

18       MR. MENSE:  That's -- I think that's comprise, to

19 my best understanding as well, yes.

20 BY MR. LAU:

21 Q    Okay.  So, the reason I was -- I'm asking, and I'm a

22 little confused is, if you add up your interest, right, that

23 you've listed from the six real properties, it comes to --

24 you know, I didn't do the math, but it comes to something

25 very -- you know, several multiples of $1,000,000.  But

50

1 you've valued your co-tenancy at $1,000,000.

2 A    I think the 1,000,000 is initial investment, but it

3 appreciated, in my opinion.  I can clear it up with Mr.

4 Steven Taylor, because I wasn't working on all the

5 schedules.

6 Q    Uh-huh.

7 A    But I think it's today's values or whatever, we gave

8 you --

9 Q    Okay.

10 A    -- is the value.

11        MR. NEISTAT:  I think we reflected it as initial

12 capital --

13        MR. MENSE:  Right.

14        MR. NEISTAT:  -- under schedule B.

15        MR. LAU:  Okay.

16        MR. NEISTAT:  which translates --

17        MR. LAU:  So this is --

18        MR. NEISTAT:  -- to -- to some extent there may be

19 a duplication.

20        MR. LAU:  -- so this is the initial capital

21 investment?

22        MR. NEISTAT:  Yes.

23        MR. LAU:  The initial investment, in other words?

24        MR. NEISTAT:  Yes.

25        MR. LAU:  Okay.  And these are the fruit of that?

51

1          MR. NEISTAT:  That's correct.

2          MR. LAU:  Okay.  And so the current value of

3   Debtors' interest, that reflects the appreciation that has

4   occurred with each of these six real properties?

5          MR. NEISTAT:  Yes, yes.

6          MR. LAU:  Okay.  So just to be clear, and, you

7   know, because I know it says what it says, but, you know,

8   not every schedule is 100-percent accurate because people

9   don't read necessarily -- listed values on schedule A are

10  your interest in the property, not the property in total,

11  but just your interest?

12         MR. MENSE:  Is this?

13         MR. NEISTAT:  The answer is, yes.  We've

14  scheduled --

15         MR. MENSE:  "The answer is, yes."

16         MR. NEISTAT:  -- it as a 50-percent tenant in

17  common.

18  BY MR. LAU:

19  Q    Okay.  You know what, Mr. Mense, if you could just take

20  a look.

21  A    The 50-percent, right.

22  Q    Okay.

23         MR. NEISTAT:  So, the net -- the difference would

24  be the net.  So, maybe if you subtract each one of these

25  from these numbers, you would -- that would be the level of

52

1  the present value of the investment, over and above your

2  initial capital.

3          MR. MENSE:  Well, then we have to calculation.

4          MR. NEISTAT:  We have a -- it's not there.

5          MR. LAU:  Okay.  Right.

6          MR. MENSE:  She caught me on such a simple issue.

7  I will do now here --

8  BY MR. LAU:

9  Q    Right.  Okay.  No, I'm -- what I'm asking is, so, Mr.

10  Taylor, as the other 50-percent tenant in common --

11  A    Yes.

12  Q    -- the current value of his interest in the property is

13  equal to this?

14  A    Yes.

15  Q    So, in each case, you know, the property itself is

16  worth two times that, two times what is listed here?

17          MR. NEISTAT:  Yes.

18          MR. MENSE:  That's --

19  BY MR. LAU:

20  Q    Roughly?

21  A    -- total makes sense what you're saying.

22  Q    Okay.

23  A    Yes.

24  Q    Okay.  All right.  And three of the properties are on

25  Ogden Drive.  Are they contiguous or, you know, like --

53

1  A     They are very close to each other.

2  Q     "Very close.

3  A     Two, I think, contiguous -- is that one next to

4  another?

5  Q     Back to back, right.

6  A     Another one is opposite.

7  Q     Okay.  I see.  All right.  And, let's see.  The

8  property at 1013 Genesee, also in West Hollywood, is that in

9  the same neighborhood?

10 A     Yes.

11 Q     Okay.  Like a block away, two blocks, something like

12 that?

13 A     Yeah.

14 Q     Okay.  All right.  The project -- or I should say, the

15 property at 7164 Melrose Avenue, that by far has the largest

16 listed value.  Your half is worth $1.3 million.  What is

17 that?

18 A     It's a building office, and underneath restaurants and

19 things like that.

20 Q     Okay.  Do you know how many --

21 A     My share is 2.3, or the total?

22 Q     Well, that's what I'm asking.  Because half --

23        MR. NEISTAT:  Yeah.  We show your interest at $2.3

24 million, against a secured claim of one-million-eight-

25 twenty-seven.

54

1          MR. MENSE:  I see.

2          Sir, I don't want to say something incorrect.

3          MR. LAU:  Uh-huh.

4          MR. MENSE:  I can't remember all those numbers.

5   If you have specific, I will go back to Steven and I'll say,

6   please, clarify to me, because I don't want to make a wrong

7   statement.

8   BY MR. LAU:

9   Q    Okay.  You know, I would appreciate if you would do

10  that for all six --

11  A    Let's do that.

12  Q    -- all six of these properties.  Now, your half of the

13  tenancy in common, is that in your name or is it held in

14  some other way?

15  A    Mense living trust.

16  Q    The "Mense living trust."  Okay.  Now, is that a

17  revokable or irrevokable trust?  I'm sorry.  I'm speaking --

18  now I'm speaking a foreign language.

19          MR. NEISTAT:  I'll describe it as a inter vivos

20  trust, revokable for estate planning purposes only.

21          MR. LAU:  Okay.  So it's revokable inter vivos

22  trust.  Okay.

23          MR. MENSE:  Thank you.

24          MR. LAU:  I see.  Okay.

25  //

55

1  BY MR. LAU:

2  Q    Okay.  What other, what other assets does that

3  revokable trust, the inter vivos revokable trust own?

4  A    All that mentioned here.

5  Q    All of the real property?

6  A    All the properties here, yes.

7  Q    Okay.  So all nine?

8  A    I'm not sure if the revokable trust has updated all the

9  Israel one, but all the American ones, I'm sure they are.

10 Q    Uh-huh.

11 A    Because they changing all the time, so you have to --

12 you know how it is.  You have to make appointment, you have

13 to go, you have to sit there and --

14 Q    Well, not all of us have that particular problem.

15 A    -- very expensive.

16 Q    But, yes, I understand.

17 A    Very expensive.

18         MR. NEISTAT:  I don't.

19         MS. OH:  Me neither.

20 BY MR. LAU:

21 Q    Okay.  Who are the beneficiaries of your inter vivos

22 trust, Mr. Mense?

23 A    My living trust?

24 Q    Uh-huh.

25 A    My wife --

56

1   Q    Okay.

2   A    -- and my children.

3   Q    Okay.  How many children do you have?

4   A    Two.

5   Q    And -- okay.  And both of them are adults, right?

6   A    Yes.

7   Q    Okay.  What are their names?

8   A    Natalie, my daughter --

9   Q    Uh-huh.

10  A    -- and Daniel, my son.

11  Q    Okay.  And your wife's name is Vicky?

12  A    "Vicky."

13  Q    Okay.  When did you -- when were these co-tenancy in

14  common agreements created?  When did they come into

15  existence?

16  A    In the last few years, three, four years, something

17  like that.

18       Did Steven give you the dates?

19          MR. NEISTAT:  I have them, yeah, but --

20          MR. MENSE:  You have the dates, yeah.

21          MR. LAU:  All right.  Mr. Neistat, when you are

22  verifying the values with Mr. Taylor --

23          MR. NEISTAT:  Yes.

24          MR. LAU:  -- if you will obtain the underlying

25  documentation, you know, that created the co-tenancy, as

57

1  well as the -- I don't --

2            MR. NEISTAT:  Well, did the --

3            MR. LAU:  -- I do think I have a copy of the trust

4  document, is that right?

5            MR. NEISTAT:  I think the only documentation would

6  be in the form of deeds to these properties, showing the --

7            MR. LAU:  Right.  That would be --

8            MR. NEISTAT:  -- tenancy in common.  So I can get

9  you the deeds.

10           MR. LAU:  Okay.  That'd be fine.  That'd be fine.

11 BY MR. LAU:

12 Q   Mr. Mense, do you have a separate, like partnership

13 agreement with Mr. Taylor, like, you know, that spells out,

14 you know, what your rights are, or did you just --

15 A   We, you know, we spoke.  We do some memorandums.  I

16 don't -- honestly, I can't remember over the years when

17 you --

18           MR. NEISTAT:  I did not find any --

19           MR. MENSE:   You know, you might --

20           MR. NEISTAT:  -- any formal agreement.

21           MR. MENSE:   -- you sit in lunch time and you make

22 some notes.  But it's your son-in-law.

23           MR. LAU:  Right.

24           MR. MENSE:  I mean, you know, if I can't trust

25 him, I'm in trouble.

58

1        MR. LAU:  I don't have to say anything about that.

2 BY MR. LAU:

3 Q    Okay.  All right.  Of the $1,000,000 initial

4 investment, is that from you alone, Mr. Mense?

5 A    From our living trust.

6 Q    Okay.  Okay.  So, Mr. Taylor put in equivalent amount?

7 A    Yes.

8 Q    Okay.  Okay.  Were each of these real properties, the

9 one -- I'm speaking only of the ones in co-tenancy right

10 now.  They all have an amount of secured claim, so I presume

11 that all of these are mortgaged, is that right?

12 A    Yes.

13 Q    Okay.  All right.  So do you and Mr. Taylor share the

14 expense of paying the mortgage?

15 A    Yes.

16 Q    Okay.  So each monthly mortgage payment that comes due,

17 you pay half and he pays half?

18 A    I have to see how it's being physically, exactly, but I

19 know that we have to share 50-50.

20 Q    Okay.

21 A    If you're asking me, do I write the check or whatever,

22 I have to check exactly how every time payments being done.

23 Not to say something that, you know -- if I'm being told,

24 you need to send $100,000, I will send $100,000.

25 Q    Uh-huh.  Okay.  That's the kind of father-in-law you

59

1 need.

2           MS. OH:  Yeah.

3           MR. LAU:  All right.

4           MR. MENSE:  I hope you're not sarcastic.

5           MR. LAU:  Well, no, I'm not, actually.  If I -- I

6 can just imagine what my father-in-law would ask me if I

7 phoned him and said, "I need you to send $100,000."

8 BY MR. LAU:

9 Q    All right.  Okay.  Let me ask you about -- I'm just

10 going to skip ahead to the business entities.  Just that --

11 okay.  Let me see that.  There.  Okay.

12      Mr. Mense, on your schedule B, there are a number of

13 holdings that are described under the category of "stock and

14 interest in incorporated and unincorporated business."  And

15 the primary reason I'm asking about these is that in your

16 statement of financial affairs, there's really only one

17 entity that's listed there, and that is Cottonsmith, LLC.

18 But on schedule B, there are these additional business

19 entities.  So my general question, are these other entities,

20 which I will, I'll just list them here, Ness Holdings, LLC,

21 (phonetic) Ness Holdings Fund --

22 A    Ness Holding, LLC is --

23 Q    Hold on one second.

24 A    I'm sorry.

25 Q    I'll say the three -- there are three.

60

1        MR. NEISTAT:  Just answer the question.

2   BY MR. LAU:

3   Q    Right.  Okay.  Ness Holdings, LLC, Ness Holdings Fund

4   I, LLC, and Glen Wok Corporation.  Okay.  So those three

5   business entities are listed on schedule B only.  Are these

6   three entities still active?

7   A    Yes.

8   Q    Okay.  What -- is Ness Holdings, LLC related in some

9   way to Ness Holdings Fund?

10  A    Ness Holding, LLC is Steven Taylor company.

11  Q    Okay.

12  A    Ness Holding Fund I, LLC, is a fund that was created

13  about now over a year-and-a-half ago, whatever, two years

14  ago.  This was a fund that I put in Mense living trust money

15  into this fund --

16  Q    Right.

17  A    -- and another investor.  And it's being managed by

18  Steven Taylor and Daniel Mense, my son, and it's called Ness

19  Holding Fund I.

20  Q    Okay.

21  A    And Glen Wok Corporation is my wife company, which

22  she's been -- she own a restaurant, now in Beverly Hills,

23  over 20 years now.

24  Q    Okay.

25  A    And the Glen Wok was established even before that.  And

61

1   what else?  Is that --

2           MR. NEISTAT:  Just those three.

3           MR. LAU:  Those are the three.

4           MR. NEISTAT:  One, two, three.

5           MR. MENSE:  "Those are the three," sir.

6           MR. LAU:  Those are the three.  Okay.  All right.

7           So, Mr. Neistat, I -- in light of that, I would

8   ask you to amend item 18 on your -- of the statement of

9   financial affairs regarding the nature, location and name of

10  businesses that Mr. Mense --

11          MR. NEISTAT:  Which schedule are you --

12          MR. LAU:  The statement of financial affairs.

13          MR. NEISTAT:  "Statement of financial affairs."

14          MR. LAU:  Because number 18 just --

15          MR. NEISTAT:  Right.

16          MR. LAU:  So I thought, I thought, well, that must

17  mean that these other companies must be defunct, but

18  apparently they're not.

19          MR. NEISTAT:  You know, the problem is the nature

20  of the question.  It's -- if the Debtor is an individual,

21  which he is --

22          MR. LAU:  Uh-huh.

23          MR. NEISTAT:  -- we are to address the details --

24          MR. LAU:  Right.

25          MR. NEISTAT:  -- in which the Debtor was an

62

1  officer, director, partner -- I guess "partner" would be the

2  key word.  Like I said, item 18 needs to be expanded on.

3         MR. LAU:  Okay.  Thank you.  All right.

4         MS. OH:  It's getting close to 5:15.

5         MR. LAU:  Yeah, we are.  We are.  Okay.  You know

6  what, I, unfortunately, I'm not going to finish in time

7  today.  So, rather than rush and make mistakes here, we need

8  to discuss when an appropriate continued date is for me to

9  finish the examination by then -- and frankly, I would have

10 to continue this anyway, because, you know, I still need

11 proof of insurance about the Israeli properties.

12        MR. NEISTAT:  Yeah.  Yeah.

13        MR. LAU:  And I've got proof of insurance on the

14 Cayenne and what have you, so.  Yesterday -- what was

15 discussed yesterday in court was, like that magical hearing

16 date of April 2nd, I think it is?

17        MR. NEISTAT:  Yeah.  The problem is, Mr. Mense is

18 scheduled to go to Israel.  He has a 92 year aunt who is

19 critically ill.  And -

20        MR. LAU:  I'm sorry to hear that.

21        MR. NEISTAT:  -- actually raised him, so more like

22 a mother.

23        MR. LAU:  I see.

24        MR. NEISTAT:  And that's going to take him away as

25 of April --

63

1          MR. MENSE:  I'm trying to book, you know, because

2   it's holidays in Israel, but first week of April definitely,

3   first, second, third.

4          MR. NEISTAT:  So anytime between now and the end

5   of the month.

6          MR. LAU:  Okay.

7          MR. NEISTAT:  And we can fit -- I'll fit in with

8   whatever your schedule requires.

9          MR. LAU:  Okay.  I -- you know, I have my own

10  family situation to deal with out of state.  So I'll be

11  leaving -- I'll be leaving town next week Thursday, then I

12  don't come back until the 24th.  But that still leaves, you

13  know, that last week of March.  So, shall we say, you know

14  -- you know, the only problem is, I don't have the calendar

15  for that last weekend in March.  So as far as --

16         MR. NEISTAT:  What day is March 24th?  Is that a

17  Monday?

18         MR. LAU:  It's a Monday.  Let's see.  Yeah.  That

19  Thursday is March 27th, and I will --

20         MR. NEISTAT:  That could work.

21         MR. MENSE:  It works for me.

22         MR. LAU:  Does that work?

23         MR. MENSE:  Yes, sir.

24         MR. LAU:  So, if I schedule -- I'll tentatively

25  continued this then to March 27th at 1:15?

64

1          MR. NEISTAT:  1:15.

2          MR. MENSE:  Perfect.

3          MR. LAU:  And if it turns out that I have

4 something intervening, then I will either move the

5 intervening event to a later time to, you know, give us at

6 least two hours --

7          MR. NEISTAT:  That's fine.  Yeah.

8          MR. LAU:  -- to try to finish.  Or I will call

9 everybody, so I'll just need everyone's -- Ms. Davis, I do

10 have your contact information.  I will send out formal

11 notice of the continued hearing date and time, but I just

12 need to go upstairs, and I don't want to keep everybody

13 here, you know --

14          MR. NEISTAT:  Yeah.  Can I have your -- can I have

15 your card?

16          MS. DAVIS:  I gave it to you.

17          MS. OH:  It's right in front of you.

18          MR. NEISTAT:  Here.  I'm sorry.

19          MR. LAU:  Okay.  So, Thursday, March 27,

20 tentatively for 1:15.

21          MR. NEISTAT:  Yup.

22          MR. LAU:  And I -- like I said, I'll let everybody

23 know if I need to change that to a different time, but that

24 is a pretty solid date.  Okay.

25          MR. NEISTAT:  Good.  All right.

65

1          MR. LAU:  All right.  So in the meantime, Mr.

2   Neistat, if you will, you know, take care of the final --

3          MR. NEISTAT:  Of --

4          MR. LAU:  -- bank statements --

5          MR. NEISTAT:  Yes, yes.

6          MR. LAU:  -- and, you know, the other things that

7   I talked about.  I don't think I have to reiterate

8   everything now.

9          MR. NEISTAT:  No.  I know what you mean.  We are

10  going to be providing that.

11         MR. LAU:  Thank you very much.

12         MR. NEISTAT:  Okay.

13         MR. LAU:  Okay.  So with that, thank you for your

14  cooperation.  This is continued to Thursday, March 27th,

15  2014 at 1:15.  Thank you.

16         MR. MENSE:  Thank you.

17      (Proceedings concluded.)

18

19

20         I certify that the foregoing is a correct

21  transcript from the electronic sound recording of the

22  proceedings in the above-entitled matter.

23  /s/ Holly Martens          3-11-14
    Transcriber                Date

24

25

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 10250 Constellation Boulevard, Suite 1700, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION BY JUDGMENT CREDITOR FRED KAYNE FOR ENTRY OF ORDER DISMISSING DEBTORS' CHAPTER 11 CASES; MEMORANDUM OF POINTS AND AUTHORITIES; DECLARATION OF FRED KAYNE IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **March 12, 2014**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Robert K Edmunds    robert.edmunds@bipc.com,
  lisa.largent@bipc.com;donna.curcio@bipc.com;christopher.schueller@bipc.com
- Ivan L Kallick    ikallick@manatt.com, ihernandez@manatt.com
- Gerald S Kim    cdcaecf@bdfgroup.com
- Yi S Kim    ykim@greenbass.com
- Kenneth G Lau    kenneth.g.lau@usdoj.gov
- Nathan D Meyer    nmeyer@raklaw.com, ksanderlin@raklaw.com
- David L. Neale    dln@lnbrb.com
- Douglas M Neistat    tkrant@greenbass.com
- Juliet Y Oh    jyo@lnbrb.com, jyo@lnbrb.com
- Diane F Suchter    ojailaw@verizon.net
- United States Trustee (LA)    ustpregion16.la.ecf@usdoj.gov
- Darlene C Vigil    cdcaecf@bdfgroup.com
- Kristin A Zilberstein    bknotice@mccarthyholthus.com, kzilberstein@mccarthyholthus.com

**2. SERVED BY UNITED STATES MAIL**: On **March 12, 2014**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **March 12, 2014**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

***Served via Attorney Service***
The Honorable Peter H. Carroll
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1460 / Courtroom 1468
Los Angeles, CA 90012

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 12, 2014 | Stephanie Reichert | /s/ Stephanie Reichert |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-2
Case 2:14-bk-11195-PC
Central District Of California

ParkMortgage, Inc., its assignees and/or suc
678 McCarthy & Holthus, LLP
1770 Fourth Avenue
San Diego, CA 92101-2607

Greenberg & Bass LLP
16000 Ventura Blvd #1000
Encino, CA 91436-2762

Yi S Kim
16000 Ventura Blvd
Ste 1000
Encino, CA 91436-2762

Bank of America
PO Box 650070
Dallas, TX 75265-0070

California United Bank
2400 East Katella Avenue
Anaheim, CA 92806-5945

Citicorp
P.O. Box 6243
Sioux Falls, SD 57117-6243

Douglas M. Neistat
Greenberg & Bass
16000 Ventura Boulevard
Suite 1000
Encino, CA 91436-2762

Franchise Tax Board
Attn: Bankruptcy
P.O. Box 2952
Sacramento, CA 95812-2952

Fred Kayne
c/o Dongell Lawrence Finney LLP
707 Wilshire Blvd.
Los Angeles, CA 90017-3609

Gil Hirshman
Berkovitz 4 St. Museum Tower
POB 18198
Tel-Aviv ,61181, Israel

Herszage Sternberg Architects
Attn: Guido Herszage
14 A Raul Wallenberg St.
Tel Aviv, Israel

INTERNAL REVENUE SERVICE*
300 North Los Angeles Street
M/S 5022
Los Angeles, CA 90012-3351

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Manatt, Phelps & Phillips, LLP
Attn: Barry S. Landsberg
11355 W. Olympic Blvd.
Los Angeles, CA 90064-1656

Ocwen
P.O. Box 6440
Carol Stream, IL 60197-6440

Ocwen
P.O. Box 780
Waterloo, IA 50704-0780

Ofir Alfassi
Berkovitc 4 St. Museum Tower
POB 18198
Tel-Aviv, 61181,  Israel

Pacific Western Bank
P.O. Box 131207
Carlsbad, CA 92013-1207

Quicken Loans, Inc
P.O. Box 6577
Carol Stream, IL 60197-6577

Cottonsmith, LLC
6380 Wilshire Blvd Ste 1020
Los Angeles CA 90048-5026

Raphael Mense
2571 Angelo Dr.
Los Angeles, CA 90077-2127

Ronen Mense
#10 Sulhumvit Soi 22
11B1 GM Height
Klongtoey, Bangkok 10110, Thailand

Russ August & Kabat
Attn: Steven Goldberg
12424 Wilshire Blvd, 12th Floor
Los Angeles, CA 90025-1031

U.S. Bank
9595 Wilshire Blvd.
Beverly Hills, CA 90212-2512

U.S. Bank - PCG
9595 Wilshire Blvd
Beverly Hills, CA 90212-2512

US Bank Mortgage
P.O. Box 21948
Eagan, MN 55121-0948

Union Bank
P.O, Box 85643
San Diego, CA 92186-5643

United States Trustee (LA)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Douglas M Neistat
16000 Ventura Blvd #1000
Encino, CA 91436-2762